# EXHIBIT 2

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    ADETAYO ADEGOKE,              )  No.  19 B 34092
 4                               )  Chicago, Illinois
                                 )  March 22, 2021
 5                 Debtor.        )  10:00 o'clock a.m.

 6

 7              VOLUME I (Pages 1 - 175)
        TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS
 8        BEFORE THE HONORABLE JACK SCHMETTERER

 9

10     APPEARANCES:

11
    For 3Cloud:            Mr. Michael Ferrell
12                         Mr. Robert Sweeney

13

14  For Adetayo Adegoke:    Mr. David Lloyd

15

16

17

18     Court Reporter:        Paula O'Driscoll, CSR
                             United States Courthouse
19                           219 South Dearborn Street,
                             Room 661
20                           Chicago, Illinois 60604

21

22

23

24

25
```

```
 1
 2                          I N D E X
 3
 4
 5     WITNESS:              DX        CX       RDX      RCX
 6
 7     MICHELANGELO ROCCO    21        137      156
 8
 9
10     ADETAYO ADEGOKE       162
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE CLERK:  The United States Bankruptcy
2     Court for the Northern District of Illinois is now
3     in session.  The Honorable Jack B. Schmetterer is
4     presiding.
5                    Taking up this Court's 10:00
6     o'clock matter, Adetayo Adegoke.  Please come to
7     order and state your appearances for the record.
8          MR. ADEGOKE:  My name is Adetayo
9     Adegoke.
10         THE COURT:  Who is speaking now?  Raise
11    your hand.  Now, would you try saying your
12    appearance clearly so I can hear your name and who
13    you represent.
14         MR. ADEGOKE:  I am Adetayo Adegoke, the
15    plaintiff in this matter, Your Honor.
16         THE COURT:  You are Mr. Adegoke, right?
17         MR. ADEGOKE:  Yes.
18         THE COURT:  Do you have a lawyer?
19         MR. ADEGOKE:  Yes.  His name is David
20    Lloyd.
21         THE COURT:  Thank you very much.  Let's
22    go ahead with the lawyer appearances, please.
23         MR. LLOYD:  Good morning, Your Honor.
24    David Lloyd on behalf of the debtor.
25         MR. FERRELL:  Good morning, Your Honor.

1    Mike Ferrell on behalf of 3Cloud, creditor.

2              MR. SWEENEY:  Robert Sweeney on behalf

3    of 3Cloud.

4              THE COURT:  Anybody else, give their

5    appearances.

6              MR. SWEENEY:  There are also two

7    representatives from 3Cloud here, Mike Rocco and

8    Jim Dietrich.

9              THE COURT:  Who do they represent?

10             MR. SWEENEY:  They are parties.  They

11   are representatives of the creditor.

12             THE COURT:  The creditor?

13             MR. SWEENEY:  Correct.

14             THE COURT:  Are they appearing in this

15   case?

16             MR. SWEENEY:  They will be witnesses

17   today, and Mr. Dietrich will be the company's

18   representative.

19             THE COURT:  Is there a motion to exclude

20   witnesses?  Can anybody hear me?

21             MR. LLOYD:  Your Honor, I don't think --

22             THE COURT:  You are making a motion to

23   exclude witnesses?

24             MR. LLOYD:  No, I am not, Your Honor.

25             THE COURT:  So that means the persons

1    who are going to testify may be sitting throughout

2    the whole trial?

3              MR. LLOYD: They are all employees of one

4    of the parties, so we have no objection.  They are

5    entitled to stay.

6              THE COURT:  Well, who they are I will

7    find out in a little bit.  I take it the answer to

8    my question is no?

9              MR. LLOYD: That is correct.  No, we have

10   no such motion.

11             THE COURT:  All right.  Does the

12   creditor wish to exclude witnesses?

13             MR. SWEENEY:  No, your Honor.

14             THE COURT:  No motion to exclude

15   witnesses.  Thank you.

16                  I have here a stipulation which

17   appears to be signed on behalf of both parties, and

18   may I ask, is there any reason why I should not

19   accept that into evidence?

20             MR. LLOYD: No, your Honor.  We both

21   signed it.

22             THE COURT:  And the creditors, what is

23   the answer to my question?

24             MR. SWEENEY:  Your Honor, we agreed that

25   you should accept it.  We did notify Mr. Lloyd this

1  morning that there were two very small mistakes

2  that were made in the stipulations which we would

3  like to correct.

4          THE COURT:  Do you have an amended copy?

5          MR. SWEENEY:  We can provide it to you.

6  We don't have one in front of you right now.

7          THE COURT:  So this stipulation is not

8  admitted into evidence?  You are not stipulating to

9  it?

10          MR. SWEENEY:  Well, I can tell you that

11  there is one -- there are two small errors in the

12  stipulation.

13          THE COURT:  What paragraph?

14          MR. SWEENEY:  Paragraph 19.

15          THE COURT:  Yes, sir.  What is the small

16  error?

17          MR. SWEENEY:  It states that Concurrency

18  is headquartered in Minneapolis.  It is actually

19  headquartered in Brookfield, Wisconsin with an

20  office in Minneapolis.

21          THE COURT:  So if I inserted the words

22  Brookfield, Wisconsin with an office at the

23  Minneapolis address, would that be accurate?

24          MR. SWEENEY:  It would.

25          THE COURT:  Mr. Lloyd, do you agree to

1   it?

2                   MR. LLOYD:  I do, Your Honor.

3                   THE COURT:  What is the second detail?

4                   MR. SWEENEY:  Paragraph 30, Your Honor.

5                   THE COURT:  Paragraph 30, what is the

6   detail?

7                   MR. SWEENEY:  In that paragraph we

8   stated that Judge Weisman entered his minute order

9   on October 26th.  It should have been October --

10                  THE COURT:  You don't give me a name of

11  any Judge.  It says that this report, et cetera.

12                  MR. SWEENEY:  Sorry.  We said that the

13  District Court entered an order on October 26th.

14  It should have been October 16th.

15                  THE COURT:  Is that the only change?

16                  MR. SWEENEY:  That is it.

17                  THE COURT:  If I change that date, would

18  that meet to your approval of the stipulation?

19                  MR. SWEENEY:  Yes.

20                  THE COURT:  Now, that brings me to the

21  question, have you given me a transcript of any

22  order by the District Court in any of these

23  materials?

24                  MR. SWEENEY:  We have not given you a

25  copy of the District Court's order.

1          THE COURT:  The answer, I take it, is

2     no, you have not given me a transcript.  Where do I

3     find the order?  Sir, can you give me a copy of the

4     order?

5          MR. SWEENEY:  Yes, your Honor.  I am

6     just -- it is Creditor's Number 61.

7          THE COURT:  Notification of docket entry

8     in the case before Judge Putlow, October 16, 2019.

9               Let's see now, you now have

10    Exhibits 1 through 3, is it?

11         MR. SWEENEY:  Creditor has 1 through 67.

12         THE COURT:  67, right.  Now, under the

13    pretrial order, exhibits were to be submitted by

14    two weeks ago.  Do you wish to say anything on the

15    subject of why you didn't do that?

16         MR. SWEENEY:  Your Honor, I believe the

17    issue was so we -- providing copies of the exhibits

18    to the debtor which we have provided digitally.

19         THE COURT:  You are saying it took that

20    long to provide copies the debtor?  Is that what

21    you mean?

22         MR. SWEENEY:  It did, and there was a

23    complicating factor in that there is a protective

24    order in place in the District Court proceeding,

25    and a number of the --

1          THE COURT:  What protective order?

2          MR. SWEENEY:  There was a protective

3     order issued in the District Court and --

4          THE COURT:  Is it in the record or

5     docket here?

6          MR. SWEENEY:  No.

7          THE COURT:  It is a protective order

8     that you feel I should know something about or I

9     don't have to know anything about?

10          MR. SWEENEY:  I think you will have to

11    know something about it.

12          THE COURT:  Then how have you presented

13    it to me?

14          MR. SWEENEY:  We were going to discuss

15    it with you today.

16          THE COURT:  What, sir?

17          MR. SWEENEY:  We were going to raise the

18    issue with you today.

19          THE COURT:  I didn't quite hear you.

20    Once again, please.

21          MR. SWEENEY:  We were going to raise the

22    issue of the District Court protective order with

23    you today.

24          THE COURT:  Without seeing it and

25    without any motion by you to do so?

1          MR. SWEENEY:  Yes.  It is more a

2     question --

3          THE COURT:  Many things are done around

4     here, sir, but I rarely am requested to deal with

5     materials that are not of record or to rule on

6     them, and I certainly am never asked to do so

7     without some notice of motion.

8               Do you follow a custom in your

9     practice of notice of motion?

10         MR. SWEENEY:  We do.

11         THE COURT:  I don't have any protective

12    order before me.  You have not identified anything

13    I have before me.

14              My question was:  With these

15    exhibits, 1 through 67, now, I want to ask the

16    debtor, when did you get your copies of exhibits?

17         MR. LLOYD: Your Honor, I am looking at

18    my e-mail list right now.  They came to me on

19    Wednesday, March 10th.

20         THE COURT:  Now, did you get copies of

21    the full document exhibits or did you get excised

22    copies?

23         MR. LLOYD: It appears that all the

24    exhibits we got are complete.  I haven't compared

25    what we received with what might have been entered

1    in some other court or you know --

2              THE COURT:  Let me ask -- May I ask the

3    creditor:  Did you ship all copies of the full

4    exhibits to debtor's counsel or did you ship him

5    excised copies?

6              MR. FERRELL:  Your Honor, this is Mike

7    Ferrell.  Counsel for debtor received full copies

8    of all of the exhibits.

9                   Our only issue and concern was

10   how to address those documents that are trade

11   secrets, confidential materials that have been

12   produced in the District Court --

13             THE COURT:  Wait, wait, wait, wait.  I

14   just couldn't follow you.

15                  You claim you gave him full

16   copies of all exhibits, right?  That was my

17   question.

18             MR. FERRELL:  Yes.

19             THE COURT:  That is your answer?

20             MR. FERRELL:  Yes.

21             THE COURT:  Now, those documents should

22   have been delivered not only to the Court 14 days

23   ago but also to Dave -- Mr. Lloyd.

24                  Mr. Lloyd, have you had a chance

25   to review these exhibits?

1    MR. LLOYD: Half.

2    THE COURT:  Do you have a position today

3    on the admissibility of the exhibits?

4    MR. LLOYD: Your Honor, yes.  My position

5    is this:  Although the creditor has not strictly

6    complied with the order, I don't believe that we

7    are prejudiced in any way; and if at some time I

8    would cry mercy for the Court, I feel that I should

9    show mercy, and I can recommend that -- I can state

10   I have no objection to the admissibility of

11   exhibits.

12   THE COURT:  That last part I wanted to

13   hear what you were going to say.  You finally said

14   it. You have no objection to admissibility of any

15   one of the exhibits, 1 through 67; is that correct?

16   MR. LLOYD: Correct.

17   THE COURT:  I think I also heard you say

18   you were half way through, so you were trying to

19   put in a little protective hook for yourself in

20   case you ran across something that you wanted to

21   object to.  Were you trying to do that?

22   MR. LLOYD: No, your Honor.  I wasn't.  I

23   was just saying that I am certainly fallible, and I

24   would hope that the Court and parties would

25   understand if I didn't strictly comply with an

1    order in the future.

2          THE COURT:  Well, under the rules, under

3    the pretrial order, you file a preliminary pretrial

4    objection to anything you want to object to.  You

5    have not done that, right?

6          MR. LLOYD: That is correct.

7          THE COURT:  I misunderstood you.  You

8    said that you have read them all.  Have you?

9          MR. LLOYD: I have not read every page of

10   every exhibit.

11         THE COURT:  You were --

12         MR. LLOYD: I looked through each exhibit

13   to see what the content is.

14         THE COURT:  You still have no objection,

15   right?

16         MR. LLOYD: That is correct.

17         THE COURT:  Now, there is a reference in

18   the creditor's list of exhibits to a party who will

19   be appearing by deposition, correct, sir?  Who

20   wishes to speak to that party?  Nobody?

21         MR. SWEENEY:  I will, Your Honor.  Yes,

22   there is a witness who we would like to --

23         THE COURT:  Yes.  Now, is there a

24   deposition by that party?

25         MR. SWEENEY:  Yes.

1          THE COURT:  Have you -- A pretrial order

2     requires you to give us copies of depositions that

3     you want to use during trial.  It is supposed to be

4     marked up as the pretrial order says.  I have not

5     seen the deposition.

6          MR. SWEENEY:  We --

7          THE COURT:  Is there an additional

8     exhibit that you are going to try to use?

9          MR. SWEENEY:  Well, I think we were --

10    the pretrial order did not specify a date by which

11    that was to be submitted.  We provided --

12         THE COURT:  Oh, yes, it does.  It is

13    supposed to be part of the exhibits you are

14    submitting.  It certainly is.

15         MR. SWEENEY:  Okay, well, we submitted

16    it to Mr. Lloyd.

17         THE COURT:  You have not given me a

18    copy, right?

19         MR. SWEENEY:  Some time ago, to counter

20    designate or provide objections as your pretrial

21    order says and --

22         THE COURT:  You have not given me a copy

23    of it, correct?

24         MR. SWEENEY:  We have not given you a

25    copy of it, no.  We did not have counter

1    designations from Mr. Lloyd, and we did not want to

2    submit it without his comments.

3                    THE COURT: Put some things on the record

4    because we have had no compliance with the pretrial

5    order and that put the Court at a severe

6    disadvantage.

7                    Let's see, we have a stipulation

8    with a couple of minor corrections.  Okay, now,

9    does anybody now wish to object to the stipulation

10   which is marked as Court Exhibit A with the two

11   corrections that were identified?

12                   MR. LLOYD: No objection.

13                   THE COURT:  Any objection from the

14   creditor's side?

15                   MR. SWEENEY:  No, your Honor.

16                   THE COURT:  Then, as modified by small

17   corrections which are part of the record, the

18   stipulations are admitted.

19                   Now, one of the problems with the

20   pretrial order is that if you identify witnesses,

21   you are supposed to give us a summary of what the

22   witness is going to testify to.

23                   Now, can I ask you whether you

24   folks have deposed the debtor?

25                   MR. SWEENEY:  Yes, your Honor.

1          THE COURT:  Who has deposed the debtor?

2          MR. SWEENEY:  I actually conducted the

3     deposition.  We did depose Mr. --

4          THE COURT:  On behalf of the creditors,

5     right?

6          MR. SWEENEY:  Correct.

7          THE COURT:  Debtor's counsel, did you

8     participate in that deposition?

9          MR. LLOYD: Did not, Your Honor, but

10    debtor's additional counsel, Mr. Fonfrias,

11    participated in that deposition.

12         THE COURT:  Was a copy given to you to

13    read?

14         MR. LLOYD: Yes.

15         THE COURT:  So both of you probably

16    learned what the debtor has to testify to, right?

17    Mr. Lloyd, did you?

18         MR. LLOYD: Yes.  I learned what he

19    testified to already; that he may have additional

20    testimony, yes.

21         THE COURT:  Okay, and the counsel for

22    the creditors, did you learn what the debtor had to

23    testify to?

24         MR. SWEENEY:  Yes.

25         THE COURT:  Well, I think we can

1    probably consider that satisfies the requirement of

2    the pretrial order as far as you giving me a

3    summary of his testimony.  I imagine it is rather

4    lengthy, and what about the other witnesses?  Give

5    me the summary -- you are required to give me the

6    summary of additional witnesses which you did not.

7                    In order to -- Concurrency, you

8    told me before that you took a deposition?

9                    MR. SWEENEY:  Of Mr. Adegoke and a

10   Concurrency witness named Dave Weiland.

11                   THE COURT:  Was a copy of the deposition

12   written up and distributed to all parties?

13                   MR. SWEENEY:  It was.

14                   THE COURT:  So I assume you folks know

15   what that -- he has to testify to at a deposition,

16   and it has not been submitted to the Court.

17                   The two other witnesses, Michael

18   Rocco and a James Dietrich, officers of 3Cloud, you

19   have not told us anything about what they are going

20   to testify to as required by the pretrial order.

21                   Have they been deposed?

22                   MR. FERRELL: They have not, Your Honor.

23                   THE COURT:  What?

24                   MR. FERRELL: They have not.

25                   THE COURT:  Please state your name and

1    who you represent, please.

2              MR. FERRELL:  Mike Farrell on behalf of

3    3Cloud.  Mr. Rocco and Mr. Dietrich have not been

4    deposed.

5              THE COURT:  Not been deposed.  Then is

6    there some reason why it isn't on the list of

7    creditor witnesses what approximately or at least

8    the substance of what they are going to testify to?

9              MR. FERRELL:  They will testify

10   regarding the allegations that were in the

11   complaint which was attached to the proof of claim.

12              I apologize.  Our reading of the

13   pretrial order was a summary of a deposition -- of

14   an entire deposition transcript.  They were going

15   to testify consistent with the complaint --

16              THE COURT:  Deposition transcript?  Were

17   they deposed?

18              MR. FERRELL:  No.

19              THE COURT:  Then they had no deposition

20   transcript?

21              MR. FERRELL:  Correct.

22              THE COURT:  How are we to know what

23   subject each of them is going to testify to since

24   you didn't comply with the pretrial order in that

25   regard?

1          MR. FERRELL:  That is what I was saying.

2     I read the pretrial order to require a summary

3     before submitting an entire deposition transcript.

4     We are not.  They are testifying consistent with

5     the complaint.

6          THE COURT:  No, we try to give people a

7     little help.  Much more is required.

8               Do you think you know anything

9     of -- Mr. Lloyd, do you think you know anything

10    about the testimony of those two people?

11         MR. LLOYD: I think I do, Your Honor.  I

12    know enough about the case to know what these

13    company officials would testify to.

14         THE COURT:  By that we are speaking of

15    Michael Rocco and James Dietrich, right?

16         MR. LLOYD: That is correct.

17         THE COURT:  I don't hear any objection

18    to the omission of the list of witnesses, so I take

19    it -- Well, have you any objection to the testimony

20    by those two creditors -- witnesses?

21         MR. LLOYD:  No, your Honor.  No, I

22    don't.

23         THE COURT:  Which witness is for the

24    creditor?

25         MR. FERRELL: Our first witness for

1    creditor will be Mr. Mike Rocco.

2              THE COURT:  Is he here?

3              MR. ROCCO:  Yes.

4              THE COURT:  Welcome, sir.  We will swear

5    you in.

6                         (Witness sworn)

7              THE CLERK:  Please state your name and

8    spell it for the record.

9              THE WITNESS:  Michelangelo Rocco.

10   Michelangelo, M-i-c-h-e-l-a-n-g-e-l-o.  Rocco,

11   R-o-c-c-o.

12             THE COURT:  Proceed, Counsel.  Who is

13   going to take the witness?  Which lawyer is going

14   to take the witness?

15             MR. FERRELL:  I will be conducting the

16   direct.  It is Mike Ferrell on behalf of 3Cloud.

17             THE COURT:  One lawyer per witness.  You

18   mean to say on cross examination you will have him

19   defended by another lawyer?

20             MR. FERRELL:  No, Judge.  I will be

21   handling the witness.

22             THE COURT:  Proceed.

23

24

25

```
 1                    MICHELANGELO ROCCO
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                    DIRECT EXAMINATION
 5                      by Mr. Ferrell
 6        Q.    Mr. Rocco, do you normally go by Mike?
 7        A.    I do.
 8        Q.    Do you mind if I call you Mike today?
 9        A.    No, I don't.
10        Q.    Mike, what is your position with 3Cloud?
11        A.    I am the chief executive officer.
12        Q.    How long have you held the position of
13   chief executive officer?
14        A.    Since we founded the company in October
15   of 2016.
16        Q.    Are you an owner of the company?
17        A.    I am.  I am now a minority owner.
18        Q.    When you founded the company, were
19   you -- you were one of the founders?
20        A.    Yes.  I founded the company along side
21   Jim Dietrich, James Dietrich, and we were equal
22   owners in the company.
23        Q.    You mentioned you are now a minority
24   owner.  Has the ownership structure changed?
25        A.    It has.  In June of 2020, we took on a
```

1    private equity partner by the name of Griffen

2    Investors.  They are now the majority owners of the

3    company.  Jim Dietrich and I are -- is very large

4    minority owners.

5         Q.    Before co-founding 3Cloud, where did you

6    work?

7         A.    I worked at Microsoft for 15 years.

8         Q.    What was your position when you left

9    Microsoft?

10        A.    I was the general manager of what was

11   called at the time the Central Region Corporate

12   Accounts Business.  It was a billion dollar

13   business for Microsoft, and where I had

14   responsibility for an 18 state geography over 300

15   Microsoft employees and over 1,000 customers,

16   again, representing $1 billion worth of Microsoft

17   revenue.

18        Q.    Where was your office located?  Where

19   did you work when you were at Microsoft?

20        A.    I worked out of the Microsoft Downers

21   Grove office which is a suburb of Chicago.

22        Q.    Were you in that office, in the Downers

23   Grove office, for all 15 years you were at

24   Microsoft?

25        A.    When I started I worked out of the

1    downtown office.  For the last ten years that I was

2    at Microsoft I worked out of the Downers Grove

3    office.

4        Q.    When you say the downtown office, that

5    was downtown Chicago?

6        A.    Yes.  Downtown Chicago, 77 West Wacker

7    at the time.

8        Q.    How about Jimmy Dietrich, where did he

9    work before co-founding 3Cloud?

10       A.    Jim worked out of Dallas, Texas which is

11   where he lives and resides today.

12       Q.    Who did you and Jim work for before

13   co-founding 3Cloud?

14       A.    Jim also worked for Microsoft for 15

15   years.  Joined Microsoft within three months of

16   each other in 2001.

17       Q.    The most recent outside -- When you and

18   Jim founded 3Cloud, did you have outside financial

19   backing?

20       A.    We did not.  We launched the company,

21   and we bootstrapped the business with our own

22   personal investment which was personal savings over

23   many years.

24       Q.    What is 3Cloud's company business?  What

25   do you do?

1     A.     We are a Microsoft partner.  We are a

2     firm of engineers and consultants.  We help

3     Microsoft customers move to what is called the

4     Azure cloud, so we will help implement Azure cloud

5     technologies to customers.

6     Q.     What is Azure, in general terms?

7     A.     Sure, Azure is what is known as

8     Microsoft's cloud technology.  So Google has their

9     own cloud.  Amazon has their own cloud or -- For

10    the longest time, companies would run their data

11    centers on premises in servers, and now the -- one

12    of the most significant technology tracks is

13    companies are moving those physical servers into

14    Microsoft-hosted data centers, and those data

15    centers are called the cloud, and Microsoft's cloud

16    is called Azure.

17    Q.     You mentioned a 3Cloud and Microsoft

18    partner firm.  What is a Microsoft partner firm?

19    A.     Sure, when Bill Gates founded Microsoft

20    in 1975, he -- the entire focus of the company was

21    to build and engineer products.  They engineered

22    and built Microsoft, Windows, products like

23    Microsoft Office, Word, Excel, Power Point, and

24    other server technologies, and they relied on

25    partners like 3Cloud to implement the products that

1    Microsoft developed.  So 3Cloud is a Microsoft

2    implementer partner for Microsoft.

3         Q.    When you were at Microsoft those 15

4    years, did you work with Microsoft partner firms?

5         A.    Yes, worked with likely hundreds of

6    Microsoft partners over the 15 years.

7         Q.    Now, what about this opportunity with

8    this transfer project caused you to leave Microsoft

9    and start 3Cloud?

10        A.    Well, three factors.  One is when Jim

11   and I were at Microsoft, we could see the enormous

12   trend of companies moving or running their servers,

13   running their applications on premise to moving to

14   cloud-based technology.

15              We saw that in the customer base

16   we were responsible for; and secondarily, we

17   recognized, again, having been at Microsoft that

18   there was a significant shortage in companies that

19   could implement cloud technology, what 3Cloud does

20   today; and so Jim and I, given the 15 years of

21   experience that we had at Microsoft, we felt that

22   with the network that we had established we would

23   be in a great position to help Microsoft implement

24   cloud technologies and drive Azure in the

25   marketplace.

1      Q.    Can you explain how your

2  relationships -- your and Jim's relationship to

3  Microsoft in the space of this Azure consulting

4  helps you all drive business in terms of getting

5  companies to want to use you to migrate their names

6  under the cloud?

7      A.    Right.  The way cloud opportunities

8  evolved is that Microsoft works with their clients

9  to identify customers that are ready to go on the

10  journey to the cloud, and what they do is they

11  reach out to companies like 3Cloud to help the

12  customer understand how to take the first step in

13  the journey.

14              We partner closely with Microsoft

15  to help customers move their data; migrate their

16  applications into the Azure cloud.  So Microsoft

17  relies on companies like 3Cloud to help drive the

18  adoption of cloud computing, and Microsoft used

19  3Cloud as a trusted partner to help on that

20  journey, and they identify only select partners

21  that have the right experience, the right

22  expertise, the right technical know how that they

23  engage and introduce us to their customers.

24      Q.    So in Chicago, for example, you

25  mentioned 3Cloud is obviously one of these

1      Microsoft partner firms in the Azure space.  Who

2      are some other competitor Microsoft partner firms

3      in the Chicago area?

4           A.    Sure, so there are others.  There was a

5      company by the name of 10th Magnitude also

6      headquartered in Chicago.  They were recently

7      acquired by a company by the name of Cognizant.

8      There are other -- Concurrency, as an example, has

9      become a competitor in the Chicagoland market as

10     well.

11          Q.    You mention Concurrency.  That is -- We

12     will talk about that as the firm Mr. Adegoke went

13     after he left -- when he left 3Cloud.

14                     How familiar, Mike, are you with

15     Concurrency?

16          A.    Very familiar.  When I started Microsoft

17     in 2001, Concurrency was a Microsoft partner.  They

18     helped implement Windows, as an example, and so I

19     personally know Jim Savage as the chief executive

20     officer of Concurrency, so I likely have known Jim

21     for almost 20 years.

22          Q.    The cloud trend or wave that you and Jim

23     were trying to catch when you left Microsoft, was

24     this as big or successful as you had hoped?

25          A.    Yes.  It is actually even bigger than

1    what we had even estimated.

2                    If you look at the technology

3    trends of today, likely the most significant and

4    hottest technology trend is what is called cloud

5    computing which is what we do; and in fact, the

6    reason that Microsoft has the third largest market

7    capitalization of any company in the world at this

8    time at 1.7 trillion is because of the adoption and

9    the market trend of companies moving their

10   applications and their data to the cloud.

11                   So Microsoft Azure and the

12   business that we were in in supporting Microsoft is

13   what is driving the substantial market value of

14   Microsoft as a company.

15       Q.    When you started in October 2016, I

16   believe Mr. Adegoke was your employee higher number

17   two; is that right?

18       A.    He was.  He was employee number two

19   after the founders, Jim Dietrich and I, and today

20   we have over 200 employees in just under five

21   years; and we feel like we are just at the

22   beginning of the acceleration in our business.

23       Q.    Now, Mr. Adegoke, do you recall when you

24   hired him as employee number two?

25       A.    I do.  We hired him in October.  October

1    21st, specifically, of 2016.

2         Q.    In what position did you hire Mr.

3    Adegoke?

4         A.    We hired him in the position of practice

5    director for cloud modernization.

6         Q.    What does that entail?  What did you

7    hire Mr. Adegoke to do?

8         A.    Sure.  His responsibility was to build a

9    practice and to build a practice specifically that

10   focused on helping clients migrate from their

11   on-premise data centers into the cloud.  So it is

12   to help modernize their data center capabilities.

13        Q.    Now, as practice director for cloud

14   modernization, did Mr. Adegoke have a role in the

15   sales or the pre-sales activities of 3Cloud to

16   customers?

17        A.    He did.  In fact, oftentimes when we

18   were introduced to a new customer by Microsoft, we

19   would have Mr. Adegoke jump on a zoom with

20   Microsoft teams all to evaluate the opportunity, to

21   conduct discovery, and to help position and propose

22   the 3Cloud solutions that we might recommend.

23        Q.    That discovery of the client systems and

24   what we might propose, is that -- I assume that is

25   referred to as cloud readiness assessments?

1      A.    That is right.  It is.

2      Q.    That was part of Mr. Adegoke's job as a

3  practice director?

4      A.    It was.  His job was to position our

5  offering which was called a cloud readiness

6  assessment and then help conduct and complete those

7  clouded readiness assessments for our clients.

8      Q.    And the practice director would -- Was

9  part of Mr. Adegoke's job preparing statements of

10 work for the clients?

11     A.    Yes.  That would be part of his role.

12     Q.    Now, I am going to try to show you --

13           THE COURT:  What function was he

14 assisting?

15           THE WITNESS:  The function -- so he

16 would be partnered with someone in sales who, Your

17 Honor, may have been myself or Jim Dietrich, but

18 Mr. Adegoke's function was to provide the technical

19 understanding and to scope the proposed project for

20 the customer from an engineering and technical

21 point of view.  Does that help?

22           THE COURT:  Well, what is there to be

23 understood that he helped in?

24           THE WITNESS: Yes, when we engage with

25 clients, the discovery that needs to be understood

1    is that clients -- they have servers, data centers,

2    information that exists on premises, and the

3    technical understanding that one needs is to

4    evaluate how one might move and migrate those

5    servers that sit on premise into what is called the

6    Microsoft cloud, and that cloud is a huge data

7    center that Microsoft would operate.  So there is a

8    technical understanding that is required to

9    complete that assessment and then eventual

10    migration.

11         THE COURT:  I have got to understand.

12    Where is the Microsoft that you are migrating to or

13    from in the cloud?

14         THE WITNESS:  Well, so, Microsoft -- As

15    an example, if you were to drive, Your Honor, 294

16    here in Chicagoland on your way to the O'Hare

17    Airport, off of the 294, Microsoft has in a very

18    large unmarked building a huge data center.  Think

19    of it as a gigantic warehouse with rows and rows of

20    servers.  Microsoft has these gigantic warehouses

21    of data centers all over the world.  That, Your

22    Honor, is what is called the Microsoft cloud, and

23    the cloud is those large gigantic warehouses

24    Microsoft calls Azure.

25              So what we do in our business is

1    we move the servers that companies have on their
2    own premises in large closets of information, we
3    move that data from those servers and that hardware
4    into the Microsoft cloud, and Your Honor, the
5    reason we do that is Microsoft fortifies their data
6    centers in the way that is much more secure.  It is
7    much more reliable, and it is much more scalable,
8    and that is a huge trend in technology today.  Does
9    that help?
10              THE COURT:  In order for him to fulfill
11   his function that you employed him for, what was
12   he -- what was he required to do?
13              THE WITNESS:  He was required to
14   evaluate what the effort would be and what would be
15   required to migrate a company's data; to migrate a
16   company's -- the company's applications from where
17   they physically reside into the Microsoft cloud.
18              So think of it as assembling --
19   Your Honor, if you were to build a house and you
20   had to assemble the architectural drawings that
21   would help you -- would give you the roadmap, the
22   blueprint for how to build it, his job is to help
23   evaluate -- create the blueprint, the architectural
24   drawings so we could build or migrate that
25   environment into the cloud.

1          THE COURT:  What does migrate mean in
2     this context?
3          THE WITNESS:  Migrate means to
4     physically move.
5          THE COURT:  So you wanted -- In each
6     case where he had a function to perform, he had to
7     help move some data from one place to another?
8          THE WITNESS:  Yes.  He had to assemble
9     the architectural blueprints, the drawings, the
10    instructions for how this move would take place.
11         THE COURT:  When the move took place,
12    what was moved?
13         THE WITNESS:  The information, the data
14    that companies had stored as well as any
15    applications that the company would run.  They
16    would now move from the companies running that
17    environment into the Microsoft data centers and --
18         THE COURT:  Would there be any -- once
19    moved, was there any residual information left in
20    the company's system?
21         THE WITNESS:  Sometimes, but the goal
22    would be -- is to help companies move that
23    information, and then the information would be then
24    managed from the Microsoft data center as opposed
25    to managed on premise.

1          THE COURT:  Now, to perform this

2     function, what did he have to know about the --

3     well, the system he was dealing with and the cloud

4     he was sending it to?

5          THE WITNESS:  Right.  Well, Your Honor,

6     when he joined us, what we thought he knew was how

7     to actually complete this -- these architectural

8     drawings and that would provide instructions for

9     how to complete -- that is what we hired him to do.

10    We believed he had that know how.

11             What we quickly learned, Your

12    Honor, in the first two months that he joined us

13    that he admitted to us that he had never actually

14    completed a data center move, and that was realized

15    in one of our first large engagements with a client

16    in Minneapolis by the name of Matrix Care.

17         THE COURT:  Go ahead, Counsel.  Thank

18    you for allowing me to ask a few questions.  Go

19    ahead with the direct.

20         MR. FERRELL:  Mr. Sweeney would like to

21    call up Exhibit Number 1.

22         MR. SWEENEY:  Your Honor, we didn't

23    discuss it with your clerk but I don't currently

24    have permission to share my screen.  I am not sure

25    if Mr. Utter is going to do it or --

1          THE COURT:  You have permission to do

2     what?

3          MR. SWEENEY:  To post the exhibit.

4          THE COURT:  Did you say that other

5     parties do not have copies?  I have a copy, don't

6     I?

7          MR. FERRELL:  You do.  We were going to

8     share the screen and post them on the screen so

9     everybody who is listening can see what the witness

10    is looking at.  We can all know we have the same

11    thing.  It would be shared in --

12         THE COURT:  You mean folks without a

13    screen.  I will use paper and read it.

14         MR. FERRELL: I have a paper one in front

15    of me as well, Judge, but we were going to put it

16    on the screen so everybody knows what we were

17    looking at.

18         THE COURT:  Exhibit 1?

19         MR. FERRELL: Exhibit 1, yes, Judge.

20              If I might, Mr. Utter, is it

21    possible for us to share -- to get access to post

22    exhibits to the screen or are you proposing we not?

23         THE CLERK:  I can give that a try. Give

24    me one second.

25         THE COURT:  Is this Exhibit 1 the same

1    exhibit as the debtor has posted as one of his two

2    exhibits?

3                MR. FERRELL:  It is.

4                THE COURT:  We will see.

5                MR. FERRELL: Mr. Utter, are we able to

6    post or --

7                THE CLERK:  We are going to -- I am not

8    having any luck with this.

9                MR. FERRELL: That is fine.  That is

10   fine.

11       Q.    Mr. Rocco, if you could open up the PDF

12   of Exhibit Number 1, are you able to do that?

13       A.    I am.  I am.

14       Q.    Tell me when you have Exhibit 1 in front

15   of you.

16                THE COURT:  Mr. Rocco, do you have a

17   copy of Exhibit 1 in front of you?

18                THE WITNESS:  I just need one moment,

19   Your Honor, and I can get that in front of me in

20   about 30 seconds.

21                THE COURT:  Have all your exhibits been

22   placed in a computer usable format, sir?

23                MR. FERRELL: They are, Judge.  Everyone

24   has them in the PDF format in zip folders.

25                THE COURT:  Then we will be able to

1   compare the convenience of use of paper with the --

2           MR. FERRELL:  I am betting on paper,

3   Judge.

4       Q.    Mr. Rocco, tell me when you have it.

5       A.    Just one moment.  I have the zip file

6   here.  I am just opening it up, and you would like

7   me to go to Exhibit Number 1?

8       Q.    Exhibit Number 1, please.

9       A.    Okay.  I have that open.

10      Q.    Having --

11          THE COURT:  You have 1, sir?  Do you

12  have 1?

13          THE WITNESS:  I do.

14          THE COURT:  What is the question?

15  BY MR. FERRELL:

16      Q.    Mr. Rocco, looking at Exhibit Number 1

17  in evidence, do you recognize this?

18      A.    I do.

19      Q.    What is it?

20      A.    It is Mr. Adegoke's offer.  His

21  employment agreement.

22      Q.    This is from October 21, 2016, correct?

23      A.    That is correct.

24      Q.    Turn to the second paragraph.

25          THE COURT:  Sir, is this your offer to

1    Mr. -- this gentleman?

2         THE WITNESS:  That is correct.  In

3    October of 2016 when he joined us.

4    BY MR. FERRELL:

5       Q.   So, Mike, if you look at the second

6    paragraph and the third sentence talks about Mr.

7    Adegoke's initial scope of his job duties and

8    responsibilities, do you see that?

9       A.   I do.

10       Q.   It says it shall include building out

11    the cloud modernization services organization.

12    What did that entail?

13       A.   We hired him to build out a practice to

14    help clients modernize their data centers in the

15    cloud, so we asked him to build a practice.

16       Q.   Does that involve recruiting and hiring

17    people?

18       A.   It does.

19       Q.   It also talks about participating with

20    pre-sales activities.  You spoke a moment ago about

21    technical support Mr. Adegoke would provide to the

22    sales team functions.  Is what you refer to here as

23    pre-sales activities?

24       A.   It is.

25       Q.   It also talks about running all aspects

1  of delivery, and the Judge asked you a few moments

2  ago about what he did in preparing blueprints.  Is

3  that what this is referring to?

4       A.    Yes, preparing the blueprints, and then

5  overseeing the team that would execute on those

6  blueprints.

7       Q.    If you look down toward the bottom of

8  the first page, there is a paragraph beginning:

9  Base salary.  Do you see that?

10      A.    I do.

11      Q.    What was Mr. Adegoke's initial offer

12  base salary?

13      A.    $175,000

14      Q.    Was he also up for a bonus?

15      A.    Yes.  In fact, he was eligible for two

16  annual bonuses.  The first bonus was for 35,000 and

17  that would be paid semi-annually.  The first 17,500

18  was payable on July 31st of 2017, and the second

19  17,500 would be payable on January 31st of 2018.

20            Again, these would be provided

21  assuming he was still employed at the time when the

22  payment was due, and then there was a second bonus.

23  There was also a second bonus that he was eligible

24  for, what we called overachievement metrics

25  payment.

1          Q.      And your description of this first bonus

2     you were talking about, is that described here at

3     the bottom of the first page of Exhibit 1?

4          A.      That is right.

5          Q.      And the second bonus you are talking

6     about is described at the top of Page 2?

7          A.      That is correct.

8          Q.      Looking at the second page, the lower

9     half of the page, there is a paragraph with a

10    caption that says:  Confidentiality and

11    non-solicitation.  Do you see that?

12         A.      I do see that.

13         Q.      What is the intent with respect to this

14    paragraph?

15         A.      So we conditioned the employment offer

16    on Mr. Adegoke agreeing to a confidential

17    information and a non-solicitation agreement, and

18    that is what we attached here in the offer letter,

19    and that was presented to Mr. Adegoke at that same

20    point.

21         Q.      The paragraph also talks about the

22    guarantee of the first year bonus being part of the

23    consideration for the confidentiality,

24    non-solicitation agreement.  Whose idea was -- or

25    whose request for proposal was it for the first

1    year bonus $35,000 guaranteed amount.

2         A.    Mr. Adegoke insisted upon that as a

3    condition of him joining us.

4         Q.    Does 3Cloud typically offer guaranteed

5    bonuses for the first year?

6         A.    No, we do not.

7         Q.    For a start-up company that was employee

8    number two, $175,000 salary, the first year bonus

9    of 35,000, what was the reason you agreed to the

10   first year bonus of 35,000?

11        A.    There were two reasons.  One is we

12   thought Mr. Adegoke, given his technical skills, he

13   could help us grow and build the practice; and

14   secondarily, we felt the guarantee was additional

15   incentive that was needed by Mr. Adegoke to agree

16   to our confidential information.

17        Q.    Looking at the last sentence of this

18   paragraph, it talks about in the event Mr. Adegoke

19   is not employed on the day of such payment, the

20   company may, at its discretion, choose to pay

21   $10,000 as separate and additional consideration

22   for the confidential information and

23   non-solicitation agreement.  What was the reason

24   for that provision?

25        A.    This is so the intent --  it was

1    intended to provide both parties with some

2    security.  So three months or six months into Mr.

3    Adegoke's employment, if either -- if he resigned

4    or we terminated his employment, then we could

5    choose either pay Mr. Adegoke 10,000 as additional

6    consideration to keep his post-employment

7    restrictions in confidential information and

8    non-solicitation in effect or we would have the

9    choice to waive that and release Mr. Adegoke from

10   any post-employment restrictions.

11          So in any scenario -- in either

12   scenario, we wanted to ensure that he was bound by

13   those post-employment restrictions.  We were

14   definitely offering up a cash payment to ensure

15   that that was the case.

16          So we would either pay him

17   10,000, 17,500, the first bonus of 35,000, and that

18   would depend upon how long he was at 3Cloud, but

19   the key was is we were going to provide him a cash

20   payment to maintain those post-employment

21   restrictions.

22          THE COURT:  Mr. Rocco, you signed the

23   basic agreement here, and Mr. Moore signed the

24   attached confidentiality agreement?

25          THE WITNESS:  Yes.

1          THE COURT:  Mr. Moore, is he part of the

2     same company as you are?

3          THE WITNESS:  Mr. Moore at the time was

4     our vice president of delivery.  He was employee

5     number one.  Mr. Adegoke was employee two.

6          THE COURT:  So we are talking about the

7     same company as you were?

8          THE WITNESS:  That is correct.

9          THE COURT:  Thank you.  Go ahead.

10    BY MR. FERRELL:

11         Q.   Can you explain why this provision of

12    this option of the $10,000, if Mr. Adegoke wasn't

13    employed until July of 2017, why that provision by

14    giving him $10,000 to keep the restrictions in

15    place was important to 3Cloud?

16         A.   As I mentioned earlier, we were building

17    a company from scratch.  Jim and I took a big risk

18    leaving Microsoft in October of 2016.  Mr. Adegoke

19    was employee number two.  The vesting and building

20    at the time that he joined us, the intellectual

21    property, a lot of the documentation to run the

22    business -- we were building it from scratch, and

23    we knew that at the time that he was joining us he

24    would have an understanding.  He would be able to

25    learn how the business was being built, and he

1    would have access to highly confidential

2    information that we were very concerned that if he

3    were to leave he would have in his possession.

4    That is why that was very important for us to

5    maintain and protect our intellectual property

6    being built.

7        Q.    On Exhibit 1, turn two pages to the

8    front of Mr. Adegoke's confidential information and

9    non-solicitation agreement.  Tell me when you

10   are --

11       A.    I think I am there.

12       Q.    This is the confidential information,

13   non-solicitation agreement that was presented to

14   Mr. Adegoke at the same time his offer of

15   employment was in October of 2016?

16       A.    Yes.

17       Q.    If you look at Section 2, competitive

18   activity, confidentiality, non-solicitation, I am

19   looking at 2(a), acknowledgements and agreement.

20   Do you see that?

21       A.    I do see that.

22       Q.    Can you explain and describe to the

23   Court what the intent or purpose of Section 2(a)

24   was in the agreement?

25       A.    Sure.  It provides context for all the

1    restrictions that follow.  So the parties

2    acknowledge that Mr. Adegoke -- he would have

3    access to 3Cloud's confidential information, and he

4    would introduce it to our clients and our customers

5    through our relationship with Microsoft; and our

6    intent with this language was to bind Mr. Adegoke

7    completely -- our intent was to bind Mr. Adegoke

8    from using this confidential information to

9    directly compete with 3Cloud's business either

10   while he was employed with us or for a reasonable

11   period afterwards.

12        Q.    If you turn to page --

13             THE COURT:  Could I ask at this point

14   for what part of the United States did your company

15   do business in?

16             THE WITNESS:  Yes.  So, Your Honor, I

17   physically reside in Chicagoland.  So at the time

18   we did quite a bit of business in the Chicagoland

19   area.  In addition, my --

20             THE COURT:  What does that mean,

21   Chicagoland area?

22             THE WITNESS:  Primarily Chicago and its

23   suburbs.  So think of it as Illinois, we would --

24   In the beginning we did business in Wisconsin, but

25   then also my business partner, James Dietrich,

1    which you will hear from at some point here soon,

2    resides in Dallas, Texas.  So we were doing quite a

3    bit of business in the state of Texas, Dallas and

4    Houston and Austin.

5         THE COURT:  Are you saying that he did

6    business in Texas?

7         THE WITNESS:  We did, yes.

8         THE COURT:  No.  Are you saying that he

9    did business in Texas or merely resides there?

10         THE WITNESS:  Mr. Dietrich, he resides

11    there, and we did business in Texas.

12         THE COURT:  Oh, and you are saying that

13    in the Chicago area you did business and also in

14    Wisconsin; is that right?

15         THE WITNESS:  Yes.  When we started the

16    company, we had a high concentration of customers

17    in Chicago, the suburbs of Chicago.  We were doing

18    business in Milwaukee.

19         Your Honor, today we do business

20    in 30 states, but at the time when we started the

21    company, we had a high concentration in Chicago

22    which is where I reside.  I live in Naperville, and

23    in Dallas, Texas is where Jim Dietrich resides, and

24    those were the primary markets at the time that we

25    were concerned with someone competing against us.

1          THE COURT:  Well, you describe a

2   non-compete area in geographic terms.  For example,

3   you said that the Chicago area or something like

4   that.  You did not describe in technological terms.

5   What was your reason for doing that?

6          THE WITNESS:  So from a technology

7   perspective, we were concerned with companies

8   competing with us, with Azure-based solutions.

9                So, Your Honor, if you look at

10  the breadth of Microsoft technologies in the

11  market, Microsoft has many, many products, Windows,

12  Microsoft Office.  Our only concern was in a very

13  niche technology area called Azure, and that is,

14  Your Honor, what we carved out as being the

15  technological area that we were concerned with.  So

16  it was simply Microsoft Azure technology and not

17  all Microsoft technology.  Only Microsoft Azure.

18          THE COURT:  I am not sure you answered

19  my question.

20               I was trying to get at why you

21  used geographic non-compete restrictions instead of

22  technological non-compete restrictions.

23          THE WITNESS:  If I am not mistaken, and

24  let me pull up the document and make sure I am

25  looking at it.  Mr. Ferrell, I think we talked

1    about both, if I am not mistaken.

2                MR. FERRELL:  Judge, if I may, we were

3    going to go through that, but the restrictions that

4    are in place actually include both activity

5    restrictions and the geographic components that

6    define the term as restricted territory.

7                     Restricted territory deals with

8    geographic -- some actual geography and some

9    specific to clients.  There is also with respect to

10   the company's business and certain activities that

11   compete with the defined company's business that

12   would be for the technological aspects.

13               THE COURT:  Now, is the use of

14   technology to ship from one cloud to another the

15   only technology your company is engaged in?

16               THE WITNESS:  Yes.  Specifically, we are

17   very niche.  The only --

18               THE COURT:  Are you describing the only

19   technology you are engaged in, right?

20               THE WITNESS:  Yes.  Microsoft Azure is

21   the only technology that our company is focused.

22               THE COURT:  Is it possible in the future

23   you will engage in other technologies?

24               THE WITNESS:  It is possible, but our

25   core strategy is to focus 100 percent on the

1  Microsoft Azure cloud.  There are other clouds, but

2  our strategy is only to focus on Microsoft cloud.

3            THE COURT:  As you understand the

4  restrictions you imposed on him for competing or

5  non-competing, would this bar him from competing

6  from only the present technology or also for any

7  future technology?

8            THE WITNESS:  Your Honor, he had many

9  opportunities.  The restriction was only this niche

10 technology, Microsoft Azure.

11           THE COURT:  But as written, it prohibits

12 him from a geographic competition.  Would that

13 include geographic competition into wholly new

14 technologies?

15           THE WITNESS:  No.  It was only -- The

16 intent was only to restrict him in competing with

17 us on Microsoft Azure technologies.

18                 There are a breadth of other

19 Microsoft technologies, and there is a breadth of

20 other cloud technologies.  Our restriction was only

21 that niche Microsoft Azure, very narrow.

22           THE COURT:  You do not read the words as

23 competing in the geographic area in new

24 technologies?

25           THE WITNESS:  No.  Microsoft Azure

1     technology was our concern.

2             THE COURT:  Go ahead, Counsel.

3     BY MR. FERRELL:

4        Q.    Mike, so at the very bottom of this very

5     first page, the confidential information,

6     non-solicitation agreement starts Section 2(b) for

7     covenants.  The actual covenants follow the next

8     page.

9                 If you turn to Page 2 of the

10    confidential information document there is two --

11    (i) that deals with during employment, but I want

12    to focus you on (ii) which is covenants following

13    termination.  Do you see that?

14       A.    I am just looking here.  This is -- You

15    are having me look at 2 --

16       Q.    The (ii) on the middle of the second

17    page of the confidential information agreement.

18       A.    Yes, I do see that.

19       Q.    The paragraph beginning:  Covenants

20    following termination.  Do you see that?

21       A.    Covenants following termination, yes, I

22    do see that.

23       Q.    For what was the period after Mr.

24    Adegoke's employment ended from which he was

25    restricted; the duration of the restriction?

1      A.    The duration was 12 months post

2   separation.

3      Q.    What provisions -- there are several

4   here.  There is four different provisions, (A)

5   through (D).  What provisions in this section did

6   Mr. Adegoke breech?

7      A.    (A) and (B).

8      Q.    Looking at (A), that looks like it

9   prohibited Mr. Adegoke from engaging in business

10  that competed with the defined company's business

11  within the restricted territory; is that right?

12     A.    That is correct.

13     Q.    We were going to get into what

14  restricted territory was defined in a moment, but

15  the company's business as you explained it to the

16  Judge a moment ago, 3Cloud is really 100 percent

17  Azure; is that right?

18     A.    That is correct.

19           THE COURT:  Interrupt again to ask

20  another question.  I will hope you forgive me.

21                According to the technology, the

22  next paragraph --

23           MR. FERRELL:  Judge, I can't quite hear

24  you.  We are looking at covenants following

25  termination section.

1          THE COURT:  Yes.  During employment, and
2     secondly, lower on the page, covenants following
3     termination.  Are you with me?
4          MR. FERRELL:  Yes, Judge.  I was just
5     asking Mr. Rocco about Sections (A) and (B) under
6     that covenant installment.
7          THE COURT:  Under (A), may not enter
8     into any business which competes with the company's
9     business.
10          Now, that paragraph was applied
11     to new technology developed in the future?
12          THE WITNESS:  No, your Honor.  That
13     would be only Azure technology which is -- which is
14     our business.
15          THE COURT:  I am asking you if there is
16     anything in (ii)(A) -- also may not enter into any
17     business which competes with the company's business
18     within the restricted territory.
19          Now, as the company develops new
20     business and new technology within the restricted
21     territory, this restriction would apply?
22          THE WITNESS:  Again, Your Honor, the
23     intent was to limit the company's business to
24     Microsoft Azure.
25          THE COURT:  Go ahead, Counsel.

1    BY MR. FERRELL:

2         Q.    Mike, just so we are clear, I think that

3    the Judge asked you about (A) at the top of Page 2

4    where it talks about company's business but it

5    doesn't have a reference to restricted territory.

6    Do you see that?

7         A.    I do.  I do.

8         Q.    But that is a restriction that only

9    applies -- this is under (i).  That only applies

10   while Mr. Adegoke was employed with 3Cloud, right?

11        A.    That is right.  That is right.

12        Q.    So while he was employed with 3Cloud,

13   the restriction was not to do anything that

14   competes with the company's business?

15        A.    That is correct.

16        Q.    Under (ii) in the middle of the page,

17   Following Termination, there was a restriction for

18   12 months not to compete with the company's

19   business which you describe as Azure within the

20   restricted territory?

21        A.    That is correct.

22        Q.    You mentioned (A) and (B) under (ii).

23   The following termination restrictions are the two

24   that we talked about.

25                         Under (B), that appears that that

1    would prohibit Mr. Adegoke from selling competing

2    products and services -- selling products and

3    services and competing with the company's business

4    within the restricted territory; is that right?

5          A.    That is correct.

6          Q.    Again, the company's business is Azure

7    consulting services essentially, right?

8          A.    That is right.

9          Q.    How did Mr. Adegoke breach these

10   covenants, (A) and (B), following the termination?

11         A.    So, he left 3Cloud in October of 2017,

12   specifically October 20th, and he immediately

13   started at Concurrency, a competitor, working out

14   of the Chicago office; and he started there on

15   October 23rd of 2017, and he was directly competing

16   with us.  As he -- His role was to head their cloud

17   data center practice.  He basically left to do the

18   same exact job at Concurrency that he was doing for

19   3Cloud.

20         Q.    Turning in this agreement to Section 3,

21   so if you will turn a couple of pages forward, a

22   couple of pages to Page 6 of the agreement, there

23   in the middle of the page there is Section 3.  That

24   is for definitions?

25         A.    Right. I believe I am there.

1     Q.     The first (A) talks about the company's

2   business being full service technology consulting,

3   correct?  This is Azure infrastructure services and

4   cloud applications.

5              I want to talk to you about (B),

6   the restricted territory, the defined term.  Do you

7   see that?

8     A.     Yes.

9     Q.     Restricted territories defined to mean

10  the geographic area within a 100 mile radius of

11  Chicago.  Why was that important to 3Cloud?

12    A.     So as I mentioned, I reside in Chicago.

13  Specifically, I worked for -- my last ten years of

14  Microsoft out of Microsoft's Downers Grove office

15  which in that same building is where 3Cloud's

16  headquarters is, but we -- What I was concerned

17  about with this territory is we didn't want to

18  bring someone into the company, train them on

19  everything that we were building, and take

20  everything that the individual would have learned

21  and go right next door to us and use that to

22  compete against us, so that was the reason that

23  that restriction was in place.

24              Then in regards to Texas, like I

25  mentioned earlier, our co-founder, Jim Dietrich,

1    resides in Dallas, Texas, so he lives there today,

2    and he also lived there in 2016 when we founded the

3    company; and we were building up that market with

4    new clients from the relationships and contacts

5    that we had in the Dallas, Houston, Austin area, so

6    in that market it was the same concern that we had

7    in the Chicago market.

8              THE COURT:  What parts of Texas had he

9    developed business in?

10             THE WITNESS:  Dallas, Houston and

11   Austin.

12             THE COURT:  Why did you feel you could

13   cover a whole state in this agreement?

14             THE WITNESS:  Well, Your Honor, that is

15   where we had relationships and where the 15 years

16   having been at Microsoft we had developed a very

17   strong network, and we had clients in those

18   markets.

19             THE COURT:  Can you give me any more

20   details about where business was down in Texas at

21   the time?

22             THE WITNESS:  As in specific?  Would you

23   like specific clients as an example?  We had a

24   client by the name of Virtus Partners out of

25   Houston.  They are still a client with us today.

1    Is that helpful?

2              THE COURT:  You are arguing that because

3    you had clients in a number of places in Texas, you

4    should be able to bar him from working in Texas on

5    any subject on any technology, right?

6              THE WITNESS:  I don't think that is what

7    we were stating, Your Honor.  We were very narrow

8    in the focus of the non-compete.  Specifically,

9    like we mentioned, the technology area that we were

10   concerned with was only Azure, and I will give you

11   an example.

12             Mr. Adegoke joined a firm by the

13   name of Concurrency.  Concurrency is a Microsoft

14   partner.  They have a broad set of technologies

15   that they focus on.  They do Windows upgrade.  They

16   implement office technology like Excel, Power Point

17   and Word.  They implement collaboration

18   technologies.  Had Mr. Adegoke gone to Concurrency

19   and focused on a different set of Microsoft

20   technologies and not Microsoft Azure, from a

21   non-compete perspective, we would have been okay

22   with that.

23             It is the focus in Azure in that

24   he went there to focus on the same niche technology

25   set in the same geography that -- where we founded

1    the company that we had a problem with around the

2    restricted territory in the non-compete.

3                    Again, Your Honor, our scope was

4    to limit him in a very narrow window of technology,

5    Azure.  In a narrow window of geography which was

6    Chicago and 100 miles outside, and then only in

7    Texas which is where Jim is.

8                    Keep in mind, Your Honor, that

9    today we do business in 30 states.  We were not --

10   From a restricted perspective, he could go work in

11   any state in any other technology, just not Azure

12   which is very narrow.

13   BY MR. FERRELL:

14        Q.    Mike, to your point, working in Chicago

15   in technology is fine, just not in Azure Consulting

16   for 12 months after he left 3Cloud, right?

17        A.    That is correct, and there are many,

18   many consultancy and technology partners in Chicago

19   that he could have gone to work with or work at to

20   apply his skills.

21                    MR. LLOYD: Your Honor -- I am sorry to

22   interrupt your answer.  Go ahead, Mr. Rocco.

23                    THE WITNESS:  My point is he elected to

24   go to a competitor and be very -- and to compete

25   with us in the same job as we trained him to do

1    while at 3Cloud.

2              MR. LLOYD:  Your Honor, may I ask the

3    indulgence of the Court and ask for a very short

4    break of about two minutes?

5              THE COURT:  Two minutes?

6              MR. LLOYD: Yes.

7              THE COURT:  I will give you until 20

8    minutes to 12:00.  Twenty minutes to 12:00, that is

9    about 12 minutes.

10             MR. FERRELL:  Okay.

11             THE CLERK:  Court is in recess until

12   11:40 a.m.

13                  (Whereupon, a short recess was

14                   taken)

15             THE COURT:  Direct exam.

16             MR. FERRELL:  Thank you, Judge.

17       Q.    Mike, we were talking about restricted

18   territory.  We talked about the concern that you

19   all had around Chicago and Texas where the company

20   was founded.

21                  There is a third element in the

22   defined term of restricted territory.  This is for

23   the specific accounts with which the employee, in

24   this case Mr. Adegoke, had contact or

25   responsibility during their -- during his

1    employment.  Do you see that?

2         A.    I do.

3         Q.    It actually talks about during the last

4    year at the time of termination and last two years

5    of employment.  Mr. Adegoke was employed for a

6    year, right?

7         A.    That is correct.

8         Q.    So this part of the restricted territory

9    application talks about 3Cloud's account clients

10   Mr. Adegoke had some involvement with while he was

11   working for 3Cloud, right?

12        A.    That is right.

13        Q.    That is the limitation on that exhibit,

14   right?

15        A.    That is correct.

16        Q.    When we were talking about this

17   restriction, if you go back, I am sorry, under (A),

18   covenants following termination, this was for 12

19   months post-separation.  So that actually has long

20   ago expired at this point, right?

21        A.    That is right.

22        Q.    Mr. Adegoke works for Microsoft now,

23   correct?

24        A.    That is correct.

25        Q.    We wouldn't consider his employment with

1    Microsoft a violation of any restriction, right?

2         A.    No.

3              THE COURT:  Can I have that question

4    read back, please?

5    BY MR. FERRELL:

6         Q.    We don't consider Mr. Adegoke's

7    employment with Microsoft to be a violation of

8    anything?

9         A.    No.

10             THE COURT:  Go ahead.

11   BY MR. FERRELL:

12        Q.    If we are looking at (A), this

13   restriction (A), it was Mr. Adegoke engaging in

14   competition with the Company's Business within the

15   restricted territory for 12 months, and the

16   Company's Business is also a defined term, right,

17   Mike?

18        A.    That is right.  I believe it is in the

19   document here.

20        Q.    It is capital C, capital B, right?

21        A.    Correct.

22        Q.    If we go back just above restricted

23   territory, this is on the sixth page of that

24   confidentiality agreement under definitions, the

25   3(a) definition is Company Business, the defined

1     term, right?

2          A.     That is right.

3          Q.     Can you explain just to make sure we are

4     clear what company's business is actually defined

5     here to include?

6          A.     Should we go to that definition?

7          Q.     Yes.  Do you have it in front of you?

8          A.     Well, we can scroll down to it.

9                 THE COURT:  What page is the definition

10    on?

11                MR. FERRELL:  It is on Page 6 of the

12    agreement.  The Bates number I am afraid is over --

13    Mr. Adegoke's initials under it.  I think it would

14    be 300.  I think it is 10 of 12 in the PDF.  It is

15    the third from the last page, Judge.

16                THE COURT:  What are we looking at,

17    confidential information or the first one?

18    BY MR. FERRELL:

19         Q.     Confidential information document.  In

20    this exhibit, it is the third page from the back.

21    It says Section 3, definitions.  3(a) is Company's

22    Business, capital C, capital B.

23                     Mike, do you have it in front of

24    you?

25         A.     I do.  I am looking at it right here.

1          MR. FERRELL: Judge, let me know if you

2     have it in front of you.

3          THE COURT:  Well, this is much broader

4     than appears Azure infrastructure services, isn't

5     it?

6          THE WITNESS:  Your Honor, it is not,

7     because if you read:  A consulting firm that

8     provides cloud strategies, and in this case, cloud

9     is Azure, services for commercial clients, all the

10    components that define the company's business,

11    cloud modernization at --

12          THE COURT: Phrased as:  Including but

13    not limited to cloud modernization.

14          THE WITNESS:  That is right, and in our

15    case, given that we are 100 percent and exclusively

16    focused on Azure which is why we added Azure in

17    there as infrastructure services, so it is very

18    narrowly tailored to Azure for these services and

19    not broader than that.

20          THE COURT:  Go ahead, sir.

21    BY MR. FERRELL:

22    Q.    So, Mike, looking at the restrictions

23    under 3(a), the following termination, it also

24    has to be an "and", right?  It has got to be

25    engaging in activity that competes with the

1    company's defined business, essentially Azure

2    Consulting Services, within the restricted

3    territory, right?

4         A.    That is correct.  It is Azure in the

5    restricted territory.

6         Q.    And that is also -- I am sorry, that is

7    also within 12 months of separation?

8         A.    Correct.  Correct.

9         Q.    If we look at the other provision, the

10   other restriction that 3Cloud claims Mr. Adegoke

11   breached under (b), do see that under (b)?

12        A.    I do.

13        Q.    This one deals with selling, soliciting

14   customers, selling products, services in

15   competition with or that competes with the

16   Company's Business, again capital C, capital B,

17   within the restricted territory.

18                    As I read that, Mike, it is

19   selling basically Azure services within the

20   restricted territory or competing products and

21   services, correct, in the Azure business?

22        A.    That is correct.  That is correct.

23        Q.    That is what Mr. Adegoke was doing at

24   Concurrency; is that right?

25        A.    Yes.  Again, just to summarize, he left

1    our firm which we are 100 percent focused on Azure.

2    He went to a competitor and helped them build the

3    exact same Azure practice that we had hired him to

4    build at 3Cloud.

5            THE COURT:  How do you know that?

6            THE WITNESS:  Well, Your Honor, we

7    were -- we read the press release that Concurrency

8    issued publicly on October 30th that described his

9    role doing exactly that at Concurrency.  So we

10   learned it via public press release.

11           THE COURT:  Are you referring to a

12   document?

13           THE WITNESS:  We are, Your Honor.

14           THE COURT:  What is that document?

15           THE WITNESS:  Exhibit 18.

16   BY MR. FERRELL:

17       Q.    Mike, why don't you go ahead and turn to

18   Exhibit 18.

19       A.    I have it right in front of me.

20       Q.    So this is the press release that you

21   saw that Concurrency released on October 30th of

22   2017?

23       A.    That is correct.

24       Q.    How many days was this after Mr.

25   Adegoke's last day of employment at 3Cloud?

1      A.    This was just about a week.

2      THE COURT:  What part of this exhibit

3  are you referring to?

4  BY MR. FERRELL:

5      Q.    If you look at the first paragraph, it

6  announces that Mr. Adegoke has been hired into a

7  newly created vice president position.  It had two

8  of the firm's five digital transformation practice

9  areas including Cloud Datacenter.  Do you see that,

10  Mike?

11      A.    That is right.

12      MR. LLOYD: Your Honor, at this point I

13  will object to the use of the document.

14      THE COURT:  You are objecting to the use

15  of the document?

16      MR. LLOYD: Yes.  This is --

17      THE COURT:  What is your objection?

18      MR. LLOYD: It is hearsay.

19      THE COURT:  Hearsay?  My opening

20  colloquy with you I thought --

21      MR. LLOYD: No, your Honor.  I don't

22  object to this document coming in.

23      THE COURT:  Mr. Lloyd, let me tell you

24  something about the pretrial order which everybody

25  has been very cavalier about except me, perhaps.

1      People are supposed to read it and comply with it.

2                     You were required to file an

3      objection to any document citing a reason for the

4      objection pretrial, and I am satisfied that you

5      have had less than -- less than the opportunity I

6      wanted you to have but enough for you to make up

7      your mind to be bound by this document, and this is

8      a heck of a time to raise the hearsay objection and

9      file no objection.  It is overruled on that

10     grounds, sir.

11                    MR. FERRELL:  May I continue?

12                    THE COURT:  Proceed, Counsel.

13     BY MR. FERRELL:

14          Q.    So, Mike, I would like you to -- of

15     these two practice areas that are listed in the

16     first paragraph of the press release, Customer

17     Engagement and Cloud Datacenter, what was 3Cloud's

18     concern?

19          A.    Specifically Cloud Datacenter which is

20     exactly the practice that Mr. Adegoke was hired to

21     build for 3Cloud.

22          Q.    You can turn to Page 2 of the press

23     release, of the Concurrency press release.  It

24     states -- Mike, do you have it in front of you?

25          A.    I do.

1      Q.     It states:  As director of Concurrency's

2   Cloud Datacenter practice, Adegoke is responsible

3   for the firm's working in support of clients'

4   journey to the cloud including infrastructure and

5   platform solutions.

6                   Mike, what is the similarity or

7   the difference between that and the job description

8   and what Mr. Adegoke had done as practice director

9   of cloud modernization at 3Cloud?

10      A.     It is 100 percent identical.

11      Q.     With respect to the Cloud Datacenter

12   piece?

13      A.     Correct.

14              MR. FERRELL: Judge, do you have a

15   question?

16              THE COURT:  Yes, sir, I do.  The

17   customer engagement means what?

18              MR. FERRELL:  Did you hear the question,

19   Mike?

20              THE WITNESS:  Customer engagement?

21              THE COURT:  Yes.  What does that mean?

22              THE WITNESS:  Well, what it means is

23   that his responsibility would have been directly to

24   interface with customers.

25              THE COURT:  Why does it relate to

1    Concurrency or relate to something else?

2              THE WITNESS:  That relates to the role

3    that Mr. Adegoke had at Concurrency, yes.

4              THE COURT:  The role he played when or

5    where?

6              THE WITNESS:  The way that this reads,

7    Your Honor, is that he had a customer engagement

8    part of his role which means rather than not

9    interfacing with customers, he was the face of the

10   practice with the customers as he was when we hired

11   him.  We put him in front of customers specifically

12   focused on cloud data center which is exactly the

13   practice that we had him lead when --

14             THE COURT:  What is cloud data center,

15   please?

16             THE WITNESS:  Yes, Cloud Datacenter is

17   what we had discussed earlier.  It is when you move

18   a client from their on-premise data center into the

19   cloud.

20             So the migration conversation

21   that we had earlier, that is the -- that is how you

22   term cloud data center, and cloud, in this case, is

23   Microsoft's cloud which is Azure.

24             THE COURT:  Sir, are there many ways of

25   moving data from one place to another that you are

1    speaking of?

2          THE WITNESS: There are some ways.  I

3    wouldn't say that there are many ways, but there

4    are several ways that one --

5          THE COURT:  Could you name them all?

6          THE WITNESS:  I don't know that I could

7    name them all, but I could name some.  We could --

8    For example, you could move data applications into

9    the Microsoft cloud.  That is one way that you

10    could move, and that is our business, Your Honor,

11    Microsoft Azure.

12          Concurrency is a Microsoft

13    partner, so they would also move to Microsoft

14    Azure.  The other ways that you could move is you

15    could move to other, what is called, cloud

16    platforms, so you could move to a Google cloud.

17    You could move --

18          THE COURT:  What cloud?

19          THE WITNESS: Google.  You could move to

20    the Amazon cloud that -- Jeff Bezos has a company

21    Amazon and you could move to the Amazon cloud.

22          THE COURT:  You mentioned several

23    different methods of moving, and how do you know

24    which one they refer to in here?

25          THE WITNESS:  Because Concurrency, just

1    like 3Cloud, is a Microsoft partner.  What they do

2    is they work along side Microsoft and that is Jim

3    Savage who started the company over 25 years ago.

4    He founded it as a Microsoft partner.

5              THE COURT:  You are saying Concurrency

6    always moves -- works along side Microsoft?

7              THE WITNESS:  Yes, and in fact, when I

8    was at Microsoft, Concurrency -- we used

9    Concurrency, not for Azure, but for different

10   Microsoft technologies.

11             THE COURT:  Sir, I don't want to

12   distract you from what you want to get into in

13   detail, but let me ask you something.  After this

14   all broke and you thought you knew what you knew,

15   did you ever go to Concurrency and ask them about

16   this; what he was working on?  How it related to

17   you?

18             THE WITNESS:  Your Honor, we did so

19   immediately.  I think our --

20             THE COURT:  I don't want another answer.

21             THE WITNESS:  Okay.

22             THE COURT:  I am not asking for their

23   answer.  Okay, go ahead.

24

25

1    BY MR. FERRELL:

2         Q.    Mike, so we are talking about these two

3    restrictions that -- Mr. Adegoke's restrictions on

4    covenant installing and termination for 12 months

5    and he breached and going to Concurrency.

6                   Are there any other provisions of

7    this agreement that we contend that -- 3Cloud

8    contends Mr. Adegoke breached?

9         A.    If I understand your question is is the

10   Azure company business in this to restrict his

11   territory?

12        Q.    I am sorry.  Let me turn your attention

13   to Section 2(e) which is on the next page of the

14   agreement, Page 3.  It talks about further

15   covenants, confidential information and returning

16   company property.

17        A.    Could you please just steer me to the

18   page that you are actually looking at?  Looking at

19   exhibit --

20        Q.    It is part of page -- of the PDF you are

21   looking at.  At the middle of the page it says:

22   Further covenants.

23                   THE COURT:  What page are we on, folks?

24                   MR. FERRELL:  It is Page 3 of the

25   confidentiality agreement.  It is page, I think, 7

1    of the exhibit. It is still Exhibit 1.

2              THE COURT:  Still Exhibit 1?

3              MR. FERRELL:  I am sorry, it is Exhibit

4    1.  It should be the seventh page of the exhibit.

5              THE COURT:  Exhibit 1 has two agreements

6    to it?

7              MR. FERRELL:  Correct.  It is the

8    seventh page of the exhibit.  It is in the second

9    agreed --

10             THE COURT:  Page 1 of what?

11             MR. FERRELL:  It is Page 3 of the

12   confidentiality agreement.  Page 7 of the

13   agreement.

14             THE COURT:  Page 3 of the

15   confidentiality agreement, okay.

16             THE WITNESS:  We are hearing background

17   noise.

18             MR. FERRELL:  I am hearing background

19   noise as well.  It sounds like almost TV.  I think

20   it just went away.

21             THE COURT:  I have that Page 3 of the

22   confidentiality agreement.

23

24

25

1    BY MR. FERRELL:

2        Q.    Mike, do you have that page in front of

3    you?

4        A.    I do have that page in front of me.

5        Q.    It is Section 2(e).  It says:  Further

6    Covenants.  Is that what you are looking at?

7        A.    I am looking at --

8        Q.    It has two sections.  One starts at the

9    bottom half of this page and the other section or

10   provision is at the top of the next page.  Do you

11   see that, (i) and (ii)?

12       A.    Yes, I do see that.

13       Q.    Correct me if I am wrong but (i) here

14   deals with the -- maintaining confidentiality and

15   not disposing the company's confidential

16   information, and the (ii) on the next page deals

17   with the return of all company property after

18   separation of employment; is that right?

19       A.    That is correct.

20       Q.    Does 3Cloud contend that Mr. Adegoke,

21   when he left 3Cloud, violated this Section 2(e)

22   with regard to confidential information and

23   returning company property?

24       A.    He did violate that.  In fact, he

25   returned his computer to us with all the files on

1    his computer erased and destroyed.

2        Q.    When you say his computer, are you

3    referring to Mr. Adegoke's personal computer or a

4    computer that was owned and issued to him by

5    3Cloud?

6        A.    The latter.  We owned the computer.  We

7    provided that to him to use during his employment.

8              When we asked for that computer

9    back on his last day, he returned the computer with

10   all of the files erased and destroyed.

11       Q.    Was he authorized to erase 3Cloud's

12   computer hard drive before returning it?

13       A.    He was not.

14             THE COURT:  What counsel -- what did

15   he -- Mr. Rocco, what was erased that you know was

16   erased that was coming -- what you know was erased,

17   if you do know anything?

18             THE WITNESS:  Well, any documents,

19   intellectual property that he would have created

20   while at 3Cloud was completely erased.

21                Your Honor, it is hard to --

22             THE COURT:  He erased things he worked

23   on?

24             THE WITNESS:  Correct.

25             THE COURT:  Now, did you try to bring

1    back that which was erased and see if you could

2    read it?

3                THE WITNESS:  We tried, but in the

4    manner in which he destroyed and deleted all of the

5    files, it was impossible for us to recreate what he

6    deleted.

7                THE COURT:  Did you use an expert in an

8    attempt to do that, expert in computer technology?

9                THE WITNESS:  We had someone from our

10   firm review the computer, and again, in the manner

11   in which Mr. Adegoke destroyed the files, it was

12   concluded that there was not a manner in which to

13   get those files back.

14               THE COURT:  Now, it was your expectation

15   that he would return the computer including all the

16   work he did?

17               THE WITNESS:  Yes, your Honor.  We have

18   a policy.  So, for example, when an employee

19   separates from 3Cloud, our policy is we schedule a

20   transition with that employee with someone within

21   3Cloud to hand over not only all the property but

22   the computer, the files, and any work that the

23   individual would have completed at 3Cloud.

24               I have just, to give you a sense,

25   Your Honor, over 200 employees in the company.  I

1    have had people leave our organization.  I have

2    never one time had an employee delete, erase, and

3    destroy the information from their computer before

4    handing it to us; and in fact, in Mr. Adgeoke's

5    case, Your Honor, we asked him to come in on his

6    last day and complete this transition.

7                    He, in fact, at his own will,

8    decided to destroy all the material, and he shipped

9    us the computer in a box that arrived in the mail.

10   So he didn't come to the office on the last day as

11   we requested.  He, instead, mailed the computer in.

12               THE COURT:  Mr. Rocco, when he was still

13   working for the company, did he give reports to the

14   company on his work?

15               THE WITNESS:  He did.  He did.

16               THE COURT:  Now, did he give those

17   reports which he then wiped out of the computer?

18               THE WITNESS:  Well, he provided a status

19   update on the work that he was completing, but all

20   the documentation, all the work that he had done

21   for us, the intent was for him to hand that over at

22   the day that he left us, but instead, he erased and

23   destroyed all that information.

24               THE COURT:  Are you surmising or

25   guessing that he destroyed more than he already

1    turned over to you?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  Is that a surmise or guess

4    work or do you know for sure that he destroyed

5    everything he failed to turnover to you?

6              THE WITNESS:  Well, here is what I know

7    for sure:  He didn't hand over any documentation,

8    and all the documents that he created, he

9    destroyed.

10                  Again, when we received the

11   laptop and we opened the box from the mail, all the

12   documents were gone.  They were destroyed.

13             MR. FERRELL:  Mike --

14             THE COURT:  You claim harm from what,

15   from destroying the documents on his computer or

16   from depriving you of getting copies or what?

17             THE WITNESS:  Your Honor, it is

18   two-fold.  One is he destroyed the documents.  He

19   didn't hand it over; and then number two, which was

20   even more concerning, Your Honor, we discovered

21   that he copied hundreds of documents from our

22   network before he left for his last day and that --

23             THE COURT:  How do you know?  How do you

24   know that, sir?

25             THE WITNESS:  Well, Jim Dietrich who

1    will be testifying to this here when we get -- will

2    talk about it in detail, but we ran a network

3    assessment that concluded and confirmed 100 percent

4    that he copied hundreds of confidential documents

5    that he had --

6            THE COURT:  Sir, are you saying I will

7    get details on that contention from another

8    witness?

9            THE WITNESS:  You will get those details

10   from another witness, Jim Dietrich, soon.

11           THE COURT:  I will certainly wait until

12   then.  Go ahead, Counsel.

13   BY MR. FERRELL:

14       Q.    Mike, if I could, in terms of the

15   concern that 3Cloud had about the laptop, you

16   talked about the files -- we don't know what is

17   lost?  You don't know what files were on Mr.

18   Adegoke's laptop, but when he had destroyed it in

19   the way that he did, when he returned the hard

20   drive and wiped it clean the way he did, did 3Cloud

21   also lose the ability to see Mr. Adegoke's history

22   of what he had done with files and with the laptop?

23       A.    On the laptop, yes, we lost that

24   history.

25           THE COURT:  I am sorry, I didn't quite

1    catch that question, and I have got my brand new

2    hearing aid in both ears, so I should be able to

3    catch it, but there is something about that

4    question that I missed.  Please repeat it, Counsel.

5              MR. FERRELL:  Sure, Judge.

6         Q.    Mike, in addition to the files that were

7    sitting on Mr. Adegoke's hard drive that were

8    erased, when he erased it in the manner which he

9    did, we also lost, I am asking, the ability to tell

10   from the computer hard drive the history of what

11   Mr. Adegoke had done with the files, that is,

12   whether he had downloaded files somewhere else,

13   sent them somewhere else?  From the hard drive, we

14   couldn't tell what he had done with the files,

15   right, because the way it was erased?

16        A.    That is correct.  The manner in which

17   Mr. Adegoke sent his computer back in and destroyed

18   the information was unusual.  It was purposefully

19   done in a manner to cover the tracks on where --

20             MR. LLOYD: Objection, Your Honor,

21   speculating.

22             THE COURT:  What is the objection?

23             MR. LLOYD: The witness is speculating as

24   to the motive of some person who is not him.

25             THE COURT:  Counsel, this is an area in

1    which I understand there is a lot of authority

2    where Courts have allowed introduction of

3    inferences or arguments to be drawn.  Are we in

4    that territory right now?

5            MR. FERRELL: I believe we were, Judge.

6            MR. LLOYD: I think we are.

7            THE COURT:  To what extent are you now

8    calling on me to reject inferences from evidence

9    that is not -- that is objectively reported to me?

10           MR. LLOYD: I am not asking the Court to

11   reject inferences, and the Court can certainly make

12   its inferences, and Counsel can argue that certain

13   facts can lead to inferences, but this witness'

14   testimony -- testifying that Mr. Adegoke had a

15   certain intent, and there is no way he could know

16   that.

17           THE COURT:  Counsel for the debtor --

18   pardon me, for the creditor, are you in this case

19   asking me to draw inferences of some sort?

20           MR. FERRELL:  We will be, Judge.  We

21   like to present all of the evidence, but we think

22   when you have heard all of the evidence, we would

23   ask if you believe it is appropriate to draw an

24   adverse inference in Mr. Adegoke deliberately

25   destroying the files.

1          THE COURT:  I think it would be

2     appropriate if you were to tell me what inferences

3     you will be asking me to draw with everybody

4     bearing in mind that the statements of Counsel are

5     not evidence but are argument that he is about to

6     inform me he will be making in this case, and

7     Counsel, are you able to make that argument now?

8          MR. FERRELL:  I believe so, Judge.

9          Once we introduce all the

10    evidence, I think it would be an appropriate time

11    to consider the inference.

12          The inference we will be asking

13    you to make is that Mr. Adegoke deliberately

14    destroyed and erased the hard drive in order to

15    cover up and conceal from the company what he had

16    done with hundreds of confidential company files

17    that he had copied from the company's network

18    before he left to go lead the Concurrency competing

19    practice.

20          If that information was not

21    destroyed, it would have revealed that he was still

22    in possession and contain information where he sent

23    those confidential company files, hundreds of them,

24    to go compete directly with 3Cloud.

25          THE COURT:  Based on that argument,

1   which was only argument that I just heard, I will

2   be overruling Counsel's objection because I don't

3   believe Counsel may, by objection, prevent me from

4   drawing the proper inferences.

5              I cannot draw those inferences

6   now because I have not heard all the evidence, but

7   that is the type of territory rationale that we

8   will have to deal with at the end of the case; and

9   therefore, I am overruling Counsel's -- debtor's

10   Counsel's objection on this very preliminary

11   record.  It is not a full record yet.  It is a

12   long -- I just think we ought to make a point of

13   saying that I need the proper inferences after all

14   the evidence.

15              Okay, Counsel, proceed.  Fifteen

16   minutes.

17   BY MR. FERRELL:

18      Q.   Mike, we talked earlier that it wasn't

19   usual within the normal practice and Mr. Adegoke is

20   not authorized to erase the hard drive of the

21   3Cloud computer before he gave it back.

22              Did Mr. Adegoke even ever inform

23   you or Jim Dietrich or anyone at 3Cloud that he

24   intended or planned to do this, or the first time

25   you learned of it was when you opened the box?

1      A.    That is right.  We asked him to come in

2   on his last day to hand over the computer and to

3   transition the files, and without notification, we

4   learned that he decided not to come into the office

5   on his last day but instead ship the computer to us

6   in the mail.

7      Q.    In getting to the question of

8   purposefulness, is there any way possible you could

9   think of that Mr. Adegoke could have erased

10  completely the hard drive of the 3Cloud laptop

11  accidentally without purposely doing it?

12     A.    No.  There is no way to accidentally do

13  that.

14     Q.    So there was the laptop files that we

15  talked about.  Were there other documents that you

16  mentioned which evidence from the network that Mr.

17  Adegoke had copied on his files, confidential files

18  on 3Cloud's network, in that had also been part of

19  our claim breach of Section 2(e) of the

20  confidentiality agreement?

21     A.    Yes.  What Jim Dietrich discovered upon

22  doing an internal audit of Mr. Adegoke's network

23  behavior, he discovered when he was looking at Mr.

24  Adegoke's 3Cloud e-mail address, he discovered a

25  link to documents, and he clicked on the link, and

1    that link took Mr. Dietrich to a series of 3Cloud

2    client files, confidential files, that were stored

3    on Mr. Adegoke's personal one drive storage

4    account.

5              We were shocked to see that

6    because not only was it against our policy, but

7    again, they were 3Cloud confidential documents that

8    Mr. Adegoke still had in his possession even

9    post-employment on a personal one drive storage

10   account.

11       Q.    To this date --

12            THE COURT:  What date was it that he

13   still had these things in his possession?

14            THE WITNESS:  I would have to defer to

15   Mr. Dietrich.  What he -- it was, Your Honor -- it

16   was within a week or two after post-employment.

17   Jim Dietrich can give you the exact date when that

18   was.

19            THE COURT:  Within a week or two after

20   he returned the computer that had been wiped clean?

21            THE WITNESS:  That is correct.

22

23

24

25

1    BY MR. FERRELL:

2        Q.    Did Mr. Adegoke, Mike, ever return the

3    client files, the confidential files that were

4    witnessed to have been seen on his personal one

5    drive?  Did he return them to the company?

6        A.    He did not.  In fact, when we reached

7    out -- we learned of this, and we reached out and

8    informed Mr. Adegoke.  We also informed Concurrency

9    stating that we had discovered these files, these

10   confidential files, that were still on his network;

11   and we asked him:  Please don't destroy that

12   information because we like to collect it.

13                      We went back a day later and

14   found that that information, those client files

15   that we asked him not to destroy, were erased, and

16   they were destroyed.

17       Q.    Mike, putting aside Exhibit 1, Mr.

18   Adegoke's employment agreement, I want to talk to

19   you about Mr. Adegoke's performance and experience

20   in the practice director role.

21                      Did you have -- he was hired

22   October 2016.  I think started in November 2016,

23   November and December.  Did you have issues with

24   Mr. Adegoke's performance in the practice director

25   role?

1      MR. LLOYD: Your Honor, I will object at

2  this point on the basis of relevance.

3      THE COURT:  What is the basis, please?

4      MR. LLOYD:  On the basis of relevance.

5  I don't see how we should get into disputes between

6  employee and employer or criticisms by employer of

7  employee's work when we are talking about the

8  compliance or non-compliance with an agreement.

9      THE COURT:  Response.

10     MR. FERRELL:  Response, Judge, is the

11  testimony, if allowed, is going to go into actually

12  Mr. Adegoke's level of knowledge and experience

13  with Microsoft Azure and Cloud Datacenter

14  migrations clients, in fact, that he did not have

15  the knowledge and experience that 3Cloud thought

16  when they hired him.

17            The result of that is by the time

18  he leaves to join Concurrency, most, if not

19  everything, that he knew about cloud data center

20  migrations, Azure from Microsoft he learned from

21  3Cloud, at 3Cloud, which he then took to go compete

22  against 3Cloud doing the same thing.

23     THE COURT:  Counsel, please repeat the

24  question that is on the floor.

25     MR. FERRELL:  I asked Mr. Rocco if they

1    had performance issues with Mr. Adegoke in his

2    practice director role after hiring him.

3            MR. LLOYD: I will have the same

4    objection.  If they want to testify what training

5    or information they gave Mr. Adegoke, if they want

6    to ask what knowledge did he have when he came in

7    and what knowledge did he have when he left, that

8    would be one thing, but if we are going to get into

9    a number of performance issues, that just sullies

10   the debtor's reputation without presenting any

11   evidence of anything relevant.

12           THE COURT:  Counsel, are you, in effect,

13   asking about a broad range of various activities

14   and -- the answer would have touched upon?

15           MR. FERRELL:  We will get into an

16   actual -- a specific example for you, Judge.

17           THE COURT:  I think you should ask a

18   narrower question, and we will deal with one

19   activity at a time, and that gives everybody an

20   opportunity to know what activity we are talking

21   about.

22                    I think the breadth of the

23   question might cause confusion, not that I think

24   that the substance may not be important.  I don't

25   think that.

1    MR. FERRELL:  I will rephrase it, Judge.

2    Q.    Mike, do you recall at a 3Cloud's

3  engagement for a client by the name of Matrix Inc?

4    A.    I do.

5    Q.    What was the Matrix Care engagement, and

6  when did it first come up?

7    A.    Matrix Care was one of our first large

8  data center migration opportunities, and we were

9  introduced to Matrix Care by Microsoft in November

10 of 2016.

11    We brought Mr. Adegoke to help

12 build proposals, in addition to building a

13 practice, for data center migration projects like

14 the one that we were about to embark on at Matrix

15 Care.

16    What we quickly learned is that

17 the experience, the knowledge, the expertise that

18 we thought we had hired Mr. Adegoke for to complete

19 data center migrations, he acknowledged to us that

20 he had never done a data center migration, and so

21 here we were with a big Microsoft client

22 opportunity.

23    We were assembling the statement

24 of work, again, the architectural blueprint to

25 complete this migration, and Mr. Adegoke

1  acknowledged to us that he had never completed the
2  project.
3                      So what happened in that case,
4  Mr. Dietrich and I had to step in and help to write
5  the statement of work again, the architectural
6  blueprint, with how to complete this migration.
7                      Mr. Adegoke was involved.  He
8  helped us, but it was very, very clear that he was
9  learning how to do data center migrations, and he
10 did not possess the expertise and the experience
11 that we thought he had when he joined us at 3Cloud.
12      Q.    What was the time -- When did this come
13 up?
14      A.    This came up in December of 2016.  We
15 were all at the Microsoft office at the Aon Center
16 working on the statement of work when Mr. Adegoke
17 acknowledged to Jim and I that he had never
18 completed a project of this nature in his past.
19      Q.    At some point in the Matrix Care
20 engagement, did the client raise concerns about Mr.
21 Adegoke's level of knowledge and expertise with
22 Azure?
23      A.    They did.  So fortunately we won the
24 project, and we signed the statement of work with
25 Matrix Care, and we kicked off the project in

1     January of 2017.

2                    Mr. Adegoke's role was to help

3     serve as the technical lead for the project.  Think

4     of that as a lead engineer to run the project.

5                    We were all in Minneapolis which

6     is where the customer resides in January of 2017,

7     and Mr. Adegoke was there to kick off the project.

8     It was very clear to both the customer, a gentleman

9     by the name of Joe Webber who is the CTO of Matrix

10    Care, and the Microsoft representative, Joe

11    Vandermark, that Mr. Adegoke did not have a good

12    plan; did not have a good road map; did not --

13                    THE COURT:  Are you reciting the opinion

14    of a customer who gave you his opinion?

15                    THE WITNESS:  Your Honor, I not only was

16    in the room when Mr. Adegoke kicked off this

17    project but both the customer and the Microsoft

18    representative pulled me aside personally afterward

19    and stated these as facts.  These are not opinions.

20    These are their --

21                    THE COURT:  Wait a minute.  They are

22    apparently opinions from a customer at -- from

23    Microsoft to you.

24                    THE WITNESS:  That is correct, sir.

25    This is their assessment.  Their assessment of Mr.

1    Adegoke's knowledge was that they were concerned of

2    whether he had the experience.

3              THE COURT:  Mr. Lloyd, do you have

4    anything to say?

5              MR. LLOYD: I do.  You have already asked

6    the question, but I will object on the basis of

7    hearsay.  Whatever these two individuals --

8              THE COURT:  I will sustain the objection

9    on hearsay grounds to what the two companies'

10   representatives told Mr. Rocco, and I will strike

11   his testimony as to what they told him about

12   feeling that the debtor is not capable or not

13   trained.

14              Well, it is about 12:30.  If you

15   have one more really choice question you want to

16   ask before you want to take a break...

17             MR. FERRELL:  I do, Judge, if I could.

18        Q.    Mike, when you had this revelation that

19   the person you hired as practice director did not

20   have the knowledge that you thought he was when you

21   hired him, the expertise, why didn't you terminate

22   Mr. Adegoke at this point?

23        A.    There were two reasons we did not

24   terminate --

25              THE COURT:  Well, you are asking him

1    to -- why he didn't do something when he learned

2    something which I struck --

3                THE FERRELL:  No, Judge.  That is not

4    right.

5                THE COURT:  Maybe you could approach it

6    a different way, but for now it is time for a lunch

7    break.  How much time do you folks want for a lunch

8    break, 30, 45 minutes?  How long?

9                MR. LLOYD: I would vote for 45 minutes,

10   Your Honor.

11               MR. FERRELL:  That is fine.

12               THE COURT:  We will take 45 minutes.

13   That will bring us to 1:15.

14               THE CLERK:  Court is in recess until

15   1:15.

16               THE COURT:  You have used two of your

17   eight hours that you asked me to reserve for this

18   trial, Counsel.

19                      All right, folks, see you at

20   1:15.

21                          (Whereupon, a recess was

22                             taken)

23               THE CLERK:  Court is reconvened.  Please

24   come to order.  Please state your name clearly when

25   you are making your appearance and state clearly

1    who you are representing, and for the record, state

2    your name and the party you represent.

3                    Taking up the Court's 10:00

4    o'clock matter, Adetayo Adegoke.

5              THE COURT:  Good afternoon.  Same folks

6    are here that were here this morning.  Welcome

7    back.

8                    Is there something you want to

9    say, Counsel?

10              MR. LLOYD: Your Honor, I was just

11   putting my appearance on the record.  David Lloyd

12   on behalf of the debtor.

13              THE COURT:  There was an objection made

14   by Mr. Lloyd that the attempts to demonstrate the

15   incompetence of the debtor in his employment, he

16   was objecting to that testimony.  I sustained

17   certain testimony on grounds of hearsay.  I now

18   sustain it on grounds I don't think it is relevant

19   at all.  At least I haven't seen it to be relevant.

20   Someone will have to persuade me it is relevant

21   before I allow it into evidence.

22              MR. FERRELL:  Judge, Mike Ferrell.

23                    If I may, just for a moment, it

24   was not so much an issue that we were raising of

25   competence.  It was about his level of knowledge

1    about Azure when he entered 3Cloud versus when he

2    leaves to go to a competing practice.  His

3    knowledge of Azure is built on what he learned and

4    was taught at 3Cloud.

5           THE COURT:  Well, I don't want to get

6    into areas that are not clearly relevant, and I am

7    not sure this one is, so for the moment I am

8    barring it being introduced.  I don't think it has

9    anything to do with the core issues of the case.

10    You folks can persuade me otherwise as we go on

11    further into the case.

12           All right, folks, Mr. Rocco, you

13    are still under oath, right?  Yes?  Are you tired

14    this morning?

15           THE WITNESS:  No.  I think I am doing

16    okay.  Thanks for asking.

17           THE COURT:  Proceed with the direct

18    examination of Mr. Rocco.

19           MR. FERRELL:  Thank you, Judge.

20    Q.    Mike, at some point toward the end of

21    2016, did 3Cloud send and invest in sending Mr.

22    Adegoke for training?

23    A.    We did.  We sent him to training by the

24    name of Movere, Movere training.  This is a

25    Microsoft-endorsed tool that would help complete

1    what is called an Azure consumption estimate which

2    those clients, those customers that are considering

3    a data center migration to the cloud, they would

4    need an Azure consumption estimate in order to make

5    the decision on whether to move.

6                    So we sent Mr. Adegoke to

7    Bellevue, Washington.  We made that investment, and

8    we sent him there for training to be trained on

9    this technology, this tool.

10       Q.    In total, what was the cost at 3Cloud to

11   send Mr. Adegoke to Bellevue, Washington to

12   complete the training and come back?

13       A.    It is just about $9,000.

14       Q.    Mike, is Movere training of commercial

15   value and significance in the Azure consulting

16   space where you are?

17       A.    It is.  At the time in 2016, there were

18   only a handful of Microsoft partners that were what

19   is called Movere certified.  3Cloud became Movere

20   certified.

21                    To be a certified Movere partner,

22   the benefits of that is that Microsoft would bring

23   you new clients in which to do what we call these

24   cloud readiness assessments which is part of the --

25   completing those assessments, you would run with

1    Movere.  So it is a very valuable certification to

2    have to differentiate yourself as a Microsoft

3    partner by having this certification.

4         Q.    Now, Mike, by August of 2017, did 3Cloud

5    make a change in its practice leadership for its

6    cloud modernization group?

7         A.    We did.  We brought in an individual by

8    the name of Matt Ketchun.  He is someone that Jim

9    and I had worked with when we were at Microsoft,

10   and we brought Matt in to step into the leadership

11   role, to serve as practice director for our

12   infrastructure practice, and that was the practice

13   that we had hired Kyle to do.  So we asked Kyle to

14   step down from that role, and we had Matt come in

15   and lead that business for us.

16        Q.    When you say Kyle, that is a reference

17   to Mr. Adegoke, correct?

18        A.    Thank you for the clarification.  Mr.

19   Adegoke, that is correct.

20        Q.    I just want to make sure.  Kyle is what

21   he commonly went by at work?

22        A.    That is correct.

23        Q.    What was the role then -- Did you say

24   what day this meeting was?

25        A.    I am sorry, could you repeat that again,

1    please?

2        Q.    What day did you inform Mr. Adegoke that

3    you were making this change in bringing in Mr.

4    Ketchun to the practice?

5        A.    That was August 2nd of 2017.

6        Q.    What was going to be Mr. Adegoke's role

7    going forward after that August 2nd?

8        A.    We gave Mr. Adegoke the title of

9    principal architect.  The reason we did that is

10   we -- we felt that he didn't have the capabilities

11   to lead the practice, but we kept him on to serve

12   as a technical -- we called it a principal

13   architect on projects, and we actually kept his

14   compensation the same, so we did not change or

15   reduce his compensation.  We left that the same.

16       Q.    What was Mr. -- what were Mr. Adegoke's

17   responsibilities going to be and were they as a

18   principal architect?

19       A.    He was going to move towards what we

20   call more delivery implementation of our solutions,

21   so he would no longer be required to help provide

22   technical pre-sales to sell the solutions but

23   rather he could serve as the technical lead to help

24   on the implementation of infrastructure and data

25   center migration projects.

1    Q.    How did Mr. Adegoke react at the meeting

2    in news of this change?

3    A.    Honestly, not well at all.  Jim Dietrich

4    and I shared this with Mr. Adegoke in our offices

5    in Downers Grove, and we shared with him that Matt

6    would come in as a new practice director, and Mr.

7    Adegoke would report to Matt; and we explained it

8    to Mr. Adegoke that we felt like this could be an

9    opportunity for Mr. Adegoke to learn from someone

10   more seasoned, more senior, that could better --

11   that had the right experiences that we recognized

12   that Mr. Adegoke did not have; but Mr. Adegoke,

13   upon learning this news, became angry.  He became

14   angry.  His voice was elevated.  His face obviously

15   was -- It was very clear that he was unhappy with

16   this, and we did what we could to help him

17   understand that this could be a benefit to him.

18   This could be a growth and learning opportunity and

19   that we were not going to make any changes, like I

20   said, to his compensation, but he was very angry

21   with us.

22   Q.    Now, I want to move forward now to

23   Sunday, October 8, 2017.  Do you recall speaking

24   with Mr. Adegoke by telephone that day?

25   A.    Yes.  This was a Sunday.  He called me

1    on my cell phone.

2         Q.    What was that conversation about?

3         A.    He told me that he was resigning from

4    his role at 3Cloud.

5         Q.    Did Mr. Adegoke say what his plans were;

6    what he was going to be doing?

7         A.    I asked him.  I asked Mr. Adegoke where

8    he was planning to go.  He would not share with me

9    on that call where he was going to work.

10        Q.    I am going to ask you to turn now to

11   Exhibit 15.  Can you open the PDF of Exhibit 15?

12        A.    I have that exhibit ahead of me, in

13   front of me.

14        Q.    Do you recognize this?

15        A.    I do.

16        Q.    What is it?

17        A.    This is Mr. Adegoke's written

18   resignation letter.

19        Q.    It says in the second sentence that his

20   last day of employment will be October 20, 2017.

21                    Was that, in fact, Mr. Adegoke's

22   last day of employment with 3Cloud?

23        A.    Yes, it was.

24        Q.    You testified earlier about seeing a

25   press release from October 30, 2017 issued by

1    Concurrency announcing the hiring of Mr. Adegoke to

2    do their cloud data center practice.

3                        Was that the first time you

4    learned where Mr. Adegoke went for his new

5    employment?

6         A.    Yes. I read it in the press release.

7         Q.    If you would turn to Exhibit 13, Mike.

8         A.    Okay.  Let me get there.  I see it.

9         Q.    Do you have Exhibit 13 in front of you?

10        A.    I do.

11        Q.    This is the October 6, 2017 offer of

12   employment from Concurrency to Mr. Adegoke.  Do you

13   see that?

14        A.    I do see it.

15        Q.    When did you become aware that for the

16   last two weeks of Mr. Adegoke's employment he was

17   already under a signed employment agreement with a

18   competitor to run their practice?

19        A.    I did not learn that until we ended up

20   filing a lawsuit in District Court against Mr.

21   Adegoke and Concurrency.

22        Q.    Looking at Section 1 of Mr. Adegoke's

23   employment agreement with Concurrency, it mentions

24   that he is going to have responsibility for

25   multiple practice groups.  Does it reference Azure?

1  A.  It does.  It says Azure and Cloud

2  Datacenter.  That is right.

3  Q.  If you look at Section 3, Mr. Adegoke's

4  Concurrency employment letter, what does it say his

5  new base salary to run the competing practice at

6  Concurrency is going to be?

7  A.  The base salary is $260,000 which is

8  considerably more than we were paying him at

9  3Cloud.

10  Q.  The salary of 3Cloud equals 175?

11  A.  That was his base salary, correct.

12  Q.  Concurrency, they also give him a

13  sign-on bonus?

14  A.  12,500, that is correct.

15  Q.  You are looking at the last line on the

16  first page of this employment agreement?

17  A.  That is right.

18  Q.  Did you see in his employment agreement

19  with Concurrency what his eligibility for a bonus

20  was?

21  A.  I do.  I do see the bonus.

22  Q.  What amount do you see there?

23  A.  It is a 60,000 bonus which, again, is

24  considerably more than the one we had offered him.

25  Q.  To get that number, you are looking at

1    the page that is in the lower right-hand corner on

2    Adegoke Page 103?  It is the fourth page of the

3    exhibit?

4          A.    That is correct.

5          Q.    It looks like behind that last page of

6    the employment agreement is the confidentiality

7    non-competition statement agreement Mr. Adegoke

8    signed with Concurrency.  Do you see that?

9          A.    I do.

10         Q.    That date on the agreement is October 6,

11   2017, right, first line?

12         A.    Correct.

13         Q.    That is while Mr. Adegoke was still

14   employed at Concurrency, right?

15         A.    The October 6th date?

16         Q.    Yes.

17         A.    Correct.

18         Q.    Did you look at Exhibit 9?  Direct your

19   attention to Exhibit 9 into evidence.  Tell me when

20   you have it.

21         A.    His resume, yes, I have it.

22         Q.    Yes, it is Mr. Adegoke's resume.  Do you

23   see that?

24         A.    I do see it.

25         Q.    In the bottom right-hand corner it says

1    Adegoke Page 19.

2              THE COURT:  What exhibit?

3              MR. FERRELL:  This is Exhibit 9 from --

4    Judge, I lost your picture.  Tell me when you are

5    ready to proceed.

6              THE COURT:  All right.  Where should I

7    look on Exhibit 9?

8              MR. FERRELL:  Exhibit Number 9, it is

9    the one page or two page document.

10             THE COURT:  I have got it in front of

11   me.  Proceed.

12             MR. FERRELL:  Okay.  I was just waiting

13   for you, Judge.

14        Q.    Mike, if you look at Mr. Adegoke's

15   resume, under experience course at this time it

16   listed 3Cloud as the present employer.  This is the

17   resume produced to us as to what he provided to

18   Concurrency when he was interviewing with them.

19                  Under practice director,

20   Microsoft cloud modernization, November 2016 to

21   present, Mr. Adegoke listed four bullets

22   highlighting his experience and accomplishments

23   with 3Cloud.  Do you see that?

24        A.    I do see that.

25        Q.    The first bullet that Mr. Adegoke

1    highlights is he worked with the founders.  The

2    founders is you and Mr. Jim Dietrich, right?

3         A.    Correct.

4         Q.    He worked with the founders to land and

5    successfully close several multimillion dollar

6    opportunities.  One of which has delivered over a

7    million dollars in less than five months.

8                   Do you know which engagement that

9    would be that delivered over a million dollars in

10   less than five months?

11        A.    Yes.  That would have been Matrix Care.

12   That was our only million dollar client at the

13   time.

14        Q.    That is the same Matrix Care engagement

15   where Mr. Adegoke had confessed to you and

16   Mr. Dietrich at the Microsoft office at the Aon

17   building that it was his first cloud data center

18   migration and he had done one before?

19        A.    That is right.

20        Q.    That is the one where you and

21   Mr. Dietrich helped write the statement of work?

22        A.    That is right.  We had to jump in and

23   write the statement of work along side Mr. Adegoke.

24        Q.    The third bullet here, Mr. Adegoke

25   mentions collaborating with Microsoft and other

1    partners to successfully accelerate solutions.  At

2    the end of the bullet it says:  Microsoft's largest

3    regional Azure deal closure of fiscal year of 2016.

4                      Again, what engagement was that

5    that he is referring to as the largest regional

6    Azure --

7         A.    That would have been Matrix Care.

8    Matrix Care represented $10 million of Azure

9    consumption to Microsoft.  That was our largest

10   deal that year.

11        Q.    The final bullet, Mr. Adegoke says that

12   he created financial and delivery models for cloud

13   migration issues at 3Cloud.

14                      Do you know what the financial

15   and delivery models that he is talking about there

16   would be?

17        A.    Sure.  The financial models were driven

18   by the Movere Azure consumption estimates that we

19   sent Mr. Adegoke out to get trained for.

20        Q.    That is the training you sent him to

21   Bellevue, Washington for?

22        A.    That is right.

23        Q.    Mike, how did you and Jim Dietrich --

24   how did you respond to the news that Mr. Adegoke

25   had joined Concurrency as their new vice president

1    for file data center practice?

2        A.    We were extremely concerned.  It was

3    clear to us that Mr. Adegoke had taken what he had

4    learned at 3Cloud, went to our competitor in our

5    backyard in Chicago, and used what he learned at

6    3Cloud to directly compete with us in the Azure

7    infrastructure data center space.  We were really

8    concerned with this.

9        Q.    Did 3Cloud take to investigate what Mr.

10   Adegoke's activities had been prior to his

11   departure from 3Cloud to Concurrency?

12       A.    We did.  Mr. Dietrich ran what is called

13   an audit report to monitor the network behavior of

14   Mr. Adegoke.

15       Q.    The network behavior meaning Mr.

16   Adegoke's activities on the 3Cloud computer

17   network?

18       A.    That is right, and it came to our

19   attention that prior to Mr. Adegoke leaving 3Cloud,

20   he copied hundreds of files before his departure,

21   and this was all confidential proprietary client

22   based information that we considered to be part of

23   our trade secrets and intellectual property that we

24   developed.

25       Q.    I am going to ask you to turn to Exhibit

1    20.   Can you open that?

2          A.     I can.

3          Q.     Let me know when you are there.

4          A.     I am just pulling it up.  There, I do

5    see it.

6          Q.     Do you recognize this?

7          A.     I do.  It is a letter that I sent Mr.

8    Adegoke on November 6th.

9          Q.     Of 2017, right?

10         A.     Of 2017, yes.

11         Q.     It says here in the first sentence of

12   the letter:  It has come to our attention through

13   an internal audit that during the month of

14   September, 30 days since submission of your

15   resignation with 3Cloud, you accessed a number of

16   files from the company's network, and these files

17   included copies of client lists,sales pipeline

18   details, agreement templates, rate cards, and other

19   intellectual property unrelated to your immediate

20   responsibilities at the time.

21                Is the internal audit you are

22   discussing there, that you reference there, is that

23   the audit that you have just testified about

24   Mr. Dietrich was leading?

25         A.     Yes, yes.  What Jim did is he went and

1  did an analysis of Mr. Adegoke's activities on our

2  3Cloud network to try to really understand what

3  damage may have been done, given the concern that

4  we had.

5              As of the date of the letter, we

6  already identified that Mr. Adegoke had copied

7  dozens of confidential files which included

8  pipeline information, rate cards, many of our

9  templates on operational documents, and that was

10  done on September 18, 2017.

11              MR. LLOYD: Your Honor, I will object to

12  this answer and ask that it be stricken.  He is

13  testifying as to --

14              THE COURT:  Hear your objection, please.

15              MR. LLOYD: It is actually best evidence

16  rule, Your Honor.  He is testifying as to the

17  content of an audit.

18              A document labeled audit has been

19  introduced as an exhibit, and I think if the Court

20  is to find out what is in the audit, the Court

21  should be presented with that audit rather than

22  someone else's opinion of what is in there.

23              THE COURT:  Is the audit an exhibit

24  here?

25              MR. FERRELL:  It is, Judge.  The full

1    audit report of Mr. Adegoke's network activities is

2    Exhibit 27.  We will be going through Exhibit 27.

3    I think it is --

4              THE COURT:  Do you want to respond to

5    the objection?

6              MR. FERRELL:  At this time, Judge,

7    Mr. Rocco is testifying as to the letter that we

8    sent to Mr. Adegoke to put him on notice with

9    respect to the preservation of evidence and the

10   potential legal action, and he has just described

11   the communication that they took to try to reach

12   out to Mr. Adegoke early on.  The audit itself is

13   substantive.  We will cover it.

14             THE COURT:  Well, the substantive -- the

15   audit can come in through the audit itself.

16   Apparently there is a document to which there is no

17   objection.  To the extent there is testimony that

18   may preliminarily cover this, I will sustain the

19   objection.

20   BY MR. FERRELL:

21        Q.    Mike, what was your purpose in sending

22   this November 6th letter to Mr. Adegoke?

23        A.    Well, to put both he, Mr. Adegoke, and

24   Concurrency on notice.  Obviously, we were very

25   concerned with the documents copied and the depth

1    of our trade secrets.  So we were concerned about

2    that, and we were concerned that it was a violation

3    of his 12 month post-employment restrictions.

4         Q.    Now, do you know what Mr. Adegoke -- His

5    role at this time was principal architect; is that

6    right?

7         A.    When he left.

8         Q.    When he left in September of 2018?

9         A.    That is right.  He was principal

10   architect.

11        Q.    So in his role as a principal architect

12   in September of 2018, do you know what Mr. Adegoke

13   was working on?

14        A.    The only client that he was working on

15   at the time was a client by the name of BCG, Boston

16   Consulting Group.

17        Q.    Do you know what his role was for Boston

18   Consulting Group?

19        A.    Yes.  He was working to implement a

20   project that we had underway.

21        Q.    I am going to show you what is in

22   evidence Exhibit 21.  If you could turn to Exhibit

23   21.

24        A.    Yes, I can.

25              THE COURT:  Go to Exhibit 21?

1         MR. FERRELL:  21, yes, Judge.

2         THE COURT:  Okay.

3  BY MR. FERRELL:

4    Q.    Mike, do you have it in front of you?

5    A.    I do.

6    Q.    Do you recognize this?

7    A.    I do.  This was Mr. Adegoke's response

8  to the letter that I sent him dated on November 7,

9  2017 where he denied having our documents or

10 violating the non-compete.

11   Q.    What was your impression of Mr.

12 Adegoke's letter of November 7th?

13   A.    I disagreed with it.  He was obviously

14 violating his non-compete --

15        THE COURT:  I hear no objection to that

16 question but to which I have an objection.  I want

17 you to rephrase the question.

18 BY MR. FERRELL:

19   Q.    Mike, did you find credible Mr.

20 Adegoke's denial that he was violating the

21 non-compete in his work at 3Cloud data center to

22 Concurrency?

23   A.    I did not find his letter credible.

24   Q.    What about the denial of possession of

25 copies of 3Cloud documents?

1     A.     I did not find that credible either,

2    given what I had learned.

3          Q.     Could you turn to Exhibit 24?  Tell me

4    when you have that in front of you.

5          A.     I do.

6          Q.     Do you recognize this?

7                 THE COURT:  Exhibit 24, sir?

8                 MR. FERRELL:  Yes, Your Honor.

9                 THE WITNESS:  I do recognize it.  It is

10   a letter on November 16, 2017 that I directed you,

11   Mr. Ferrell, to send to Mr. Adegoke.

12   BY MR. FERRELL:

13         Q.     If you look at Attachment 1 of the

14   letter, do you recognize that one?  Tell me when

15   you see it.  This is the lower right-hand corner

16   Bates number Concurrency 40 and starting on 41.

17         A.     Yes, Attachment 1, I do recognize it.

18         Q.     What is that?

19         A.     This is the completed analysis of the

20   network activity that Jim Dietrich had completed

21   that Mr. Adegoke copied hundreds of financial

22   3Cloud files that he, quite frankly, had no need to

23   be working on at that time.

24         Q.     I am sorry, let me ask you if you are

25   looking at Exhibit 1 --

1      THE COURT:  Sir, will you tell me what

2  you think Exhibit 1 is?

3      MR. FERRELL:  I am sorry, Attachment 1.

4      THE WITNESS:  Attachment 1, am I not

5  looking at the right --

6      MR. FERRELL:  Attachment 1.

7      THE COURT:  The first attachment after

8  the letter.

9      THE WITNESS:  That is Attachment 1; is

10  that correct?

11      MR. FERRELL:  Yes.

12      THE COURT:  It is not labeled but it is

13  the first page.  I think the first page after the

14  letter, yes, Attachment 1.  What is it?

15      THE WITNESS:  What this is, Your Honor,

16  this is a copy of a report that Jim Dietrich ran

17  which shows the hundreds of files, one by one, that

18  Mr. Adegoke copied prior to his departure of

19  3Cloud.

20  BY MR. FERRELL:

21      Q.    Now, Mike, this Attachment 1 is just

22  five pages.  Do you know whether this is the full

23  or just an excerpt of the audit report that Jim

24  created?

25      A.    To my understanding, this is an excerpt,

1    and that Mr. Dietrich, when we get to his

2    testimony, will be in a position to talk about the

3    full length and extent of the hundreds of files

4    that were in the audit.

5        Q.    Also, in this letter that went to Mr.

6    Adegoke on November 16th of 2017, there is an

7    Attachment 2.  Can you turn to Attachment 2?

8        A.    Yes, I can. Let me just scroll down to

9    Attachment 2.  I do see that.

10       Q.    This is a -- Well, you tell me do you

11   recognize this, and can you tell us what this is?

12       A.    Yes, I do recognize this.  What this is

13   here is when Mr. Dietrich was doing an analysis of

14   Mr. Adegoke's 3Cloud e-mail in-box, he came across

15   a link to a 3Cloud document.

16                 When he clicked on the link, it

17   took him to this personal one drive storage

18   account.  This was Mr. Adegoke's personal one drive

19   storage account, and he noticed that all of the

20   3Cloud documents, proprietary confidential

21   documents, were sitting in the one drive storage

22   account.

23                 MR. LLOYD: Objection, your Honor.  I

24   will make the best evidence objection again.  This

25   attachment is itself an exhibit, and for the

1    witness to characterize what these entries mean or

2    what is in this report -- Let's take a look at the

3    report; go through it.

4              MR. FERRELL:  Judge, this is not part

5    of --

6              THE COURT:  Mr. Rocco, do you have

7    anything to do with the preparation of this Exhibit

8    2, Attachment 2?

9              THE WITNESS:  Mr. Dietrich, Your Honor,

10   prepared this exhibit.

11             THE COURT:  Do you understand that this

12   is somehow a summary of something else?

13             THE WITNESS:  This is an excerpt of

14   documents that he copied and then destroyed.

15             THE COURT:  Excerpt of documents, and

16   how do you know that, from some other document?

17             MR. FERRELL:  I think we are getting a

18   couple attachments confused, Judge.  Attachment 1

19   is an except.  Attachment 2 is the screen shot, and

20   Mr. Dietrich will testify about these.

21                  Again, my point with respect

22   to -- there will be testimony --

23             THE COURT:  Your other witness?

24             MR. FERRELL: The other witness.  There

25   will be testimony that we provided Mr. Adegoke

1    with --

2               THE COURT:  I will sustain this

3    objection until we get the other witness on the

4    stand.

5               MR. FERRELL: That is fine.

6         Q.    Mike, I want to shift gears and talk

7    about Mr. Adegoke's work for Concurrency that was

8    in direct competition with 3Cloud.

9                    Do you recall Microsoft

10   introducing 3Cloud to a Chicago area manufacturer

11   Komatsu in late October or early November of 2017?

12        A.    I do.  We at 3Cloud -- we were

13   introduced to Komatsu by Microsoft by Mike Trotta

14   who was the Microsoft account executive that we

15   knew for a period of time.

16        Q.    What was the proposed engagement that

17   Microsoft was bringing 3Cloud in to introduce them

18   to Komatsu about?

19        A.    Given we were -- 3Cloud was Movere

20   certified, they had introduced us to Komatsu to

21   complete what was called a Movere assessment.

22                    So we had a series of calls,

23   introductory conversations, and workshops with

24   Komatsu where we proposed completing this

25   assessment, and they had verbally agreed to move

1    forward with 3Cloud to complete this assessment.

2         Q.    In terms of the size of the opportunity

3    for 3Cloud and this Komatsu engagement, did you

4    have an idea or estimate about -- from a revenue

5    standard what this represented to 3Cloud?

6         A.    We had, given the size of the potential

7    data center migration.  Joe Cernovich from

8    Microsoft shared with us that this was a seven

9    figure implementation opportunity.

10        Q.    So more than a million dollars?

11        A.    More than a million dollars.  That is

12   right.

13        Q.    Can you turn to Exhibit 40?

14        A.    I can.  I just have to pull up another

15   folder.  Just bear with me for 30 more seconds.

16                    Exhibit 40; is that right?

17        Q.    Yes, 4-0, 40.

18        A.    Okay.  I am here.

19        Q.    If you will turn to the last page of the

20   exhibit, this is an e-mail chain that runs in

21   reverse chronological order.  So if you are on the

22   earliest e-mail on the last page, tell me when you

23   are there.

24        A.    I see it.

25        Q.    You do, okay.

1          So the substance of the e-mail at

2    the top of that page -- if you scroll or turn to

3    the previous page, you will see it is an e-mail on

4    November 3rd of 2017 from Tom Mulnix at Concurrency

5    to Mike Trotta Microsoft.

6          Mike Trotta, you testified a

7    moment ago, you all knew well and introduced you to

8    Komatsu?

9          A.   That is correct.

10         Q.   It is also an e-mail that is addressed

11   to Mr. Adegoke who at this time was at Concurrency.

12   Do you see that?

13         A.   I do see that.

14         Q.   Now, the day is November 3rd.  Mr.

15   Adegoke had left Concurrency October 20th, right?

16         MR. ADEGOKE:  I am sorry, people.  I

17   have to interrupt.  I do not have a copy of this

18   exhibit.  I don't know what we are talking about at

19   this point in time.  I have never seen this piece

20   of evidence.  I have never been asked about it, and

21   this is a very first time ever that I have ever

22   heard about it.

23         MR. LLOYD: Your Honor, this is David

24   Lloyd on behalf of the debtor.  My assistant at my

25   office sent Mr. Adegoke all the exhibits that we

1    had as far as I know.  If there are some documents

2    that Mr. Adegoke did not receive, we can remedy

3    that.

4                    At this point, since he is not

5    being asked to testify about these documents, I

6    wonder if we could, at our next break, take care of

7    this for me to find out what he has and what he

8    doesn't have.

9                    THE COURT:  Okay.

10                   Mr. Rocco, do you know what

11   Exhibit 40 -- Are you familiar with Exhibit 40?

12                   THE WITNESS:  I am, Your Honor.

13                   THE COURT:  What is it, do you think, or

14   what do you know it to be?

15                   THE WITNESS:  Well, it is correspondence

16   between Microsoft and folks at Concurrency after

17   Mr. Adegoke had left 3Cloud, and it references a

18   mutual customer, Komatsu.

19                   MR. FERRELL:  Judge, if I might, for

20   clarification, Mr. Rocco is on the other side of

21   the transaction that is discussed in this

22   correspondence.

23                   THE COURT:  Repeat what you said about

24   Mr. Rocco.

25                   MR. FERRELL: Mr. Rocco and 3Cloud were

1    the people that Microsoft was introducing to

2    Komatsu, and Komatsu is also a Concurrency client.

3    So Concurrency in this e-mail is trying to keep

4    3Cloud out.

5             THE COURT:  Mr. Rocco, what is Exhibit

6    40 as far as you understand it?  Did you create it

7    or did you have something to do with creating it?

8             THE WITNESS:  No, Your Honor.

9             THE COURT:  Did the associate who is

10   going to testify in the future have something to do

11   with creating it?

12            THE WITNESS:  No, he did not, Your

13   Honor.

14            What this serves, Your Honor, is

15   evidence that Mr. Adegoke's experience at 3Cloud

16   helped Concurrency push 3Cloud out of Komatsu.

17            MR. LLOYD: I am sorry to interrupt with

18   this, Your Honor, but now --

19            THE COURT:  I am not clear what the

20   witness had to do with making this document.

21            Did you have something to do with

22   making it, sir?

23            MR. FERRELL:  Judge, if I might, it is

24   Mike Ferrell.  The witness did not create this

25   document.  This is an e-mail correspondence that

1    Concurrency, our competitor, involved Mr. Adegoke.

2              THE COURT:  Objection until the other

3    witness testifies, I think, is the best thing to do

4    at the moment.  I think we will get some more

5    firsthand information from the other witness.  The

6    next --

7              MR. FERRELL:  The best firsthand will

8    come from Mr. Adegoke.

9              THE COURT:  Well --

10             MR. LLOYD: Your Honor --

11             MR. FERRELL:  With respect to these

12   e-mails, with respect to transactions, Mr. Rocco

13   has firsthand experience since he was dealing with

14   Microsoft on the Komatsu transaction.

15             MR. LLOYD:  Your Honor, if I may, this

16   is correspondence that does not involve anyone at

17   3Cloud.  None of the senders or recipients are

18   3Cloud staff or employees.

19             THE COURT:  Your office is objecting?

20   You didn't get this document?

21             MR. LLOYD: No, we received it, but for

22   any witness at 3Cloud to testify as to the

23   creation, the sending, the receiving, or the

24   meaning of any of this, none of them is competent

25   to testify.  The people who sent these and the

1    people who received these can certainly testify on

2    it.

3              MR. FERRELL:  Judge, to be fair, Mr.

4    Rocco is not being asked to testify about the

5    intent of the e-mails.  He is testifying about his

6    personal knowledge on the other side of the

7    transaction.  He was dealing with Komatsu and

8    Microsoft in the transaction that is being

9    discussed here about their --

10             THE COURT:  Mr. Rocco, what transaction

11   did you participate in that you could tell us about

12   one aspect of it?

13             THE WITNESS:  Sure, Your Honor.

14                  Like I said earlier, Microsoft,

15   Mr. Trotta, reached out to 3Cloud to engage us at a

16   company by the name of Komatsu.  We engaged.  We

17   provided a proposal.  We positioned our Movere

18   assessment, and Komatsu had accepted verbally our

19   proposal.

20                  What happened shortly after that

21   verbal acceptance is a week later, Microsoft

22   reached out to us and said Komatsu has changed

23   their mind.  They would like to now do this --

24             THE COURT:  Does this document talk

25   about the change-in-mind business?

1          THE WITNESS:  Your Honor, that

2     conversation Microsoft had with me.  Mr. Trotta

3     called me directly and told me that Komatsu has

4     changed their mind and wants to --

5          MR. LLOYD: I will object.  I will wait

6     and continue my objection.

7          THE COURT:  You were not party to a

8     conversation with Komatsu?

9          THE WITNESS:  I was.

10          THE COURT:  I will strike that

11     testimony.  Anything else?

12          THE WITNESS:  No.

13     BY MR. FERRELL:

14     Q.     Mr. Rocco, did 3Cloud end up going

15     forward with the engagement with Komatsu or not?

16     A.     We did not, and what was very unusual is

17     we did not understand after Komatsu verbally

18     comitted to moving forward with us why they called

19     us back and changed their mind on moving forward.

20     This is something that we learned later.

21     Q.     Now, at the time, and this is early

22     November 2017, were you aware whether or not

23     Concurrency was a Movere approved Microsoft

24     partner?

25     A.     At that time, Concurrency was not a

1    Movere partner.

2         Q.    The Komatsu engagement that was being

3    proposed was a Movere transaction, correct?

4         A.    Right, and there were very few Microsoft

5    partners, 3Cloud being one of them, that were

6    certified to complete this Movere assessment.

7         Q.    That is the reason Microsoft reached out

8    to 3Cloud to introduce them to Komatsu for this

9    engagement, correct?

10        A.    That is right.

11        Q.    Is it possible for Concurrency or for

12   anyone to become Microsoft Movere certified by

13   having one trained certified Microsoft person?

14        A.    It certainly helps.

15                 By Mr. Adegoke going to

16   Concurrency, it accelerated their ability to become

17   Movere certified because we had sent Mr. Adegoke to

18   be trained on Movere.

19                 So by him being technically

20   trained, and then him appointing additional folks

21   to be trained, accelerated their ability to become

22   certified and to be part of the short list of

23   partners that Microsoft would recommend to complete

24   these Movere assessments.

25        Q.    Mike, I want you to turn to a group of

1    exhibits here.  This is Exhibit 63.

2        A.    Just give me one moment and let me go to

3    that file folder.

4        Q.    We are going to be dealing with 63

5    through 67.  Tell me when you have got them opened.

6            THE COURT:  Go ahead.

7            THE WITNESS:  I have every one opened,

8    63 to 67 to 62 --

9            THE COURT:  Are you ready to proceed?

10           MR. FERRELL:  I am waiting for the

11   witness to get it on his screen here.

12           THE WITNESS:  Mike, if you could tell me

13   what the exhibit reference is?

14   BY MR. FERRELL:

15       Q.    63 through 67 are legal invoices.

16       A.    I see.  I have got it.  Thank you.

17       Q.    Got it great.  Tell me when you can see

18   it.

19       A.    I can.

20       Q.    So looking at Exhibit 63, this is a

21   group exhibit of legal invoices for services and

22   fees incurred from November 2007 to March 2019 from

23   Jones Day addressed to 3Cloud.  Do you recognize

24   these?

25       A.    I do.

1          THE COURT:  What is this document that

2     is 63?  What page?  It starts out at the Jones Day?

3          MR. FERRELL:  Yes, it is.

4          THE COURT:  Let me try --

5          THE WITNESS:  Your Honor, could you

6     repeat the question?  You were muffled a little

7     bit.

8          THE COURT:  Do you have the exhibit in

9     front of you, 63 exhibit?

10          THE WITNESS:  I do.

11          THE COURT:  Are you familiar with it?

12          THE WITNESS:  The invoices, yes.

13          THE COURT:  No.  I am not saying the

14     invoice.  Are you familiar with this document?

15          THE WITNESS:  I am.

16          THE COURT:  What is it?

17          THE WITNESS:  They are invoices for

18     legal services.

19          THE COURT:  From who to who?

20          THE WITNESS:  I think Exhibit 63 was

21     from Jones Day to 3Cloud.

22          THE COURT:  To who?

23          THE WITNESS:  To 3Cloud.  That would

24     have come to me.  That was for legal services

25     rendered.

```
 1                    THE COURT:  Rendered to who?
 2                    THE WITNESS:  Rendered to 3Cloud which
 3      is --
 4                    THE COURT:  Is that your company?
 5                    THE WITNESS:  Yes.
 6                    THE COURT:  Who assembled this, do you
 7      know?
 8                    THE WITNESS:  The invoice, it would have
 9      been assembled by Mr. Ferrell.
10                    THE COURT:  Is he somebody who works at
11      your company?
12                    MR. FERRELL:  I am Mr. Ferrell, sir.  It
13      is the legal invoices that I sent to Mr. Rocco.
14                    THE COURT:  Your lawyer assembly of the
15      bills?
16                    THE WITNESS:  Yes.  My lawyer assembling
17      of the bills.
18                    THE COURT:  Well, do you happen to know
19      whether -- Are these supposed to be all the bills
20      that were sent to your company?
21                    THE WITNESS:  We have assembled all of
22      the bills that are relevant to this case, Your
23      Honor.
24                    THE COURT:  I see.  These are -- You are
25      familiar with the standard for assembling this
```

1    compilation?

2           THE WITNESS:  Yes.

3           THE COURT:  So everything to do with

4    bills you feel related to the defendant, the other

5    party in the case, the debtor?

6           THE WITNESS:  Yes, your Honor.  The

7    reason I feel confident in these invoices is

8    that --

9           THE COURT:  Did you assemble this

10    compilation or somebody else?  Mr. Ferrell, did

11    he -- I don't think I ought to let you testify to

12    it.

13           MR. FERRELL: Judge, my -- If I may,

14    these are each -- they are compilations of just the

15    invoices that were all individually sent to 3Cloud

16    to Mr. Rocco in which he reviewed and approved and

17    paid the invoices.  I am simply introducing them.

18              Mr. Rocco has, in fact, paid --

19    these invoices he paid in this case and the

20    District Court litigation.  They constitute claims

21    sought after in the claim.

22           THE COURT:  I don't think this witness

23    has knowledge of how this was assembled enough to

24    allow him to testify.

25           MR. FERRELL: Okay, just a couple

1    questions then, Judge.

2        Q.    Mike, the invoices from your law firms,

3    Epstein Becker Green now and when I was at Jones

4    Day and Mr. Sweeney's firm, Sweeney Scharkey, are

5    they sent to your attention?

6        A.    They are sent to my attention.

7        Q.    When you received those invoices for the

8    litigation brought against Mr. Adegoke and

9    Concurrency and Mr. Adegoke's bankruptcy, are you

10   the one who reviews and approves payment of this?

11       A.    That is right.

12       Q.    Do you approve the payment of the

13   invoices that are compiled here in Exhibits 63

14   through 67 that are being sought in the proof of

15   claim in this case?

16       A.    I include them and they have been paid.

17             THE COURT:  Sir, Mr. Rocco, did you read

18   the invoices before this compilation was made up?

19             THE WITNESS:  I have reviewed their

20   invoices, Your Honor.

21             THE COURT:  Did you know that each and

22   all of them are somehow pertinent to the defendant

23   or the other party?

24             THE WITNESS:  What I understand, Your

25   Honor, is that the work that was completed on the

```
 1    invoices --
 2              THE COURT:  The what?  Go ahead, finish
 3    your sentence.
 4              THE WITNESS:  No, your Honor, the work
 5    that is listed on the invoices is --
 6              THE COURT:  You didn't make up this
 7    exhibit, but the person that made it up should be
 8    the one who testifies.
 9                   Any other questions of the
10    witness?
11              MR. FERRELL: No more questions, Judge.
12              THE COURT:  Are you finished with the
13    witness on direct?
14              MR. FERRELL:  I have.
15              THE COURT:  Okay, how long of cross do
16    you want, Mr. Lloyd?
17              MR. LLOYD: Thank you, Your Honor.
18              THE COURT:  Pardon me?
19              MR. LLOYD: Yes.  May I cross examine the
20    witness?
21              THE COURT:  Do you want a recess?
22              MR. ADEGOKE:  I would ask for a recess.
23    I would like to talk to Mr. David.
24              MR. LLOYD: I think we could all use a
25    short break, Your Honor.
```

1          THE COURT:  Who wants to talk to who?

2          MR. ADEGOKE:  I would like to talk to my

3     attorney.

4          THE COURT:  Yes, your attorney, okay.

5     How much time do you need to recess?

6          MR. LLOYD: Fifteen minutes.

7          MR. ADEGOKE:  Fifteen would be great.

8          THE COURT:  How long?

9          MR. ADEGOKE:  Fifteen minutes, sir.

10          THE COURT:  Fifteen minutes, yes.  We

11     will recess until 2:30.

12          MR. ADEGOKE:  Attorney David Lloyd, can

13     you please call me on my cell phone?

14          THE CLERK:  Court is in recess until

15     2:30.

16               (Whereupon, a short recess was

17               taken)

18          THE COURT:  Nobody pays attention to the

19     pretrial order.  The documents were all supposed to

20     be identified 14 days in advance, otherwise all the

21     documents would come in without any trouble, but

22     these particular documents were added on the last

23     few days or a day or two before the trial started.

24               Counsel said he had enough time

25     to look at them.  I don't know why we are getting

1    this objection now.  I could apply the pretrial

2    order.  Every document identified by the creditor

3    would come right into evidence, no objection having

4    been filed.  I am not sure I should do that in this

5    case.

6                    All right, Mr. Lloyd, what do you

7    want to say about what the issue is at the moment?

8                    MR. LLOYD: Well, there is certainly

9    proof that regarding these documents, documents 63

10   and following --

11                   THE COURT:  No one has yet said that

12   this is a compilation of all the exhibits that were

13   sent out as lawyer bills that relate to this

14   debtor.  No one has yet said that clearly.

15                   MR. LLOYD: And --

16                   THE COURT:  Go ahead.

17                   MR. LLOYD: The creditor has not

18   identified any witness who can say what these are.

19   They got the bills and paid them.

20                   THE COURT:  Are you objecting to these

21   documents?

22                   MR. LLOYD: I am objecting to 63 and the

23   following because they were filed much later than

24   the others.

25                   THE COURT:  But didn't object to them

1    before.  Why raise it now?

2                MR. LLOYD: Your Honor has already called

3    them into question.

4                THE COURT:  What do you want to say,

5    Counsel Ferrell?

6                MR. FERRELL:  With respect to Exhibit 63

7    to 67, they are the legal invoices for --

8                THE COURT:  Can somebody be put on to

9    testify what these invoices are?

10                MR. FERRELL:  Mr. Rocco reviewed and

11    paid all of those invoices.  If you are talking

12    about the --

13                THE COURT:  If he could do that without

14    your taking the stand, then why don't we wait until

15    he testifies.

16                MR. FERRELL:  Mr. Rocco just testified

17    he is the one who paid the bills.

18                THE COURT:  Just testified?  Oh, Rocco,

19    did you pay these bills, sir?

20                THE WITNESS:  Yes, your Honor.  I

21    reviewed the bills.  I inspected the bills.

22                THE COURT:  What were the bills for?

23                THE WITNESS:  For legal services, sir.

24                THE COURT:  Do you want to tell me did

25    they have any particular legal services they were

1  for?

2  THE WITNESS:  They did.  They were in

3  support of the Adegoke case as we have been working

4  on for a number of years.

5  THE COURT:  What exhibits does your

6  testimony pertain to?

7  THE WITNESS:  If I am not mistaken --

8  THE COURT:  What is the numbers of the

9  exhibits your testimony pertains to?

10  THE WITNESS:  Yes, sir, it would be

11  Exhibit 63, Exhibit 64, Exhibit 65, Exhibit 66, and

12  67.  So, Your Honor, Exhibits 63 through 67

13  represent the legal fees incurred by 3Cloud that

14  were paid in the District Court in the bankruptcy

15  litigation over Mr. Adegoke's breach.

16  THE COURT:  Do you want to offer these

17  into evidence, sir?

18  THE WITNESS:  Yes.

19  MR. FERRELL:  Yes, Judge.

20  THE COURT:  Do you want to object to

21  them, Mr. Lloyd?

22  MR. LLOYD: I do, Your Honor.  I object.

23  THE COURT:  Go ahead and object to them.

24  MR. LLOYD: I am objecting on the basis

25  of hearsay.  These are documents that have not been

1    authenticated.  I didn't object to the document

2    coming in because we can certainly have Mr. Rocco

3    testify that he received them and paid them but --

4             THE COURT:  That is what he said.  He

5    sees them and pays them.  These are paid bills.  I

6    am going to admit them.  64, 65, 66 and did you

7    identify 67, sir?

8             THE WITNESS:  I did, sir.

9             THE COURT:  As what?  Identify them.

10   Tell me what they are.

11            THE WITNESS:  Those are legal fees

12   incurred from Epstein Becker Green for the Adegoke

13   bankruptcy.

14            THE COURT:  They are -- Look at all

15   these bills that have lines drawn through them.

16   What does that mean?  Do you have copies in front

17   of you?

18            THE WITNESS:  I do, sir.  The lines

19   would have been for -- Your Honor, if you see any

20   line that is stricken through services, those would

21   not have pertained -- those should have been

22   included.  All of the lines that were not -- all

23   the services --

24            THE COURT:  Sir, these are paid bills

25   for which the Circuit Court have nothing to do with

1    this case.

2              THE WITNESS:  That is correct, Your

3    Honor.

4              THE COURT:  Anything else for this

5    witness?

6              MR. FERRELL:  No, your Honor. Not from

7    3Cloud, Judge.

8              THE COURT:  What?  Do you have anymore

9    testimony for this witness?

10             MR. FERRELL:  Not on direct, not from

11   3Cloud.

12             THE COURT:  Okay, then are you ready

13   for cross, Mr. Lloyd?  Let's proceed with cross.

14                  CROSS EXAMINATION

15                    By Mr. Lloyd

16        Q.    Mr. Rocco, you testified that Mr.

17   Adegoke was the second employee that 3Cloud had

18   hired; is that right?

19        A.    That is correct.

20        Q.    When he left the company in October of

21   2017, how many employees did the company have?

22        A.    I would have to give you a rough

23   estimate in how many employees.  I don't have that

24   specific, but there were likely -- and that would

25   have been at the end of roughly 30, 35 employees.

1      Q.    Between the time that Mr. Adegoke

2  started with 3Cloud and the time that he left, how

3  many employees of 3Cloud had left the employment of

4  the company?

5      A.    I don't have that specific exact answer,

6  but I would assume we may have had in the area of

7  five to ten.  If you are asking for an answer that

8  I don't specifically have, I can give you an

9  estimate, so between five to ten people.

10           THE COURT:  Now, sir, you are not asked

11  to be an estimator.  You are asked to be a

12  testifier of information for which you have

13  personal knowledge of.  There is nothing shameful

14  in this world about saying I do not know.

15           THE WITNESS:  Thank you, Your Honor.  I

16  do not know.  Thank you.

17           THE COURT:  Did you get an answer to the

18  last question?

19           MR. LLOYD: I heard the answer:  I do not

20  know, Your Honor.

21           THE WITNESS:  I do not.

22           THE COURT:  He said that, okay.

23

24

25

1    BY MR. LLOYD:

2        Q.    I will ask you to turn to your

3    Creditor's Exhibit 1.

4        A.    Okay.  Let me just --

5              THE COURT:  What exhibit?

6              MR. LLOYD: Creditor's Exhibit 1.

7              THE WITNESS:  Mr. Lloyd, I do have that

8    in front of me.

9              MR. LLOYD: We will let the Court get

10   there.

11       Q.    You testified earlier that the first

12   part of this exhibit is your offer letter dated

13   October 21, 2016, and the second part is the

14   confidential information and non-solicitation

15   agreement, right?

16       A.    That is correct.

17       Q.    The letter portion dated October 21,

18   2016, it went out over your signature.  Did you end

19   up signing a copy of this letter?

20       A.    Yes.  There would be a signed copy.

21       Q.    Who prepared this letter?

22       A.    This letter was prepared by Jim Dietrich

23   and myself.

24       Q.    You testified earlier that Mr. Adegoke

25   negotiated salary and specifically about the

1    guaranteed bonus; is that correct?

2         A.    That is right.

3         Q.    Was there an earlier draft of this

4    letter that he received that had changes to or did

5    this letter incorporate non-written discussions

6    that you had about compensation?

7         A.    This was the final letter.  I don't

8    recall a previous draft.  This is the only draft

9    that I see.

10        Q.    It is fair to say that Mr. Adegoke

11   didn't draft any of the wording of this but that

12   you did agree before sending this letter to the

13   compensation terms?

14        A.    That is fair, yes.

15        Q.    The second part of this exhibit,

16   confidential information and non-solicitation

17   agreement, who prepared that?

18        A.    That would have been a document that

19   would have been prepared by our legal counsel at

20   the time, Jones Day, which is Mike Ferrell who is

21   on this call.

22        Q.    Did Mr. Adegoke discuss or change or add

23   any of the terms to this confidentiality agreement?

24        A.    No, I don't believe so.

25        Q.    You sent it to him and he initialed and

1    signed it?

2        A.    That is correct.

3        Q.    You previously described your company's

4    business as working with the Azure platform for

5    moving data from servers to the cloud, and I think

6    you testified that Microsoft and the Azure product

7    is not the only cloud-based storage.  I think you

8    cited as an example Google is one and Amazon is

9    another; is that correct?

10       A.    That is correct.

11       Q.    And there are other likely cloud service

12   companies?

13       A.    There are other cloud providers.

14       Q.    I am going to ask you to turn to Page 6

15   of the confidentiality agreement which is Page 10

16   of 12 of the document that was filed.

17       A.    I think I am here.

18       Q.    In the 3(a), definitions, Company's

19   Business?

20       A.    That is right.

21       Q.    So for the purpose of this agreement,

22   Company's Business is defined as it says there:  A

23   full service technology consulting firm that

24   provides cloud strategies, solutions, and managed

25   services and other terms for commercial clients

1    including, but not limited to, cloud modernization,

2    advanced data analytics, Internet of things, Azure

3    infrastructure services, and cloud applications

4    development.

5                        Did 3Cloud provide cloud

6    migration services for any company other than

7    Microsoft and any product other than Azure?

8         A.    No.  We were 100 percent focused on

9    Azure and no other cloud.

10        Q.    But what the employee is being limited

11   here is from doing anything that competes with the

12   company's business including, but not limited to,

13   client modernization, advanced data analytics,

14   Azure infrastructure services, and cloud

15   application development.

16                        Is it fair to say that if someone

17   went to work for a company that did migration of

18   data to a Google platform that that would fall

19   within this definition?

20        A.    It would not.  We were 100 percent and

21   are 100 percent focused on Azure.  The only

22   restriction we have here is Azure infrastructure

23   cloud related.

24        Q.    Then why does it say including but not

25   limited to?  Isn't it a fair reading to say that

1    cloud strategies including but not limited to cloud

2    modernization and Azure infrastructures would

3    include other types of migration services and other

4    cloud strategy solutions and managed services?

5        A.    That is not our intent.  Our intent was

6    only focused around protecting against Azure

7    infrastructure and Azure-related cloud services.

8        Q.    Even though that is not what the

9    document says?

10            MR. FERRELL:  Objection.  Asked and

11   answered.

12            MR. LLOYD: I am asking if it is his

13   testimony that that is what it was limited to even

14   though that is not what the document says.

15            MR. FERRELL:  Objection.  Asked and

16   answered.

17            THE COURT:  I am -- the documents, I

18   pick them as I read them, and I read them for what

19   they say, not for what somebody thought they may

20   have meant.  Does that help you folks at all?

21            MR. LLOYD: It does, Your Honor.  Thank

22   you.

23       Q.    Did Mr. Adegoke ever provide any

24   training service to other employees at your

25   company?

1    A.    Can you elaborate?  When you mean

2    training service, what does that mean?

3    Q.    Did he engage in training other

4    employees in any aspect of the business?

5    A.    Yes.  Part of his role to lead the

6    practice, he may have "trained" new employees.

7    Q.    Did he perform any accounting functions

8    for the company?

9    A.    No.

10   Q.    Did he perform any payroll functions for

11   the company?

12   A.    No.

13   Q.    When he provided whatever training he

14   did, that assisted the company in carrying on its

15   business; is that correct?

16   A.    Yes.

17   Q.    But his -- he wasn't hired as a trainer?

18   A.    No.

19   Q.    When you hired him, you didn't hire him

20   on the basis of experience or certification or

21   credentials in training?  It was just a good thing

22   that one employee would train another; is that

23   correct?

24   A.    As a condition and responsibility of the

25   role of the practice director is to not only hire

1    new employees but also to on-board them, coach

2    them, mentor them; and if that implies training

3    them, then that would be part of his

4    responsibility.

5        Q.    It certainly helped the company when he

6    trained other people; is that right?

7           MR. FERRELL:  Objection.  Asked and

8    answered.

9    BY MR. LLOYD:

10       Q.    I will ask you, Mr. Rocco, to turn to

11    Page 2 of the confidential information agreement.

12       A.    What page is that in the PDF?

13       Q.    It is Page 6 of 12.

14       A.    I am there.

15       Q.    Thank you.  We look at (ii), covenants

16    following termination.  Do you see that?

17       A.    I do.

18       Q.    Letter (D) says:  The employee will not

19    promote or assist, financially or otherwise, any

20    person, firm, association, partnership,

21    corporation, or other entity engaged in any

22    business which competes with the company's business

23    within the restricted territory.

24             If Mr. Adegoke had gone to work

25    for a competing business and done solely training,

1    would you testify that that would assist the

2    company?

3         A.    As long as it was outside of Azure.  Our

4    concern was the company's business of Azure.  If

5    that was outside of Azure, right, we would have

6    been okay with it.

7         Q.    But nonetheless, the agreement does say

8    employee will not assist?

9         A.    Will not assist, again, specifically

10   with Azure and on the infrastructure, that is

11   right.

12        Q.    So if a -- if Mr. Adegoke had gone to

13   work for some company and done training that you

14   already testified the training assisted the

15   company, that would have assisted the competing

16   company; is that correct?

17             MR. FERRELL:  Objection as to what "some

18   company" means.  Some company or a competing Azure

19   company?

20   BY MR. LLOYD:

21        Q.    A company that competes with the

22   company's business as defined within this

23   agreement.

24                  Let's say, since we knew he went

25   to Concurrency, if he had done training at

1      Concurrency, that would have assisted Concurrency;

2      is that correct?

3          A.    I am going to repeat your question only

4      because I want to make sure it is what I understand

5      what you said.

6                        If he would have gone to

7      Concurrency and --

8                    THE COURT:  Repeat the question,

9      Counsel.

10                   THE WITNESS:  Can you repeat the

11     question, please?

12     BY MR. LLOYD:

13         Q.    If Mr. Adegoke had gone to Concurrency

14     in the role of trainer and just went there to train

15     employees, would that have assisted that competing

16     business?

17                   MR. FERRELL:  Objection, vague.  What is

18     training on?

19                   THE COURT:  What, Counsel?

20                   MR. FERRELL:  I said vague as to what

21     the question applies to what Mr. Adegoke would be

22     training on.  Training on Azure or office training

23     on Office 365?  What is he training on?

24                   THE COURT:  Training on what?

25                   MR. LLOYD: Let's find it.  I am framing

1    my revised question on cloud application

2    development or on advanced data analytics or on

3    internet of things.

4            THE COURT:  Is that the question now?

5            MR. LLOYD: Yes.

6      Q.   If Mr. Adegoke had gone to Concurrency

7    and --

8            THE COURT:  Mr. Rocco, can you respond?

9            THE WITNESS:  I can.  That training

10   would be fine as long as it was not related to

11   Azure.

12   BY MR. LLOYD:

13      Q.   But you would agree that such training

14   would assist Concurrency if he did that training

15   for the company; is that right?

16          MR. FERRELL:  Objection.  Speculation on

17   what might assist Concurrency.

18          THE COURT:  If that is an objection, I

19   overrule it.  He may answer the question as best he

20   can, and let's get on to the next question.

21          THE WITNESS:  In training Concurrency on

22   how to use Azure in the way that he learned at

23   3Cloud would definitely benefit Concurrency.

24          THE COURT:  Mr. Rocco --

25

1    BY MR. LLOYD:

2         Q.    You testified that you received the

3    company laptop from Mr. Adegoke shortly after the

4    time he left the company; is that correct?

5         A.    That is correct.

6         Q.    And that there were no company files or

7    applications on the laptop when you received it; is

8    that correct?

9         A.    Correct.  Everything was destroyed.

10        Q.    Prior to the removal of data from that

11   laptop, was there anything on that laptop that did

12   not exist on 3Cloud's own servers?

13        A.    Mr. Lloyd, it is impossible for us to

14   know because when we got the laptop returned,

15   everything was destroyed.

16        Q.    So you can't really point to anything

17   that the company lost or had to recreate by the

18   removal of data from the laptop; is that correct?

19        A.    All the data was destroyed and erased,

20   but we can't -- that is correct.

21        Q.    You testified that you sent Mr. Adegoke

22   for training in Washington State on the Movere

23   software; is that correct?

24        A.    That is right.

25        Q.    What exactly is Movere?

1      A.    Movere is a tool.  It was a company on

2   its own.  Microsoft has since acquired that

3   company; but at the time, Movere was a tool that

4   companies like 3Cloud would use to run an

5   assessment of a company's data center, and what

6   that assessment would do is help to assemble what

7   is called the Azure consumption estimates.

8                    Think of it as the monthly Azure

9   bill, per se, that a company would incur if they

10   were to move their on-premise data center into

11   Azure, and without that, a company would need to

12   know that monthly bill before they would make the

13   decision to move to Azure.

14      Q.    Is it fair to describe Movere as

15   software that enables or assists in the movement of

16   data from servers to the cloud?

17      A.    That is not the way I would describe it.

18      Q.    How would you describe what the Movere

19   product is?

20      A.    What the Movere product is is it -- it

21   is an analysis tool.  It allows you to analyze an

22   existing environment, and then estimate if you were

23   to move that environment into Azure, what the Azure

24   consumption would be.

25                    It doesn't actually do the

1    migration, but it helps you assess financially how

2    much it would cost and also providing specific

3    sizing of the Azure environment that will enable

4    you to create the blueprints, the architectural

5    drawings that enabled the move.

6        Q.    Is there any other software that does a

7    similar job in assessing and measuring the cost and

8    the size of the move?

9        A.    There are other tools in the market that

10   perform that function.  This is Microsoft's.  At

11   the time it was Microsoft's preferred

12   recommendation, and they, in fact, acquired the

13   company.

14       Q.    Mr. Rocco, we stipulated, and this is a

15   stipulation that was filed with the Court, that a

16   company like 3Cloud can become a preferred Movere

17   vendor with a single Movere resource such as

18   Adegoke once trained on the Movere platform by

19   Unified Logic.

20             Is it your understanding that

21   that is a true statement?

22       A.    That process, to my understanding, is

23   correct.

24       Q.    Is there a benefit to 3Cloud being a

25   preferred Movere vendor?

1          A.     Absolutely.

2          Q.     I know you testified to some length

3     about the process, but what was the advantage that

4     3Cloud gained by being a preferred Movere vendor?

5          A.     That is a good question.  The advantage

6     is that when the Microsoft sellers work with their

7     customers to position these investments, they would

8     only reach out to Movere certified Microsoft

9     partners where 3Cloud at the time was one of them

10    to complete the assessments.

11               So said a different way, if you

12    were not a certified partner, where Concurrency was

13    not a certified partner at the time when Mr.

14    Adegoke joined, that lead, that introduction that

15    Microsoft would provide would not -- would go to

16    3Cloud as opposed to Concurrency.

17         Q.     So at the time that Mr. Adegoke started

18    with 3Cloud, did the company have any other Movere

19    vendors, or excuse me, Movere trained employees?

20         A.     Could you repeat that question?  At the

21    time --

22         Q.     When Mr. Adegoke started with 3Cloud,

23    did 3Cloud have any other Movere trained employees?

24         A.     No.  We invested in Mr. Adegoke

25    receiving the training and sent him to Bellevue,

1      Washington to receive that certification.

2          Q.    That was in view of the advantage that

3      3Cloud would gain by being a preferred Movere

4      vendor; is that correct?

5          A.    That is correct.

6          Q.    It was an investment in being able to

7      seek out other business by becoming a preferred

8      Movere vendor, correct?

9          A.    That is right.

10         Q.    It wasn't a favor to Mr. Adegoke?  You

11     were expecting to gain benefits from this?

12         A.    Well, it was two-fold.  One is we wanted

13     to receive certification, but secondarily, we

14     wanted to invest in Mr. Adegoke as we brought him

15     on board to build a practice.

16         Q.    I will ask you to turn to Creditor's

17     Exhibit 27.

18         A.    I do have the exhibit.

19         Q.    When you testified about this document

20     earlier, I think you said something about files

21     being copied.  Do you recall that testimony?

22         A.    I do.

23              MR. FERRELL:  Objection.  Mr. Rocco

24     actually didn't testify about Exhibit 27.  We were

25     on Exhibit 24, Attachment 1 to Exhibit 24.

1        THE COURT:  I agree what you want to ask

2   him about but tell him which one you want to ask

3   him about.

4   BY MR. LLOYD:

5        Q.    Well, when you testified about Exhibit

6   24 and Attachment 1, is it correct that Attachment

7   1 to Exhibit 24 is an excerpt of this Exhibit 27?

8        A.    It is.

9        Q.    In your testimony, you said something

10  about files being copied.  Do you remember that

11  testimony?

12       A.    I do.

13       Q.    Reading through this, I see a column

14  that is headed Operations and the notation file

15  access numerous times, page after page after page.

16       A.    That is right.

17       Q.    Is there some sort of notation here that

18  says file copied or am I missing something?

19       A.    There is not a notation, but you are

20  missing something here.

21       Q.    Okay.  Does file access here mean what

22  we all understand accessing a file means, opening,

23  viewing, perhaps using?

24       A.    In this case, Mr. Lloyd -- and Jim

25  Dietrich, in his testimony, will prepare to go

1    through this very detailed.

2               In this case, given the quantity

3    of files accessed and in the timeframe in which

4    they were accessed, what this implies is that they

5    were --

6    Q.    Mr. Rocco, I am not asking what these

7    words imply.  I am asking what the meaning of the

8    word file access is, if you know it?

9    A.    File access in the case of this exhibit

10    means copied.

11    Q.    So when the company uses words, it

12    doesn't always mean what the words say?  It is

13    specific to its own practices; is that what you are

14    saying?

15    A.    Jim Dietrich will go through the

16    explanation of this at length.

17            THE COURT:  To the extent that you had

18    to ask him whether the company uses words they

19    don't necessarily mean, use words that mean what

20    they say, to that question I sustain my objection.

21            MR. LLOYD:  Thank you, Your Honor.

22            THE WITNESS:  My apologies.  Am I asked

23    to answer that question.

24            MR. LLOYD:  No.  The question has been

25    stricken.

1          THE WITNESS:  Thank you.

2          MR. LLOYD:  Your Honor, I have no

3     further questions of this witness.

4          THE COURT:  Redirect.

5               REDIRECT EXAMINATION

6                    by Mr. Ferrell

7     Q.    Mike, can you get Exhibit 1 in front of

8     you?

9     A.    I can.

10         THE COURT:  Go back to Exhibit 1?

11         MR. FERRELL:  Yes, Judge.

12    Q.    Specifically, Mike, I want you to go to

13    the second page of the confidentiality agreement.

14    A.    Mr. Ferrell, is that Page 6 in the PDF?

15    Q.    Yes.

16    A.    Okay.  I am there.

17    Q.    Counsel asked you about a restriction

18    that is listed in (D) under (ii) about promote or

19    assist.  Do you see that?  Are you on the right

20    page?

21    A.    Promote or assist financially or

22    otherwise?

23    Q.    Right.

24    A.    Okay.

25    Q.    Is that a provision that 3Cloud is

1   actually contending Mr. Adegoke breached either in

2   the District Court case or in this case?

3       A.   Yes.

4       Q.   When you testified earlier, you talked

5   about the provisions that Mr. -- that 3Cloud

6   contends Mr. Adegoke breached in (A) and (B) above

7   that.  Do you see that?

8       A.   That is correct.

9       Q.   So I will ask you again:  Is D an issue

10  in the case from 3Cloud's perspective?

11           MR. LLOYD: Asked and answered.  Counsel

12  didn't get the answer he liked, and he is trying to

13  get the witness to back off of his answer.

14           THE WITNESS:  As I look at it now --

15           THE COURT:  The answer to the last

16  question, again, if necessary or with a different

17  innuendo?

18  BY MR. FERRELL:

19      Q.   Can you answer the question?  At the

20  bottom of the page --

21           THE COURT:  Do you want to repeat the

22  question so that he can answer it again?

23           MR. FERRELL:  Yes, Judge.

24      Q.   Mr. Rocco, you testified earlier about

25  the provisions that 3Cloud was contending were

1    issues.  We talked about (A) and (B) above, and now

2    I am asking you about (D).

3                       Is 3Cloud contending Mr. Adegoke

4    breached D?

5    A.    Let me just read the -- You are talking

6    about (D) under (ii); is that correct?

7    Q.    Yes, 2(ii), that would be following

8    termination, not during employment.

9    A.    I am not concerned about (D).

10    Q.    If you could turn to Section 5 which is

11    the third page from the end of the exhibit.

12    A.    Is that -- Which page of the PDF is

13    that, Mr. Ferrell?

14    Q.    I believe it is ten.

15    A.    Okay.  I am here.

16    Q.    You see at the bottom of the page there

17    is a section called severability in Section 5?

18    A.    I do see that.

19    Q.    The first sentence talks about whenever

20    possible, each provision of this agreement shall be

21    interpreted in such a manner as to be effective and

22    valid under applicable law.  Do you see that?

23    A.    I do.

24    Q.    And the last phrase of severability it

25    says -- the last line:  But this agreement shall

1  be -- I am sorry.  It says:  But if any provision

2  of this agreement is held to be invalid or

3  unenforceable in any respect under any applicable

4  law, such invalidity or unenforceability shall not

5  affect any other provisions but this agreement

6  shall be reformed, construed or enforced as if such

7  invalid or unenforceable provision had never been

8  contained herein.  Do you see that?

9       A.    I see that.

10          THE COURT:  What question do you want to

11  ask him about that?

12  BY MR. FERRELL:

13       Q.    With respect to Counsel's question with

14  you on cross about whether the provision (D) under

15  the restriction of promote or assist was too broad,

16  if it were deemed to be too broad by this Honorable

17  Court in the agreement, do you understand Section 5

18  would strike the Section D?

19       A.    That is right.

20       Q.    The rest of the agreement would continue

21  as if Section D did not exist in the agreement,

22  correct?

23          MR. LLOYD: Objection, your Honor.  Calls

24  for a legal conclusion.

25          THE COURT:  That last question back

1    slowly, please.

2    BY MR. FERRELL:

3        Q.    If under the agreement in Section (D)

4    were found to be overly broad and not enforceable

5    under Section 5, it would strike that Section D and

6    the rest of the agreement would continue as if it

7    was not in here?

8                MR. LLOYD: My objection is --

9                THE COURT:  Is that what you are asking

10   what the legal effect of overbroad means?

11               MR. FERRELL:  No.  The meaning of the

12   severability clause, the intent of Section 5 of the

13   agreement.

14               THE COURT:  I will sustain the

15   objection.

16               MR. FERRELL:  No further questions.

17               MR. LLOYD: Nothing on recross.

18               THE COURT:  I think we are finished, so

19   we will excuse the witness which I am sure will be

20   glad.

21                   Now, I think we will start again

22   tomorrow.  How long will you take for the next

23   witness, Counsel?

24               MR. SWEENEY:  I would guess, Your

25   Honor --

1     THE COURT: Who will the next witness

2 be?

3     MR. SWEENEY: Robert Sweeney on behalf

4 of the creditor. We will be calling Mr. Adegoke,

5 the debtor.

6     THE COURT: There is no person with the

7 name Sweeney on the witness list, is there?

8     MR. SWEENEY: No. This is counsel for

9 3Cloud, Robert Sweeney. We will be calling Mr.

10 Adegoke, the debtor, as our next witness.

11     THE COURT: The debtor, okay. Do you

12 want to get started now for 20 minutes or so?

13     MR. SWEENEY: Yes. We could do that.

14     THE COURT: All right.

15     Sir, will you please raise your

16 right hand and be sworn.

17        (Witness sworn)

18     THE CLERK: Please state your name and

19 spell it for the record.

20     THE WITNESS: My name is Adetayo

21 Adegoke, spelled A-d-e-t-a-y-o. Last name is

22 spelled A-d-e-g-o-k-e.

23     MR. SWEENEY: May it please the Court.

24     THE COURT: Please.

25

1                         ADETAYO ADEGOKE

2    having been first duly sworn, was examined and

3    testified as follows:

4                      DIRECT EXAMINATION

5                    by Mr. Robert Sweeney

6        Q.    Good afternoon, Mr. Adegoke.

7        A.    Good afternoon.

8        Q.    I would like to start by directing your

9    attention to Exhibit 1.  This is the copy of the

10   offer letter and restricted covenant that you

11   received from 3Cloud on or around October 21st of

12   2016; is that correct?

13       A.    That is correct.

14       Q.    If you go to the very last page of the

15   exhibit which is the fifth page of the covenant,

16   that is your signature at the bottom; is that

17   correct?

18       A.    That does look like my signature.

19       Q.    Then if you could -- Each page of that

20   restrictive covenant has your initials in the lower

21   right corner, AA?  These are your initials,

22   correct?

23       A.    As far as I remember, correct.

24       Q.    You reviewed this document and you

25   initialed each page, and then when you were done

1    reviewing it, you signed the agreement, correct?

2        A.    I don't remember exactly what I did,

3    let's see here, five years ago with this particular

4    agreement.

5            THE COURT:  There is an old saying which

6    I really like.  You don't have to read anything you

7    sign but you are bound by it any way.

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Do you like that saying,

10   folks?

11                At any rate, I didn't mean to

12   interrupt.  Go on to the next question.

13   BY MR. SWEENEY:

14       Q.    Then, Mr. Adegoke, on the last page of

15   the offer letter which, I believe, is at the bottom

16   Bates stamped 3Cloud 000294, that is your signature

17   as well, correct?

18       A.    That does look like my signature.

19       Q.    And you wrote in the date of October 21,

20   2016, correct?

21       A.    Which page are you referring to,

22   Counsel?

23       Q.    The exact same page.

24       A.    What is that exact same page?  What is

25   the page number, Counsel?

1        Q.      I just asked you if that was your

2    signature on Page 3Cloud 000294 which is the last

3    page of your offer letter, and you said yes, it is,

4    and then I said, you wrote the date right

5    underneath of October 21, 2016, correct?

6        A.      And I am looking at two places that have

7    dates.  Which one are you referring to?  That is

8    what I am asking for.

9        Q.      Are you on the last page of the offer

10   letter at the bottom it says 3Cloud 000294?

11       A.      000294.  Okay, I believe you are

12   referring to Page 4 of 12 of PDF.  Yes, that looks

13   like my handwriting.

14       Q.      Okay.  So let's confirm it then.

15               Is that your signature?

16       A.      It does look like my signature.

17       Q.      And that is your handwriting with the

18   dates?

19       A.      It does look like my handwriting as

20   testified.

21       Q.      If you could go to the actual

22   confidential information non-solicitation agreement

23   which is attached to the letter and go to Section 2

24   (e).

25       A.      This is Exhibit 1, Section 2(e), and I

1   believe you are referring to further covenants?

2        Q.    Exactly.  The title of the paragraph is

3   Further Covenants.  I would direct your attention

4   to Subparagraph 2 which actually starts on the next

5   page.  Do you see that?

6        A.    I see it.  I would also like to just

7   mention something very quickly.

8                   I have testified, Judge, in a

9   deposition to these questions and to these

10  documents.

11                  THE COURT:  Yes.

12                  THE WITNESS:  Should I -- what I would

13  be saying consistent to what I testified to

14  previously would be that I have already testified

15  to these, and I would like my answer to be

16  consistent with what is already on record in the

17  deposition because there is a lot of stuff to talk

18  about that is over five years and two employers

19  ago.

20                  THE COURT:  Are you trying to raise an

21  objection to your testifying?

22                  THE WITNESS:  I am, Judge, because I

23  have already testified --

24                  THE COURT:  It is repetitive.  I

25  understand.  While he is entitled to take your

1 testimony at trial, and even though it is

2 repetitive of what you have already testified to,

3 the lawsuit has been going on such a long time, you

4 will have to go on a little while longer while we

5 finish.

6        Next question, sir.

7 BY MR. SWEENEY:

8    Q.  So, Mr. Adegoke, Section (e) Sub 2 says:

9 The employee agrees upon termination of his

10 employment with the company, for any reason,

11 employee shall return to the company in good

12 condition all property of the company including,

13 without limitation, the originals and all copies of

14 any materials which contain, reflect, summarize

15 describe, analyze, or refer or relate to any items

16 of information listed in Subparagraph 2(e)(i) of

17 this agreement.

18       In the event such items are not

19 so returned, the company will have the right to

20 charge employees for all reasonable damages, cost,

21 attorneys' fees, and other expenses incurred in

22 searching for, taking, removing and/or recovering

23 such property.

24       Did you agree to that provision

25 when you signed your name --

1          THE COURT:  Sir, sir.  His signature has

2     been acknowledged, so I take it he has agreed to

3     it.

4               Is there any dispute about this

5     document?  Does anybody wish to offer the document

6     in evidence which nobody has bothered to do yet?

7          MR. SWEENEY:  We would definitely like

8     to offer the document into evidence, Your Honor.

9          THE COURT:  Is there any objection to my

10    taking it into evidence?

11         MR. LLOYD: No, there isn't, Your Honor.

12    Actually, I understood the pretrial order to

13    provide that without objection all documents to

14    come in.

15         THE COURT:  Yes, that is true, but we

16    have a little unusual problem with a pretrial

17    order.  Nobody followed it, and I am hesitant to

18    admit documents without everybody knowing that they

19    are being admitted.

20              This document is admitted, and I

21    do urge anybody that wants other documents to be

22    admitted to make a motion to admit them.

23         MR. SWEENEY:  Your Honor, we were

24    operating under the same understanding as

25    Mr. Lloyd, that the documents were already

1    admitted, but we will do that.

2            THE COURT:  All right.  Do you wish to

3    offer admission of all documents of the debtor --

4    of the creditor?

5            MR. SWEENEY:  We do.

6            THE COURT:  1 through 67, I think it is,

7    right?

8            MR. SWEENEY:  Right.

9            THE COURT:  Do you wish to offer them

10    pursuant to the pretrial order, right?

11            MR. SWEENEY:  Correct.

12            THE COURT:  Do you have any objection,

13    sir?

14            MR. LLOYD: No, I don't, Your Honor.

15            THE COURT:  They will all be admitted

16    pursuant to the pretrial order without objection.

17                (Whereupon, Exhibit Numbers 1

18                though 67 were received into

19                evidence)

20            THE COURT:  Go ahead, sir.

21

22

23

24

25

1    BY MR. SWEENEY:

2         Q.     So Section 2 referred to -- it said

3    half way down that you would return in good

4    condition all documents, materials that refer or

5    relate to any items contained in 2(e)(i) which is

6    directly above that, and I would direct your

7    attention to the second sentence of Section 2

8    (e)(i) which says:  Such confidential information

9    shall include.  Do you see that, Mr. Adegoke?

10              THE COURT:  What is the question, sir?

11              MR. SWEENEY:  I am directing him to the

12   portion of the --

13              THE COURT:  Sir, do you have a question

14   of the witness?

15              MR. SWEENEY:  I do.

16              THE COURT:  Ask it.

17   BY MR. SWEENEY:

18        Q.     Mr. Adegoke, did you have on your laptop

19   information regarding the company's selling,

20   manufacturing, and servicing method?

21        A.     I don't remember what I had specifically

22   on the laptop five years ago.

23        Q.     We can't check today because you wiped

24   all those files out, right?

25        A.     I cannot speak to your abilities to

1    check the laptop.  That is not in my purview.

2                    THE COURT:  Wait.  Stop, Counsel.

3                        Let me ask you:  Sir, before you

4    returned the laptop, was there material of any sort

5    on it?

6                    THE WITNESS:  There would have been, and

7    there would have been copies of those materials on

8    3Cloud's network because that is how --

9                    THE COURT:  Did you remove material that

10   was on the laptop before you returned the laptop?

11                   THE WITNESS:  I did not, Judge.

12                   THE COURT:  Who did?

13                   THE WITNESS:  I do not --

14                   THE COURT:  Can you answer my question?

15                   THE WITNESS:  I do not -- I don't

16   know -- Nobody, Judge, from my --

17                   THE COURT:  Sir, is somebody objecting

18   to the question?

19                   MR. LLOYD: I am really not in a position

20   to object to the Court's question, but I am trying

21   to be helpful by saying that --

22                   THE COURT:  Sir, if you are not

23   objecting to the Court's question, please remain

24   until I get an answer.

25                        Is anybody objecting to the

1  Court's question?

2            Okay, now, sir, I am asking you:

3  Who did remove from the computer materials that

4  were on it before you returned the computer?

5            THE WITNESS:  I wiped the computer,

6  Judge, and the reason why I wiped --

7            THE COURT:  Yes, go ahead.

8            THE WITNESS:  The reason why I wiped the

9  computer, Judge, was because I was going to be

10 shipping the computer back to 3Cloud.

11            In transit I was concerned about

12 having data -- copies of data that 3Cloud already

13 had access to to be out of my control.  Knowing

14 that they have copies to all pertinent data that I

15 have ever worked on, I wiped it to remove that risk

16 from myself while having that data potentially go

17 to someone else while in transit through FedEx.

18            THE COURT:  You just testified that you

19 knew that they had copies of everything that was on

20 the computer, right?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  How do you know that?

23            THE WITNESS:  Because there is a

24 technology.  It is one of the cloud technologies,

25 Judge.  It is called one drive, and one drive --

1    what it does is as you are working on files, it

2    takes the copy of that -- those files and it moves

3    them, copies them to the cloud so --

4              THE COURT:  To the cloud?

5              THE WITNESS:  To the cloud, correct.

6                   By the way, Judge, this is not --

7    Azure is not the only Microsoft cloud.  One drive

8    is yet another Microsoft cloud where copies of data

9    that 3Cloud has access to exist.

10             THE COURT:  Okay, Counsel.  Back to you.

11   So your answer -- you have given an answer to my

12   question.

13                   Does Counsel wish to ask any

14   further questions before we break?

15             MR. SWEENEY:  I would like to cover one

16   thing, Your Honor, before we take that break.

17                   I went around and around with Mr.

18   Adegoke as to what steps he took to preserve the

19   hard drive and the laptop, and I would like to

20   follow up with him as to the answers he gave at his

21   deposition with regard --

22             THE COURT:  You have some questions to

23   ask on that subject?

24             MR. SWEENEY:  I do.

25        Q.    Mr. Adegoke, do you recall sitting for

1    your deposition with me back in October of last

2    year?

3         A.    I recall having a deposition, correct.

4         Q.    And I asked you questions under oath

5    about the laptop and what steps you took to

6    preserve it, right?

7         A.    You did.

8         Q.    In fact, on Page 155 of your deposition,

9    Line 15, I asked you the following question and you

10   gave me the following answer.  Question:  Did

11   you --

12             THE COURT:  Do you have the transcript

13   with you?

14             MR. SWEENEY:  I do.  I don't have --

15             THE COURT:  You have to show it to the

16   witness.

17             MR. SWEENEY: I am not able to do that at

18   the moment.

19             THE WITNESS:  I don't think the --

20             THE COURT:  Counsel, just a second.  Do

21   you want to impeach him in any way?  Show the

22   transcript to the witness and the page that you

23   want.

24             MR. SWEENEY:  Okay.  Can we -- I can --

25   What I can do is we could continue this until

1  tomorrow, if you would like.  I can make sure he

2  has the transcript.

3          THE COURT:  If you have a transcript,

4  Counsel, you bring it and show it to the witness.

5  Has it been signed by the witness?

6          MR. SWEENEY:  He has waived his

7  signature.

8          THE COURT:  He has?  Yes?  Is that a

9  yes?

10          MR. SWEENEY:  He waived signature.

11          THE COURT:  Oh, he waived his signature.

12  Well, then he is going to have to -- we are going

13  to have to have somebody like a court reporter to

14  testify as to his deposition.

15          MR. SWEENEY:  It is a certified copy,

16  Your Honor.

17          THE COURT:  Oh, is it?  Oh, there we go.

18  Actually, perhaps, we don't need all the bells and

19  whistles.

20                  I think it is time.  We have had

21  enough today, and sir, I am addressing the debtor,

22  I am very grateful for you being here today, and

23  you are going to have to be here tomorrow starting

24  at 1:00 o'clock.  Please be here tomorrow.  He is

25  going to ask you about that deposition.  You might

1    have your copy with you so you can convene and look

2    at it.  We are going to recess until 1:00 o'clock

3    tomorrow.

4                    MR. LLOYD: If I may, Your Honor, if

5    Counsel can send me a copy of the deposition, I

6    will make sure that Mr. Adegoke has it.

7                    MR. SWEENEY:  I will do that.

8                    THE WITNESS:  And that goes back, Judge,

9    to I have literally testified through depositions

10   for grilling for about, I would say, almost six to

11   eight hours.

12                   THE COURT:  You can be grateful that you

13   are close to the end of the case.  Good night,

14   folks.

15                        (Which were all the proceedings had

16                         in the above-entitled cause,

17                         March 22, 2021, 10:00 o'clock

18                         a.m.)

19

20   I, PAULA O'DRISCOLL, CSR, DO HEREBY CERTIFY THAT
     THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
     PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.)(s/s)

21

22

23

24

25