# EXHIBIT 17

**Fill in this information to identify the case:**

Debtor 1    Adetayo Adegoke

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern District of Illinois

Case number    19-34092

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. **Who is the current creditor?** | 3Cloud, LLC | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. **Has this claim been acquired from someone else?** | ☑ No ☐ Yes.  From whom? | |
| 3. **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | Sweeney Scharkey & Blanchard / Garrett Nye | |
| | Name | Name |
| | 230 W. Monroe St., Suite 1500 | |
| | Number          Street | Number          Street |
| | Chicago             IL          60606 | |
| | City                State          ZIP Code | City                State          ZIP Code |
| | Contact phone  312-384-1287 | Contact phone |
| | Contact email  gnye@ssbpartners.com | Contact email |
| | | |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | |
| 4. **Does this claim amend one already filed?** | ☑ No ☐ Yes.  Claim number on court claims registry (if known) _____        Filed on ____ / __ / ____  MM / DD / YYYY | |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No ☐ Yes.  Who made the earlier filing? _____ | |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____ Unliquidated . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Breach of Contract

**9. Is all or part of the claim secured?**

☑ No
☐ Yes.    The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                 $_____
**Amount of the claim that is secured:**    $_____
**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | | |
|---|---|---|---|
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | |
| | | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:  Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    01/22/2020
                MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Garrett H. Nye |
|---|---|
| | First name      Middle name      Last name |
| Title | Attorney for Claimant |
| Company | 3Cloud, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 230 W. Monroe St., Suite 1500 |
| | Number     Street |
| | Chicago                IL      60606 |
| | City                State     ZIP Code |
| Contact phone | 312-384-1287      Email   gnye@ssbpartners.com |

**Attachment to Proof of Claim**

Debtor is a former employee of 3Cloud. Shortly after resigning, Debtor was hired by Concurrency, Inc., 3Cloud's competitor. Around this time, 3Cloud became aware that Debtor misappropriated certain trade secrets belonging to 3Cloud. Among other things, these actions constituted breaches of the terms of Debtor's Employment Agreement and/or Confidential Information and Non-Solicitation Agreement (together, the "Agreements"). Accordingly, on January 4, 2018, 3Cloud filed its Complaint in the United States District Court for the Northern District of Illinois, thereby commencing *3Cloud, LLC v. Concurrency, Inc. and Adetayo Adegoke*, Case No. 1:18-CV-0076 ("District Court Litigation"). In its Complaint, 3Cloud seeks recovery of damages resulting from Debtor's actions. A true and correct copy of the Complaint is attached hereto as Exhibit "A." 3Cloud is also entitled to attorneys' fees on an order sanctioning Debtor for discovery violations. A true and correct copy of the minute order awarding sanctions is attached hereto as Exhibit "B." 3Cloud is currently calculating the precise amount of its damages it has suffered and will amend this proof of claim as is appropriate.

**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| 3CLOUD, LLC, | Civil Action No. |
| Plaintiff, | |
| v. | Judge |
| | Magistrate |
| CONCURRENCY, INC., and ADETAYO ADEGOKE, | |
| | Demand for Jury Trial |
| Defendants. | |

## COMPLAINT

Plaintiff 3Cloud, LLC ("3Cloud" or the "Company"), by and through its undersigned counsel, for its Complaint against Defendants Concurrency, Inc. ("Concurrency") and Adetayo Adegoke ("Adegoke") (collectively "Defendants") states as follows:

## NATURE OF THE ACTION

1.      This is an action for damages, equitable relief, and permanent injunctive relief based on Defendants' theft of 3Cloud's confidential information and trade secrets, tortious conduct, and Mr. Adegoke's breach of his employment agreement. Founded by former Microsoft executives, 3Cloud is the premier technology consulting firm in Chicago that helps businesses transition to and maximize the Microsoft Azure platform. 3Cloud helps businesses develop applications and processes to take advantage of cloud computing, using the Azure platform to provide better data services and analytics, cloud-scale infrastructure, and a host of other capabilities that

Microsoft Azure makes possible for small businesses or enterprise clients seeking public, private or hybrid cloud solutions.

2.     3Cloud spends substantial sums protecting its confidential and proprietary information and in educating its employees in processes and training that make 3Cloud the premier Microsoft Azure partner for businesses seeking to improve or create a cloud presence.

3.     During the late summer and fall of 2017, unbeknownst to 3Cloud, Adegoke, 3Cloud's former Practice Director for Cloud Infrastructure and Principal Architect, began a calculated and deceitful enterprise of accessing and stealing proprietary and confidential documents from 3Cloud so that he could utilize that information in subsequent employment he would obtain with one of 3Cloud's direct competitors, Defendant Concurrency.

4.     As a result, Adegoke has violated multiple provisions of his employment agreements, entitling 3Cloud to the relief sought in this action. Additionally, Concurrency's conduct in knowingly continuing to employ Adegoke in violation of his contractual obligations to 3Cloud and with the intent of using his knowledge, training and experience gained at 3Cloud, including the inevitable disclosure of its illegally acquired confidential information and trade secrets, tortiously interfered with 3Cloud's contract with Adegoke.

5.     Adegoke further breached his fiduciary duty of loyalty to 3Cloud by stealing 3Cloud's trade secrets and confidential information while employed by 3Cloud and then attempting to cover his trail and lie about what he did.

## PARTIES

6.     3Cloud is a Delaware limited liability company, with its principal place of business at 3025 Highland Parkway in Downers Grove, Illinois.

7.     On information and belief, Adegoke is an Illinois resident who resides at 4756 South Drexel in Chicago, Illinois.

8.     Concurrency is a Wisconsin corporation doing business in Illinois with offices at 150 North Wacker Drive in Chicago, Illinois.

## JURISDICTION AND VENUE

9.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of 18 U.S.C. § 1832 and 18 U.S.C. § 1030, and 28 U.S.C. § 1367(a) permits supplemental jurisdiction over the remaining state-law claims.

10.     Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because this action arises from a contract in which a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS
## COMMON TO ALL COUNTS AND ALL DEFENDANTS

### Adegoke's Agreements with 3Cloud

11.     On or about October 21, 2016, 3Cloud offered Adegoke employment with the Company at an annual base salary of $175,000. His position was Practice Director – Cloud Modernization, and in that capacity he was responsible for, among other things, building out the Cloud Modernization services organization,

3

participating in presales activities with potential customers, and running all aspects of delivery to potential clients and clients.

12. In conjunction with his acceptance of the offer of employment from 3Cloud, Adegoke signed an Employment Agreement ("Employment Agreement") and a Confidential Information and Non-Solicitation Agreement ("Confidentiality Agreement"), true and accurate copies of which are attached hereto and the terms are fully incorporated herein as Exhibit A and Exhibit B, respectively.

13. As part of the Employment Agreement, 3Cloud gave Adegoke a guaranteed first year $35,000 bonus as consideration for Adegoke executing the Confidentiality Agreement. The guaranteed bonus was payable to Adegoke in two installments, on July 31, 2017 and January 31, 2018, provided Adegoke was employed on the date of payment. In the event Adegoke's employment was separated before July 31, 2017, 3Cloud had the option to pay Adegoke the sum of $10,000 as consideration for the Confidentiality Agreement. (Exhibit A at 1-2; Exhibit B ¶ 1.)

14. 3Cloud paid Adegoke the first guaranteed bonus installment of $17,500 on July 31, 2017 in exchange for Adegoke signing the Confidentiality Agreement.

15. Adegoke voluntarily resigned his employment with 3Cloud before the second guaranteed installment was due. Specifically, Adegoke notified 3Cloud on October 8, 2017 that he would resign in two weeks in order to accept other employment. At the time, Adegoke declined to provide information about his new employment, which turned out to be with Concurrency in direct violation of the post-employment restrictions in Adegoke's Confidentiality Agreement.

16.     Under the Confidentiality Agreement, Adegoke agreed that he would, during the course of his employment, have access to confidential documents and information; that he would be brought into frequent contact with existing and potential customers of the Company; and that the Company had developed its confidential information and trade secrets through the substantial expenditure of time, effort and money.  Adegoke further agreed that he would not disclose this information.  (*See* Exhibit B ¶ 2(a).)

17.     Adegoke agreed in the Confidentiality Agreement that:

> (ii) For a period of (12) months following the termination of Employee's employment with the Company, Employee will not:
>
>> (A) enter into or engage in any business which competes with the Company's Business within the Restricted Territory;
>>
>> (B) solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;
>>
>> (C) divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or
>>
>> (D) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation, or any other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(Exhibit B ¶ 2(b)(ii)(A-D).)

18.     The Confidentiality Agreement further provides:

> (i)     Employee will keep in strict confidence, and will not, directly or indirectly, at any time, during or after

5

Employee's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any trade secrets, or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Employee may have acquired such information. Such confidential information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses, and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information. Employee specifically acknowledges that all such confidential information, whether reduced to any form of writing, maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by the Company, and/or Employee, derives independent economic value from not being readily known or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by Employee during Employee's employment with the Company (except in the course of performing Employee's duties and obligations to the Company) or after the termination of Employee's employment shall constitute a misappropriation of the Company's trade secrets.

(ii)   Employee agrees that upon termination of his employment with the Company, for any reason, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement. In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing, and/or recovering such property.

6

(Exhibit B ¶ 2(e)(i-ii).)

19. With respect to the relief available under the Confidentiality Agreement, it states:

> i. Employee acknowledges and agrees that the remedy at law available to the Company for breach of any of Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provisions contained in subparagraphs 2(b), 5(d), 5(e), 5(f), 5(g) and 5(h) inclusive, of this Agreement, without the necessity of proof of actual damage.

(Exhibit B ¶2(i).)

20. With respect to Adegoke's concurrence that the restrictions of the Confidentiality Agreement are reasonable, the Confidentiality Agreement states:

> j. Employee acknowledges that the Employee's obligations under this paragraph 2 are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Employee were to violate such obligations. Employee further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration, which Employee acknowledges constitutes good, valuable and sufficient consideration.

(Exhibit B ¶2(j).)

21. The Confidentiality Agreement defines Company's Business and Restricted Territory as:

> (a) "Company's Business" means a full service technology consulting firm that provides cloud strategies, solutions and managed services for commercial clients, including but not limited to, cloud modernization, advanced data analytics,

7

Internet of Things, Azure infrastructure services and cloud applications development.

(b) "Restricted Territory" means (i) the geographic area(s) within a one-hundred (100) mile radius of Chicago; (ii) the State of Texas, and (iii) all of the specific customer accounts, whether within or without the geographic area described in (i) or (ii) above, which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

(Exhibit B ¶3(a-b).)

### Adegoke's Prior Job Experience and Performance at 3Cloud

22.    Adegoke's primary job experience prior to coming to 3Cloud was in the desktop environment.

23.    Nonetheless, Adegoke billed himself as having greater experience in cloud infrastructure and digital transformation projects than he actually had.

24.    At various times, when called upon to perform tasks appropriate for a Practice Director, Adegoke had to admit that he had never done such work before. For example, prior to working for 3Cloud Adegoke had not done a cloud data migration for a business.

25.    3Cloud nonetheless invested significant resources in training Adegoke in all aspects of its business.

26.    For example, in addition to providing Adegoke access and training with respect to all of 3Cloud's methods, strategies, pricing and other proprietary information, 3Cloud sent Adegoke to Seattle, Washington to train and become

certified in a critical Platform as a Service (PaaS) called Movere owned by Unified Logic. 3Cloud did this at significant expense.

27.     Movere certification is extremely limited and valuable and a company can become a preferred Movere vendor with only a single Movere resource, like Adegoke, once trained by Uniform Logic.

28.     Recognizing that it needed someone with more experience and knowledge in the role of Practice Director, on August 2, 2017, 3Cloud told Adegoke that he was being moved into the role of Principal Architect. The change in role resulted in no loss in pay to Adegoke and did not modify the terms of his Confidentiality Agreement.

29.     Approximately five weeks later, on September 8, 2017, Adegoke accessed and copied hundreds of files on 3Cloud's secure computer network, including files from key clients and across file directories containing information regarding confidential pricing models, architectural documents, and client presentations, among other things. These confidential 3Cloud files included numerous files for which Adegoke was not authorized to access and for which he had no legitimate need based on his current position with the Company or his responsibilities attendant thereto.

30.     On September 13, 2017, Adegoke accessed 3Cloud's secure network and copied documentation related to 3Cloud's newly launched Managed Services business ("Azure Assurance"), including proposed contractual terms, pricing and service definitions.    None of these materials had anything to do with Adegoke's responsibilities at 3Cloud.

9

31. On September 18 and 19, 2017, Adegoke accessed 3Cloud's secure network and copied dozens more documents that did not pertain to Adegoke's current work or responsibilities. These documents included 3Cloud's business agreements and contract templates, Microsoft partner documentation, 3Cloud's rate cards, pricing calculators, and sales pipeline information, among other things.

32. On October 8, 2017, Adegoke contacted 3Cloud CEO, Mike Rocco, by phone and advised Rocco that he was giving two weeks' notice of his voluntary resignation. While Adegoke stated he was going to work for another company, he declined to identify his new employer.

33. On October 20, 2017, Adegoke's last day of employment, instead of coming into the office, Adegoke shipped his 3Cloud issued laptop computer back to 3Cloud.

34. Adegoke did not send the computer back in its unaltered condition with 3Cloud's business files and hard drive intact. Instead, without instruction or permission from 3Cloud, Adegoke erased the hard drive of 3Cloud's laptop computer before returning it, including reimaging the hard drive and deleting his personal profile, in order to completely wipe the hard drive of any digital signature of his activities and make it extremely difficult, if not impossible, to determine what was on or done with the computer.

35. At no time was Adegoke told or given permission to wipe his 3Cloud issued computer, nor reinstall Windows.

10

36. Adegoke's actions in wiping clean and reimaging his 3Cloud laptop computer prior to returning it resulted in 3Cloud losing business files stored on the laptop, losing software licensed to 3Cloud that was on Adegoke's computer such as Azure Docit, and losing the ability to analyze Adegoke's conduct with the computer, including the handling of 3Cloud's confidential business information and trade secrets.

**Adegoke Joins Concurrency**

37. On October 31, 2017, Concurrency issued a press release announcing Adegoke was being hired at its office in downtown Chicago in a "newly created vice president position to head two of [Concurrency's] five Digital Transformation practice areas: Customer Engagement and Cloud Datacenter." In his new role at Concurrency, Adegoke is doing much the same work he did for 3Cloud in direct competition with 3Cloud and in plain violation of the twelve-month post-employment non-compete provision in Paragraph 2(b)(ii) of his Confidentiality Agreement.

38. On November 6, 2017, Mike Rocco at 3Cloud sent a letter to Adegoke advising him 3Cloud had become aware of his apparent theft of trade secrets, including his accessing and copying hundreds of confidential documents for which he had no legitimate business reason or need at the time. 3Cloud also advised Adegoke that he was exposing himself to liability as a result of his misconduct, including violating his non-compete obligations.

39. On November 7, 2017, Adegoke called Rocco and denied having improperly accessed any 3Cloud documents for other than legitimate business

11

reasons, and he further denied copying or still having in his possession any 3Cloud documents.

40.     With respect to his work at Concurrency, Adegoke offered no defense to the improper competition. Instead, Adegoke described his current position at Concurrency as being in more of a business strategy role to build Concurrency's Cloud Datacenter and Customer Engagement practices.

41.     From 3Cloud's standpoint, that only exacerbates the harm to 3Cloud by Adegoke utilizing the knowledge and inevitable disclosure of 3Cloud's confidential business information and trade secrets, as well as his experience and training developed by 3Cloud, to strategically build a practice in downtown Chicago that is direct in competition with 3Cloud.

42.     Adegoke sent a letter the following day reasserting his denial of allegations that he was still in possession of any 3Cloud documents.

43.     On November 16, 2017, counsel for 3Cloud sent a letter to Adegoke as well as Concurrency chronicling Adegoke's preceding two months of misconduct with audit results of files Adegoke improperly accessed, including the accessing of hundreds of files within seconds of each other, consistent with a large scale copying effort, involving files for which Adegoke had no legitimate business reason or need at the time, while reiterating and insisting that Adegoke honor the terms of the Employment Agreement and Confidentiality Agreement.

44.     3Cloud and its counsel also advised Defendants that Adegoke's Employment Agreement and Confidentiality Agreement had a non-compete

provision, a non-solicitation provision, and provisions regarding the return of 3Cloud documents and materials upon separation. 3Cloud demanded that Adegoke and Concurrency acknowledge and abide by the terms of Adegoke's continuing post-employment obligations to 3Cloud.

45.     3Cloud also advised Defendants that virtually all of Adegoke's knowledge of Digital Transformation to a cloud environment was provided to Adegoke by 3Cloud, and that his interaction with some of 3Cloud's most important customers, and his access to 3Cloud's sale strategies, pricing strategies, and overall business strategies required that he honor the post-employment restrictions of his Employment Agreement and Confidentiality Agreement.

46.     Additionally, 3Cloud's November 16, 2017 letters specifically advised Adegoke and Concurrency that all materials in their possession or control related in any way to 3Cloud and Adegoke's new employment at Concurrency needed to be preserved in light of potential litigation over the theft of 3Cloud's trade secrets and the violation of Adegoke's post-employment non-compete restrictions.

47.     Specifically, 3Cloud's November 16, 2017 letter advised Adegoke that:

> You are also on notice, as you have been since at least receiving 3Cloud's November 6 letter, regarding potential litigation over your breach of the non-compete and non-solicitation restrictions in your Agreement, and the misappropriation of 3Cloud's confidential business information and trade secrets, including potential statutory claims under the federal Defend Trade Secrets Act and the Computer Fraud and Abuse Act, as well as the Illinois Trade Secrets Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. As such, you are legally obligated to preserve all documents, information, and communications in your possession, custody or control relating in any way to 3Cloud, regardless of whether in hard copy or electronic form, and including information stored on your personal as well as your work computer(s), mobile device(s), and/or flash

13

drives, and all documents and information relating to your efforts to find other employment outside of 3Cloud, including, but not limited to, personal calendars, interview appointments, notes, and communications with Concurrency, other potential employers, recruiters, or any other persons.

48.    After receiving 3Cloud's November 16, 2017 letter, including the above quoted instructions regarding the legal obligation to preserve all documents and information in any form relating to 3Cloud, Adegoke has deliberately destroyed such information, including at the very least 3Cloud documents formerly stored on Adegoke's personal OneDrive account.

49.    On or about December 14, 2017, Defendants advised 3Cloud that they did not intend to honor the terms of Adegoke's non-compete restrictions. They further announced that Adegoke would agree only to provide limited access to one of Adegoke's digital storage mediums to search for 3Cloud documents on the condition that 3Cloud not file a civil action over the theft of 3Cloud's trade secrets or to enforce the non-compete or any other provision of Adegoke's Employment Agreement or Confidentiality Agreement.

50.    At no time have Defendants offered to return the $17,500 payment that Adegoke received as express consideration for the twelve-month non-compete and other post-employment restrictions under his Employment Agreement and Confidentiality Agreement with 3Cloud.

## COUNT I
## <u>MISAPPROPRIATION OF TRADE SECRETS UNDER THE DTSA</u>
### (Against Adegoke)

51.    3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

52.    At all times relevant, there was in effect the Defend Trade Secrets Act, 18 U.S.C. 1832, et seq.

53.    Adegoke has continued to misappropriate 3Cloud's trade secrets by using 3Cloud's confidential information to develop technology and market himself to competitors of 3Cloud in order to undercut 3Cloud's position in the market and steal 3Cloud's business.

54.    As a result of Defendants' continued and willful misappropriation of 3Cloud's trade secrets, 3Cloud is entitled to actual damages in an amount to be determined at trial, as well as punitive damages stemming from Adegoke's willful and deliberate misrepresentation to 3Cloud that he did not take and does not have 3Cloud's trade secrets and confidential information.

55.    Because 3Cloud lacks a complete and adequate remedy law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment.  Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures that actual loss attributed to the theft or profits acquired by Adegoke as a result of the trade secret theft.

56.     Alternatively, because 3Cloud lacks an adequate remedy at law for actual damages done, and because Adegoke is currently in possession of 3Cloud's secrets and using them to his advantage, 3Cloud requests that this Court grant the Company a "reasonable royalty" on sales generated by Adegoke at Concurrency, pursuant to 18 U.S.C. § 1836 (b)(3)(B).

57.     In addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further use and disclosure of 3Cloud's trade secrets.

**COUNT II**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**(Against Adegoke)**

58.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

59.     At all times relevant, there was in effect the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et. seq.

60.     While still employed by 3Cloud, Adegoke intentionally accessed 3Cloud's protected computer system and without authorization, or acting beyond what he was authorized to do, accessed information on the protected systems and transmitted confidential information belonging to 3Cloud to undisclosed storage devices or systems.

61.     As a result of Adegoke's unauthorized access and/or exceeding his authorized access, 3Cloud has been damaged by the loss of the value of 3Cloud's trade

16

secrets and 3Cloud's competitive edge in the market. 3Cloud has also incurred substantial response costs to address the breach by Adegoke.

62.     Adegoke's conduct violates the Computer Fraud and Abuse Act.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS UNDER ITSA**
**(Against Adegoke)**

63.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

64.     At all relevant times there was in effect the Illinois Trade Secrets Act, 765 ILCS 1065, et seq.

65.     3Cloud regularly expends substantial time and money to develop and maintain confidential, proprietary, and trade secret information, including, but not limited to, specific and unique techniques and procedures relating to cloud based strategies, a client/prospects database complete with contact information, marketing strategies, client/prospects needs and feedback, and rates, terms and other project specifications, among other data. This information constitutes "trade secrets" under the Illinois Trade Secrets Act.

66.     Adegoke's actions constitute misappropriation of 3Cloud's trade secrets. His conduct in this regard was willful and deliberate, particularly in that Adegoke promised he would abide by the terms of his Confidentiality Agreement while at 3Cloud and thereafter, when in reality he was stealing 3Cloud's trade secrets and then taking steps to hide his activities, including by destroying evidence of his wrongdoing.

17

67.    3Cloud has been damaged by Adegoke's conduct, including the time, money and efforts spent developing unique processes and strategies and protecting them from becoming publicly known.

68.    If Adegoke is not enjoined from any and all violations and continuing use and disclosure of the trade secrets misappropriated from 3Cloud, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

69.    Accordingly, as a result of Adegoke's misappropriation, 3Cloud is entitled to actual damages in an amount to be determined at trial, as well as punitive damages stemming from Adegoke's willful and deliberate misrepresentation to 3Cloud that he would not use 3Cloud's trade secrets and confidential information.

70.    Alternatively, because 3Cloud lacks a complete and adequate remedy at law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment. Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures the actual loss attributed to the theft or profits acquired by Adegoke as a result of his theft of 3Cloud's trade secrets.

71.    Further, in addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further use and disclosure of 3Cloud's trade secrets.

## COUNT IV
## BREACH OF CONTRACT
### (Against Adegoke)

72.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

73.     Adegoke executed and agreed to abide by the terms of his Employment Agreement and Confidentiality Agreement with 3Cloud.

74.     The Employment and Confidentiality Agreements were supported by good and valuable consideration including, but not limited to, Adegoke's hiring and continued employment with 3Cloud, his training both at 3Cloud and at 3Cloud paid for programs, the guarantee of a first-year fixed bonus of $35,000, on top of Adegoke's base annual salary of $175,000 and any discretionary performance bonus, and payment to Adegoke of the first such guaranteed bonus payment on July 31, 2017, in the amount of $17,500.

75.     The terms of the Agreements protect the legitimate interest of 3Cloud, including its highly valuable, proprietary, and confidential trade secret information. The provisions and covenants pose no undue hardship on Adegoke, and are reasonable as to duration and scope to protect 3Cloud's legitimate business interests.

76.     Adegoke voluntarily terminated his employment from 3Cloud on October 20, 2017.

77.     Adegoke breached his Employment and Confidentiality Agreements by, among other things, studying, copying, and taking 3Cloud trade secrets, including

19

processes and other information used to create cloud based applications, digital transformation strategies, pricing, client and prospective client lists.

78.     Adegoke further breached his Agreements by transmitting 3Cloud's confidential and trade secret information to his remote storage platforms, without 3Cloud's consent, attempting to hide the fact he copied the information, lying about the fact he copied the information, not returning the misappropriated information to 3Cloud, not providing access to his personal storage platforms and devices involved in the theft, destroying the data and files on his 3Cloud issued laptop computer, and using the misappropriated confidential information and trade secrets to his own benefit and those of 3Cloud's competitors.

79.     Adegoke has also breached his Employment and Confidentiality Agreements by performing defined Company Business within the Restricted Territory for Concurrency - a known direct competitor of 3Cloud.

80.     3Cloud has been damaged by Adegoke's conduct, including the time, money and efforts spent developing its unique digital transformation processes, business and pricing plans, client lists, the costs of training Adegoke, and the loss of the guaranteed bonus paid to Adegoke in exchange for the post-employment restrictive covenants he is now violating, among other things.

81.     If Adegoke is not enjoined from any and all violations and continuing violations of his Agreements, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well

20

as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

82.     Accordingly, as a result of Adegoke's breach of his Employment and Confidentiality Agreements, 3Cloud is entitled to actual damages in an amount to be determined at trial.

83.     Alternatively, because 3Cloud may lack a complete and adequate remedy at law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment.  Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures that actual loss attributed to the breach by Adegoke as a result of his trade secret theft and use with competitors.

84.     Further, in addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further violations of the restrictive covenants contained in his Employment and Confidentiality Agreements with 3Cloud.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Adegoke)

85.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

86.     As Practice Director and as a Principal Architect, Adegoke held a position of trust and confidence at 3Cloud, and as an employee, owed 3Cloud a fiduciary duty of loyalty.

87.     While Adegoke was still employed by 3Cloud and therefore bound by his fiduciary duty, he purposely accessed and copied confidential and proprietary information for the purpose of using such information to his own benefit and/or that of 3Cloud's competitors.

88.     Adegoke has since attempted to hide the fact he stole the information by destroying files and records of his activities on the laptop computer issued to him by 3Cloud, fabricating false excuses for accessing the information, and then denying he had taken or still had in his possession any files belonging to 3Cloud.

89.     As a result of Adegoke's actions, 3Cloud has been damaged in the form of lost profits, price reductions, recovery costs, and loss of good will among other things.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Concurrency)

90.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

91.     Adegoke knew that he was obligated not to compete with 3Cloud's Company Business within the Restricted Territory, as demonstrated by his signing the Confidentiality Agreement and confirming his awareness of the same after his resignation.

92.     Concurrency similarly was aware of Adegoke's post-employment obligations to 3Cloud, including for twelve months not to assist 3Cloud's competitors

22

with respect to "Company Business" within the Restricted Territory, nor to take or use 3Cloud's confidential information and trade secrets.

93.     Despite this knowledge, Concurrency's has interfered with the Employment and Confidentiality Agreements with Adegoke by employing him to act in a business strategy role to build Concurrency's Cloud Datcenter and Customer Engagement practices for Concurrency's benefit.

94.     Concurrency's employment of Adegoke, which is based on his experience, training, and certifications developed by 3Cloud, will result in unfair competition against 3Cloud, including but not limited by the inevitable disclosure and use of 3Cloud's confidential business information and trade secrets.

95.     3Cloud has been damaged by Adegoke's and Concurrency's conduct, including the time, money and efforts spent developing its unique digital transformation processes, business and pricing plans, client lists, the costs of training Adegoke, and the loss of the guaranteed bonus paid to Adegoke in exchange for the restrictive covenants, among other things.

96.     If Defendants are not enjoined from any and all violations and continuing violations of interference with 3Cloud's contractual relations, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

## COUNT VII – SPOLIATION OF EVIDENCE
### (Against Adegoke)

97.    3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

98.    Pursuant to Sec 2(e)(ii) of the Confidentiality Agreement (see ¶ 21 *infra*), there was a special relationship between Adegoke and 3Cloud in the form of a contractual duty to preserve and return to the Company, in good condition, all items referenced in Sec. 2(e)(i) of the Confidentiality Agreement.

99.    Adegoke was reminded of his duty to preserve and return following his voluntary resignation in correspondence from counsel for 3Cloud.

100.    Notwithstanding his obligation to return all 3Cloud materials to 3Cloud following Adegoke's voluntary resignation Adegoke: a) erased the hard drive of 3Cloud's laptop computer before returning it, including reimaging the hard drive and deleting his personal profile; b) he either deleted or refuses to return the hundreds of files he copied from 3Cloud's secure server; and c) he has either deleted or refuses to return the 3Cloud files that were stored on his Microsoft OneDrive account.

101.    Adegoke's destruction or hiding of 3Cloud materials violates the special relationship created by the contractual duty outlined in Sec 2(e)(ii) of the Confidentiality Agreement.

102.    A reasonable person in Adegoke's position should have foreseen that the material he destroyed or is currently refusing to return would be material to a potential civil action against him given he had a contractual duty not to do what he has done and he was reminded of that duty.

24

103.     3Cloud has been injured to the extent that its materials have been stolen, that software on Adegoke's computer has been lost, 3Cloud's ability to prove a case against Adegoke and Concurrency is jeopardized, and other injuries to be proven at trial.

104.     Adegoke's destruction and/or withholding of 3Cloud materials is the proximate cause of 3Cloud's damages in this case.

WHEREFORE, based on the foregoing facts 3Cloud prays that judgment be entered in its favor and against Adegoke and Concurrency as follows:

(a)     that 3Cloud be entitled to actual damages from Defendants in an amount to be determined at trial;

(b)     that 3Cloud be entitled to the equitable remedies of restitution and unjust enrichment from Defendants in the amount of the value derived from the multiple breaches of Adegoke's Agreements and Concurrency's interference with said Agreements, as well as the amount that measures that actual loss attributed to the theft or profits acquired by Adegoke as a result of the trade secret theft;

(c)     that 3Cloud be awarded its attorneys' fees, costs, compensatory damages, and punitive damages from Defendants in an amount to be proven at trial;

(d)     that 3Cloud be entitled to a permanent injunction to prevent Adegoke from engaging in any further violations of the Agreements, stop Adegoke from their continuing misappropriation of 3Cloud's trade secrets, and

identify and return all confidential information and trade secrets Adegoke took from 3Cloud or provided to its competitors;

(e)     and for any other relief this Honorable Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: January 4, 2018                    Respectfully submitted,


By:     s/ Robert D. Sweeney
Robert D. Sweeney (6238209)
John J. Scharkey (6278387)
Sweeney & Scharkey LLC
111 West Washington Street
Burnham Center, Suite 1160
Chicago, Illinois 60602
Tel. (312) 384-0500

*Counsel for Plaintiff, 3Cloud, LLC*

EXHIBIT A



October 21, 2016

Adetayo Adegoke
4756 S Drexel Blvd
Chicago, IL 60615

Mr. Adegoke,

     We are pleased to offer you the position of Practice Director - Cloud Modernization with 3Cloud, LLC ("3Cloud" or the "Company"). This offer is contingent on our completion of a satisfactory pre-employment background check and reference check. Additional details about the terms and conditions of your employment offer are set forth below.

     Subject to your acceptance of this offer, your employment with 3Cloud will begin on November 16, 2017. You will report to Bob Moore, Vice President of Professional Services, unless notified otherwise. The initial scope of Employee's job duties and responsibilities shall include building out the Cloud Modernization services organization, participating in presales activities, running all aspects of delivery, as well as such other duties and responsibilities as may be determined by the Company. During your employment, you shall devote your best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity, or other approved leave) to the business and affairs of the Company, including any subsidiaries and/or affiliates. You shall perform your duties and responsibilities to the best of your abilities in a diligent, trustworthy, businesslike and efficient manner.

     Employment Period. Notwithstanding any provision to the contrary, the nature and term of your employment shall be "at-will," such that either you or the Company may terminate your employment with the Company for any reason, or for no reason at all, at any time, upon two-week's notice of the termination.

     Base Salary. The Company shall pay you for work performed on a salary basis in installments twice per month based on the Company's normal payroll practices as may be in effect from time to time. Your initial base salary will be $175,000 per year. Thereafter, the Company may review and make modifications to your salary from time to time. The Company may withhold from any amounts payable under this letter all federal, state, city or other taxes as the Company is required to withhold pursuant to any applicable law, regulation or ruling.

     Bonus. Effective January 1, 2017, you will be eligible to receive an annual bonus of $35,000 to be paid semi-annually on July 31, 2017 and January 31, 2018. These bonus payments are guaranteed provided that you are employed by 3Cloud at the time of the payment.

In future years, 3Cloud will establish appropriate revenue and gross profit margin targets to fund an attractive bonus structure.

Overachievement Bonus Payment. You may also be eligible to receive discretionary performance bonuses based on the achievement of revenue and gross profit margin metrics as determined from time to time by the Company. In 2017, you will be eligible to receive such a discretionary bonus payment of up to $40,000 to be earned in the following manner:

(a) $20,000 provided either condition is met: (i) $1,500,000 in revenue is generated by/in the Company's Cloud Modernization practice; or (i) $600,000 in gross

Any Overachievement Bonus Payment earned shall be paid to you on January 31, 2018. The Company may reevaluate your eligibility for Overachievement Bonus Payments annually thereafter; and such payments shall be paid in the calendar year following the calendar year in which such bonus was earned.

Benefits. You will be entitled to participate in the 3Cloud's standard medical benefits that are generally made available to the Company's employees and as they exist and are modified from time to time and subject to satisfying the applicable eligibility requirements. Benefits offered by 3Cloud are subject to modification, suspension or termination at any time in accordance with the terms of the plan documents and applicable law.

Vacation. You are eligible to take vacation as needed on an appropriate basis and subject to manager approval.

Confidentiality; Non-Solicitation. This Offer is contingent on you signing the attached Confidential Information and Non-Solicitation Agreement attached hereto. As added consideration for the same, the Company will guarantee the first-year bonus payment of $35,000 (to be paid semi-annually on July 31, 2017, ant January 31, 2018) ("Fixed Bonus Payment"), provided you are employed on the date of payment. In the event you are not employed on the date of such payment, the Company may in its discretion choose to pay you $10,000 as separate and additional consideration for the Confidential Information and Non-Solicitation Agreement, or choose to waive enforcement of the same as part of a general release agreement signed by you.

General Provisions. This letter shall be governed by, and construed in accordance with, the internal, substantive laws of the State of Illinois. This letter is personal to you and you may not assign it. It will be binding upon and inure to the benefit of 3Cloud's successors and assigns.

If you accept this Offer, subject to the conditions and contingencies described above, please sign this letter in the space provided below, sign the enclosed Confidential Information and Non-Solicitation Agreement, and return both signed documents to my attention. We are

excited to welcome you as a member of 3Cloud's team and look forward to your future contributions to the Company's success.

Sincerely,


Mike Rocco
Chief Executive Officer



Accepted and Agreed to:

_____
Adetayo Adegoke

Date: _____10 - 21 - 2016_____



Enclosure
Confidential Information and Non-Solicitation Agreement

# EXHIBIT B

# CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT

This CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT ("Agreement") is entered into as of October 21, 2016 (the "Effective Date") between 3Cloud, LLC (the "Company") and Adetayo Adegoke ("Employee") (collectively, the "Parties").

WHEREAS, the Employee signed an Offer Letter on October 21, 2016 and agreed to employment with the Company; and

WHEREAS, the Employee, in the course of his or her employment by the Company, will have access to and use certain documents and information in a confidential nature; and

WHEREAS, the Employee has agreed that as a condition of his or her employment with the Corporation that he or she will not disclose such confidential information.

In consideration of the mutual covenants contained herein and other good and valuable consideration as described below, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    Consideration.  As described more fully in the Offer Letter dated October 21, 2016, as separate and additional consideration for the Employee's agreement to abide by the restrictions contained in this Agreement, the Company will guarantee the first-year bonus payment of $35,000 (to be paid semi-annually on July 31, 2017, and January 31, 2018) ("Fixed Bonus Payment"), provided Employee is employed as of the date of the first payment (July 31, 2017).  In the event Employee is not employed on the date of the first payment (July 31, 2017), the Company may in its discretion choose to pay Employee $10,000 as separate and additional consideration, or choose to waive enforcement of this Agreement as part of a general release agreement signed by Employee.

2.    Competitive Activity; Confidentiality; Non-Solicitation.

(a)    Acknowledgements and Agreements.  Employee hereby acknowledges and agrees that in the performance of Employee's duties to the Company during his employment, Employee will be brought into frequent contact with existing and potential customers of the Company throughout the United States. Employee also agrees that trade secrets and confidential information of the Company, more fully described in subparagraph 2(e)(i), below, gained by Employee during his association with the Company have been developed by the Company through substantial expenditures of time, effort and money, and constitute valuable and unique property of the Company. Employee further understands and agrees that the foregoing makes it necessary for the protection of the Company's Business that Employee not compete with the Company during Employee's employment with the Company and not compete with the Company for a reasonable period thereafter, as further provided in the subparagraphs, below.

(b)    Covenants.

1

(i)     Covenants During Employment.  While employed by the Company, Employee will not compete with, undermine or otherwise work in a manner that is contrary to the interests of the Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, while employed by the Company, Employee will not:

    (A)     enter into or engage in any business which competes with the Company's Business;

    (B)     solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business;

    (C)     divert, entice or otherwise take away any customers, business, patronage or orders of the Company or attempt to do so; or

    (D)     promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

(ii)     Covenants Following Termination.  For a period of twelve (12) months following the termination of Employee's employment with the Company, Employee will not:

    (A)     enter into or engage in any business which competes with the Company's Business within the Restricted Territory;

    (B)     solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;

    (C)     divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or

    (D)     promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(iii)     Indirect Competition.  For the purposes of subparagraphs 2(b)(i) and (ii) inclusive, but without limitation thereof, Employee will be in violation if Employee engages in any or all of the activities set forth therein directly as an individual on Employee's own account, or indirectly as a partner, joint venturer, employee, agent, salesperson, consultant, officer and/or director of any firm,

2

Initial A.A.

association, partnership, corporation or other entity, or as a stockholder of any corporation in which Employee or Employee's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than three percent (3%) of the outstanding stock.

(iv)  If it shall be judicially determined that Employee has violated this subparagraph 2(b), then the period applicable to each obligation that Employee shall have been determined to have violated shall automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

(c)  The Company.  For purposes of this Agreement, the Company shall include any and all direct and indirect subsidiary, parent, affiliated, or related entities of the Company for which Employee worked or had responsibility at the time of termination of Employee's employment and at any time during the two (2) years prior to such termination.

(d)  Non-Solicitation.  Employee will not directly or indirectly at any time during the period of Employee's employment or thereafter, attempt to disrupt, damage, impair or interfere with the Company's Business by raiding any of the Company's employees or soliciting any of them to resign from their employment by the Company, or by disrupting the relationship between the Company and any of its consultants, agents or representatives.  Employee acknowledges that this covenant is necessary to enable the Company to maintain a stable workforce and remain in business.

(e)  Further Covenants.

(i)  Employee will keep in strict confidence, and will not, directly or indirectly, at any time, during or after Employee's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any trade secrets or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Employee may have acquired such information.  Such confidential information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information.  Employee specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by the Company, and/or Employee, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by

Initial A.A.

Employee during Employee's employment with the Company (except in the course of performing Employee's duties and obligations to the Company) or after the termination of Employee's employment shall constitute a misappropriation of the Company's trade secrets.

(ii)     Employee agrees that upon termination of his employment with the Company, for any reason, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement.  In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

(f)     Discoveries and Inventions; Work Made for Hire.

(i)     Employee agrees that upon conception and/or development of any idea, discovery, invention, improvement, software, writing or other material or design that:  (A) relates to the business of the Company, or (B) relates to the Company's actual or demonstrably anticipated research or development, or (C) results from any work performed by Employee for the Company, Employee will assign to the Company the entire right, title and interest in and to any such idea, discovery, invention, improvement, software, writing or other material or design. Employee has no obligation to assign any idea, discovery, invention, improvement, software, writing or other material or design that Employee conceives and/or develops entirely on Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information unless the idea, discovery, invention, improvement, software, writing or other material or design:  (x) relates to the business of the Company, or (y) relates to the Company's actual or demonstrably anticipated research or development, or (z) results from any work performed by Employee for the Company.  Employee agrees that any idea, discovery, invention, improvement, software, writing or other material or design that relates to the business of the Company or relates to the Company's actual or demonstrably anticipated research or development which is conceived or suggested by Employee, either solely or jointly with others, within one (1) year following the termination of Employee's employment shall be presumed to have been so made, conceived or suggested in the course of such employment with the use of the Company's equipment, supplies, facilities, and/or trade secrets.

(ii)     In order to determine the rights of Employee and the Company in any idea, discovery, invention, improvement, software, writing or other material, and to insure the protection of the same, Employee agrees that during Employee's employment, and for one (1) year after the termination of Employee's employment, Employee will disclose immediately and fully to the Company any idea, discovery, invention, improvement, software, writing or other material or

4                                                                    Initial K.A.

design conceived, made or developed by Employee solely or jointly with others. The Company agrees to keep any such disclosures confidential. Employee also agrees to record descriptions of all work in the manner directed by the Company and agrees that all such records and copies, samples and experimental materials will be the exclusive property of the Company. Employee agrees that at the request of and without charge to the Company, but at the Company's expense, Employee will execute a written assignment of the idea, discovery, invention, improvement, software, writing or other material or design to the Company and will assign to the Company any application for letters patent or for trademark registration made thereon, and to any common-law or statutory copyright therein; and that Employee will do whatever may be necessary or desirable to enable the Company to secure any patent, trademark, copyright, or other property right therein in the United States and in any foreign country, and any division, renewal, continuation, or continuation in part thereof, or for any reissue of any patent issued thereon. In the event the Company is unable, after reasonable effort, and in any event after ten business days, to secure Employee's signature on a written assignment to the Company of any application for letters patent or to any common-law or statutory copyright or other property right therein, whether because of Employee's physical or mental incapacity or for any other reason whatsoever, Employee irrevocably designates and appoints one of the founders of the Company as Employee's attorney-in-fact to act on Employee's behalf to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, copyright or trademark.

(iii)   Employee acknowledges that, to the extent permitted by law, all work papers, reports, documentation, drawings, photographs, negatives, tapes and masters therefore, prototypes and other materials (hereinafter, "items"), including without limitation, any and all such items generated and maintained on any form of electronic media, generated by Employee during Employee's employment with the Company shall be considered a "work made for hire" and that ownership of any and all copyrights in any and all such items shall belong to the Company. The item will recognize the Company as the copyright owner, will contain all proper copyright notices, e.g., "(creation date) 3Cloud, LLC, All Rights Reserved," and will be in condition to be registered or otherwise placed in compliance with registration or other statutory requirements throughout the world.

(g)   Communication of Contents of Agreement.  While employed by the Company and for a period of twelve (12) months following the termination of Employee's employment thereafter, Employee will communicate the contents of paragraph 2 of this Agreement to any person, firm, association, partnership, corporation or other entity that Employee intends to be employed by, associated with, or represent.

(h)   Confidentiality Agreements.  Employee agrees that he shall not disclose to the Company or induce the Company to use any secret or confidential information belonging to Employee's former employer(s). Employee warrants that Employee is not bound by the terms of a confidentiality agreement or other agreement with a third party that he has not fully disclosed to the Company that would potentially preclude or limit

5                                                          Initial A.A.

conceived during employment with the Company. Employee agrees to provide the Company with a copy of any and all agreements with a third party that preclude or limit Employee's right to make disclosures or to engage in any other activities contemplated by Employee's employment with the Company.

        (i)    <u>Relief</u>. Employee acknowledges and agrees that the remedy at law available to the Company for breach of any of Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that, in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision contained in subparagraphs 2(b), 5(d), 5(e), 5(f), 5(g) and 5(h) inclusive, of this Agreement, without the necessity of proof of actual damage.

        (j)    <u>Reasonableness</u>. Employee acknowledges that Employee's obligations under this paragraph 2 are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Employee were to violate such obligations. Employee further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration, which Employee acknowledges constitutes good, valuable and sufficient consideration.

3.    <u>Definitions</u>.

        (a)    "<u>Company's Business</u>" means a full service technology consulting firm that provides cloud strategies, solutions and managed services for commercial clients, including, but not limited to cloud modernization, advanced data analytics, Internet of things, Azure infrastructure services and cloud applications development.

        (b)    "<u>Restricted Territory</u>" means: (i) the geographic area(s) within a one-hundred (100) mile radius of Chicago; (ii) the State of Texas, and (iii) all of the specific customer accounts, whether within or outside of the geographic area described in (i) or (ii) above, with which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

4.    <u>Survival</u>. Subject to any limits on applicability contained therein this Agreement shall survive and continue in full force in accordance with its terms notwithstanding any termination of Employee's employment.

5.    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid or unenforceable in any respect under any applicable law, such invalidity or unenforceability shall not affect any other provision, but this Agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

Initial

6. <u>Prevailing Party's Litigation Expenses</u>. In the event of litigation between the Company and Employee related to this Agreement. the non-prevailing party shall reimburse the prevailing party for any costs and expenses (including, without limitation, attorneys' fees) reasonably incurred by the prevailing party in connection therewith.

7. <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of and be enforceable by Employee, the Company and their respective heirs, executors, personal representatives, successors and assigns, except that neither party may assign any rights or delegate any obligations hereunder without the prior written consent of the other party. Employee hereby consents to the assignment by the Company of all of its rights and obligations hereunder to any successor to the Company by merger or consolidation or purchase of all or substantially all of the Company's assets, provided such transferee or successor assumes the liabilities of the Company hereunder.

8. <u>Choice of Law</u>. This Agreement shall be governed by, and construed in accordance with, the internal, substantive laws of the State of Illinois. Employee agrees that the state and federal courts located in the State of Illinois shall have jurisdiction in any action, suit or proceeding against Employee based on or arising out of this Agreement and Employee hereby: (a) submits to the personal jurisdiction of such courts; (b) consents to service of process in connection with any action, suit or proceeding against Employee; and (c) waives any other requirement (whether imposed by statute, rule of court or otherwise) with respect to personal jurisdiction, venue or service of process.

9. <u>Amendment and Waiver</u>. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee. and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

10. **<u>Operation of Agreement</u>. This Agreement will be binding immediately upon its execution, but, notwithstanding any provision of this Agreement to the contrary, this Agreement will not become effective or operative (and neither Party will have any obligation hereunder) until the "<u>Effective Date</u>".**

[SIGNATURES ON FOLLOWING PAGE]

Initial  A·A·

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**3Cloud, LLC**

By: _____

Name:  Robert C. Moore

Title:  VP, Professional Services


**Adetayo Adegoke**

_____

Adetayo Adegoke

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.1
### Eastern Division

3Cloud, LLC

                    Plaintiff,

v.

Concurrency, Inc., et al.

                    Defendant.

Case No.: 1:18−cv−00076
Honorable Elaine E. Bucklo

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 16, 2019:

      MINUTE entry before the Honorable M. David Weisman: Motion hearing held. For the reasons stated on the record, including the complete inadequacy of Defendant Adegoke's objections and responses, the Court grants the portion of Plaintiff's motion to compel [99] regarding specific discovery requests and an award of fees. Defendant Adegoke shall supplement his response to all discovery requests identified in Plaintiff's motion by 10/23/19. The Court will issue an order with respect to Rule 37 fees after reviewing Plaintiff's anticipated fee petition and Defendant's objections (if any). The Court enters and continues the portion of the motion concerning an award of default judgment. Status/Motion hearing set for 10/30/19 at 9:15 a.m. For the reasons stated on the record, Plaintiff's oral motion to compel written discovery production by Defendant Concurrency is granted over Defendant Concurrency's objection. Defendant shall produce the information discussed on the record by 11/22/19. If Defendant fails to produce the requested information by 11/22/19, Plaintiff may file a motion for sanctions, if appropriate. Mailed notice (ao,)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**Fill in this information to identify the case:**

Debtor 1    Adetayo Adegoke

Debtor 2    _____
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern District of Illinois

Case number    19-34092

---

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

3Cloud, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Sweeney Scharkey & Blanchard / Garrett Nye<br>Name | Name |
| 230 W. Monroe St., Suite 1500<br>Number   Street | Number   Street |
| Chicago    IL    60606<br>City    State    ZIP Code | City    State    ZIP Code |
| Contact phone   312-384-1287 | Contact phone _____ |
| Contact email   gnye@ssbpartners.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.   Claim number on court claims registry (if known)   No. 2     Filed on   01/22/2020
                                                     MM   / DD   / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.   Who made the earlier filing? _____

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _____ 430,810.62* . **Does this amount include interest or other charges?**

\* This claim is subject to litigation in the U.S. Dist. Court for the N. Dist. of Ill. in the case of 3Cloud, LLC v. Concurrency, Inc. and Adetayo Adegoke, Case. No. 18-CV-0076. The claim reflects the amount that Claimant believes it is owed on the claims asserted in the District Court litigation.

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Claims asserted in pending litigaiton in the U.S. Dist. Court for the N. Dist. of Ill.

The specific claims are detailed in Exhibit A and B to the this proof of claim.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  02/11/2020
　　　　　　　　　　MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Michelangelo Rocco |
| | First name          Middle name          Last name |
| Title | CEO |
| Company | 3Cloud, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3025 Highland Parkway, Suite 525 |
| | Number          Street |
| | Downers Grove                          IL          60515 |
| | City                                   State      ZIP Code |
| Contact phone | _____       Email  mrocco@3Cloudsolutions.com |

## Attachment to Proof of Claim

Debtor is a former employee of 3Cloud. Shortly after resigning, Debtor was hired by Concurrency, Inc., 3Cloud's competitor. Around this time, 3Cloud became aware that Debtor misappropriated certain trade secrets belonging to 3Cloud. Among other things, these actions constituted breaches of the terms of Debtor's Employment Agreement and/or Confidential Information and Non-Solicitation Agreement. Accordingly, on January 4, 2018, 3Cloud filed its Complaint in the United States District Court for the Northern District of Illinois, thereby commencing *3Cloud, LLC v. Concurrency, Inc. and Adetayo Adegoke*, Case No. 1:18-CV-0076. In its Complaint, 3Cloud seeks recovery of damages resulting from Debtor's actions. These claims arise in contract, tort and pursuant to certain statutory provisions. A true and correct copy of the Complaint is attached hereto as Exhibit "A." 3Cloud is also entitled to attorneys' fees on an order sanctioning Debtor for discovery violations. A true and correct copy of the minute order awarding sanctions is attached hereto as Exhibit "B."

While litigation is currently pending (and now stayed as to Debtor), 3Cloud has calculated the amount it believes that it is owed. An itemization of its claim is as follows:

| | |
|---|---|
| Attorneys' Fees: | $220,585.78 |
| Restitution for Breach (2017 – 2019): | $183,724.84 |
| Disgorgement of Bonus for Breach: | $ 17,500.00 |
| Return of Investment in Movere Certification: | $   9,000.00 |
| Total: | $430,810.62 |

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| 3CLOUD, LLC, | Civil Action No. |
| Plaintiff, | |
| v. | Judge |
| | Magistrate |
| CONCURRENCY, INC., and ADETAYO ADEGOKE, | |
| | Demand for Jury Trial |
| Defendants. | |

## COMPLAINT

Plaintiff 3Cloud, LLC ("3Cloud" or the "Company"), by and through its undersigned counsel, for its Complaint against Defendants Concurrency, Inc. ("Concurrency") and Adetayo Adegoke ("Adegoke") (collectively "Defendants") states as follows:

## NATURE OF THE ACTION

1.     This is an action for damages, equitable relief, and permanent injunctive relief based on Defendants' theft of 3Cloud's confidential information and trade secrets, tortious conduct, and Mr. Adegoke's breach of his employment agreement. Founded by former Microsoft executives, 3Cloud is the premier technology consulting firm in Chicago that helps businesses transition to and maximize the Microsoft Azure platform. 3Cloud helps businesses develop applications and processes to take advantage of cloud computing, using the Azure platform to provide better data services and analytics, cloud-scale infrastructure, and a host of other capabilities that

Microsoft Azure makes possible for small businesses or enterprise clients seeking public, private or hybrid cloud solutions.

2. 3Cloud spends substantial sums protecting its confidential and proprietary information and in educating its employees in processes and training that make 3Cloud the premier Microsoft Azure partner for businesses seeking to improve or create a cloud presence.

3. During the late summer and fall of 2017, unbeknownst to 3Cloud, Adegoke, 3Cloud's former Practice Director for Cloud Infrastructure and Principal Architect, began a calculated and deceitful enterprise of accessing and stealing proprietary and confidential documents from 3Cloud so that he could utilize that information in subsequent employment he would obtain with one of 3Cloud's direct competitors, Defendant Concurrency.

4. As a result, Adegoke has violated multiple provisions of his employment agreements, entitling 3Cloud to the relief sought in this action. Additionally, Concurrency's conduct in knowingly continuing to employ Adegoke in violation of his contractual obligations to 3Cloud and with the intent of using his knowledge, training and experience gained at 3Cloud, including the inevitable disclosure of its illegally acquired confidential information and trade secrets, tortiously interfered with 3Cloud's contract with Adegoke.

5. Adegoke further breached his fiduciary duty of loyalty to 3Cloud by stealing 3Cloud's trade secrets and confidential information while employed by 3Cloud and then attempting to cover his trail and lie about what he did.

## PARTIES

6.      3Cloud is a Delaware limited liability company, with its principal place of business at 3025 Highland Parkway in Downers Grove, Illinois.

7.      On information and belief, Adegoke is an Illinois resident who resides at 4756 South Drexel in Chicago, Illinois.

8.      Concurrency is a Wisconsin corporation doing business in Illinois with offices at 150 North Wacker Drive in Chicago, Illinois.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of 18 U.S.C. § 1832 and 18 U.S.C. § 1030, and 28 U.S.C. § 1367(a) permits supplemental jurisdiction over the remaining state-law claims.

10.      Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because this action arises from a contract in which a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS
## COMMON TO ALL COUNTS AND ALL DEFENDANTS

### Adegoke's Agreements with 3Cloud

11.      On or about October 21, 2016, 3Cloud offered Adegoke employment with the Company at an annual base salary of $175,000.  His position was Practice Director – Cloud Modernization, and in that capacity he was responsible for, among other things, building out the Cloud Modernization services organization,

participating in presales activities with potential customers, and running all aspects of delivery to potential clients and clients.

12. In conjunction with his acceptance of the offer of employment from 3Cloud, Adegoke signed an Employment Agreement ("Employment Agreement") and a Confidential Information and Non-Solicitation Agreement ("Confidentiality Agreement"), true and accurate copies of which are attached hereto and the terms are fully incorporated herein as Exhibit A and Exhibit B, respectively.

13. As part of the Employment Agreement, 3Cloud gave Adegoke a guaranteed first year $35,000 bonus as consideration for Adegoke executing the Confidentiality Agreement. The guaranteed bonus was payable to Adegoke in two installments, on July 31, 2017 and January 31, 2018, provided Adegoke was employed on the date of payment. In the event Adegoke's employment was separated before July 31, 2017, 3Cloud had the option to pay Adegoke the sum of $10,000 as consideration for the Confidentiality Agreement. (Exhibit A at 1-2; Exhibit B ¶ 1.)

14. 3Cloud paid Adegoke the first guaranteed bonus installment of $17,500 on July 31, 2017 in exchange for Adegoke signing the Confidentiality Agreement.

15. Adegoke voluntarily resigned his employment with 3Cloud before the second guaranteed installment was due. Specifically, Adegoke notified 3Cloud on October 8, 2017 that he would resign in two weeks in order to accept other employment. At the time, Adegoke declined to provide information about his new employment, which turned out to be with Concurrency in direct violation of the post-employment restrictions in Adegoke's Confidentiality Agreement.

16.     Under the Confidentiality Agreement, Adegoke agreed that he would, during the course of his employment, have access to confidential documents and information; that he would be brought into frequent contact with existing and potential customers of the Company; and that the Company had developed its confidential information and trade secrets through the substantial expenditure of time, effort and money.  Adegoke further agreed that he would not disclose this information.  (*See* Exhibit B ¶ 2(a).)

17.     Adegoke agreed in the Confidentiality Agreement that:

> (ii) For a period of (12) months following the termination of Employee's employment with the Company, Employee will not:
>
> > (A) enter into or engage in any business which competes with the Company's Business within the Restricted Territory;
> >
> > (B) solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;
> >
> > (C) divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or
> >
> > (D) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation, or any other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(Exhibit B ¶ 2(b)(ii)(A-D).)

18.     The Confidentiality Agreement further provides:

> (i)     Employee will keep in strict confidence, and will not, directly or indirectly, at any time, during or after

5

Employee's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any trade secrets, or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Employee may have acquired such information. Such confidential information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses, and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information. Employee specifically acknowledges that all such confidential information, whether reduced to any form or maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by the Company, and/or Employee, derives independent economic value from not being readily known or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by Employee during Employee's employment with the Company (except in the course of performing Employee's duties and obligations to the Company) or after the termination of Employee's employment shall constitute a misappropriation of the Company's trade secrets.

(ii)     Employee agrees that upon termination of his employment with the Company, for any reason, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement. In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing, and/or recovering such property.

6

(Exhibit B ¶ 2(e)(i-ii).)

19. With respect to the relief available under the Confidentiality

Agreement, it states:

> i. Employee acknowledges and agrees that the remedy at law available to the Company for breach of any of Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provisions contained in subparagraphs 2(b), 5(d), 5(e), 5(f), 5(g) and 5(h) inclusive, of this Agreement, without the necessity of proof of actual damage.

(Exhibit B ¶2(i).)

20. With respect to Adegoke's concurrence that the restrictions of the

Confidentiality Agreement are reasonable, the Confidentiality Agreement states:

> j. Employee acknowledges that the Employee's obligations under this paragraph 2 are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Employee were to violate such obligations. Employee further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration, which Employee acknowledges constitutes good, valuable and sufficient consideration.

(Exhibit B ¶2(j).)

21. The Confidentiality Agreement defines Company's Business and

Restricted Territory as:

> (a) "Company's Business" means a full service technology consulting firm that provides cloud strategies, solutions and managed services for commercial clients, including but not limited to, cloud modernization, advanced data analytics,

Internet of Things, Azure infrastructure services and cloud applications development.

(b) "Restricted Territory" means (i) the geographic area(s) within a one-hundred (100) mile radius of Chicago; (ii) the State of Texas, and (iii) all of the specific customer accounts, whether within or without the geographic area described in (i) or (ii) above, which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

(Exhibit B ¶3(a-b).)

### Adegoke's Prior Job Experience and Performance at 3Cloud

22.   Adegoke's primary job experience prior to coming to 3Cloud was in the desktop environment.

23.   Nonetheless, Adegoke billed himself as having greater experience in cloud infrastructure and digital transformation projects than he actually had.

24.   At various times, when called upon to perform tasks appropriate for a Practice Director, Adegoke had to admit that he had never done such work before. For example, prior to working for 3Cloud Adegoke had not done a cloud data migration for a business.

25.   3Cloud nonetheless invested significant resources in training Adegoke in all aspects of its business.

26.   For example, in addition to providing Adegoke access and training with respect to all of 3Cloud's methods, strategies, pricing and other proprietary information, 3Cloud sent Adegoke to Seattle, Washington to train and become

8

certified in a critical Platform as a Service (PaaS) called Movere owned by Unified Logic. 3Cloud did this at significant expense.

27.    Movere certification is extremely limited and valuable and a company can become a preferred Movere vendor with only a single Movere resource, like Adegoke, once trained by Uniform Logic.

28.    Recognizing that it needed someone with more experience and knowledge in the role of Practice Director, on August 2, 2017, 3Cloud told Adegoke that he was being moved into the role of Principal Architect. The change in role resulted in no loss in pay to Adegoke and did not modify the terms of his Confidentiality Agreement.

29.    Approximately five weeks later, on September 8, 2017, Adegoke accessed and copied hundreds of files on 3Cloud's secure computer network, including files from key clients and across file directories containing information regarding confidential pricing models, architectural documents, and client presentations, among other things. These confidential 3Cloud files included numerous files for which Adegoke was not authorized to access and for which he had no legitimate need based on his current position with the Company or his responsibilities attendant thereto.

30.    On September 13, 2017, Adegoke accessed 3Cloud's secure network and copied documentation related to 3Cloud's newly launched Managed Services business ("Azure Assurance"), including proposed contractual terms, pricing and service definitions.    None of these materials had anything to do with Adegoke's responsibilities at 3Cloud.

31.     On September 18 and 19, 2017, Adegoke accessed 3Cloud's secure network and copied dozens more documents that did not pertain to Adegoke's current work or responsibilities.  These documents included 3Cloud's business agreements and contract templates, Microsoft partner documentation, 3Cloud's rate cards, pricing calculators, and sales pipeline information, among other things.

32.     On October 8, 2017, Adegoke contacted 3Cloud CEO, Mike Rocco, by phone and advised Rocco that he was giving two weeks' notice of his voluntary resignation. While Adegoke stated he was going to work for another company, he declined to identify his new employer.

33.     On October 20, 2017, Adegoke's last day of employment, instead of coming into the office, Adegoke shipped his 3Cloud issued laptop computer back to 3Cloud.

34.     Adegoke did not send the computer back in its unaltered condition with 3Cloud's business files and hard drive intact.  Instead, without instruction or permission from 3Cloud, Adegoke erased the hard drive of 3Cloud's laptop computer before returning it, including reimaging the hard drive and deleting his personal profile, in order to completely wipe the hard drive of any digital signature of his activities and make it extremely difficult, if not impossible, to determine what was on or done with the computer.

35.     At no time was Adegoke told or given permission to wipe his 3Cloud issued computer, nor reinstall Windows.

10

36. Adegoke's actions in wiping clean and reimaging his 3Cloud laptop computer prior to returning it resulted in 3Cloud losing business files stored on the laptop, losing software licensed to 3Cloud that was on Adegoke's computer such as Azure Docit, and losing the ability to analyze Adegoke's conduct with the computer, including the handling of 3Cloud's confidential business information and trade secrets.

## Adegoke Joins Concurrency

37. On October 31, 2017, Concurrency issued a press release announcing Adegoke was being hired at its office in downtown Chicago in a "newly created vice president position to head two of [Concurrency's] five Digital Transformation practice areas: Customer Engagement and Cloud Datacenter." In his new role at Concurrency, Adegoke is doing much the same work he did for 3Cloud in direct competition with 3Cloud and in plain violation of the twelve-month post-employment non-compete provision in Paragraph 2(b)(ii) of his Confidentiality Agreement.

38. On November 6, 2017, Mike Rocco at 3Cloud sent a letter to Adegoke advising him 3Cloud had become aware of his apparent theft of trade secrets, including his accessing and copying hundreds of confidential documents for which he had no legitimate business reason or need at the time. 3Cloud also advised Adegoke that he was exposing himself to liability as a result of his misconduct, including violating his non-compete obligations.

39. On November 7, 2017, Adegoke called Rocco and denied having improperly accessed any 3Cloud documents for other than legitimate business

11

reasons, and he further denied copying or still having in his possession any 3Cloud documents.

40.     With respect to his work at Concurrency, Adegoke offered no defense to the improper competition. Instead, Adegoke described his current position at Concurrency as being in more of a business strategy role to build Concurrency's Cloud Datacenter and Customer Engagement practices.

41.     From 3Cloud's standpoint, that only exacerbates the harm to 3Cloud by Adegoke utilizing the knowledge and inevitable disclosure of 3Cloud's confidential business information and trade secrets, as well as his experience and training developed by 3Cloud, to strategically build a practice in downtown Chicago that is direct in competition with 3Cloud.

42.     Adegoke sent a letter the following day reasserting his denial of allegations that he was still in possession of any 3Cloud documents.

43.     On November 16, 2017, counsel for 3Cloud sent a letter to Adegoke as well as Concurrency chronicling Adegoke's preceding two months of misconduct with audit results of files Adegoke improperly accessed, including the accessing of hundreds of files within seconds of each other, consistent with a large scale copying effort, involving files for which Adegoke had no legitimate business reason or need at the time, while reiterating and insisting that Adegoke honor the terms of the Employment Agreement and Confidentiality Agreement.

44.     3Cloud and its counsel also advised Defendants that Adegoke's Employment Agreement and Confidentiality Agreement had a non-compete

provision, a non-solicitation provision, and provisions regarding the return of 3Cloud documents and materials upon separation. 3Cloud demanded that Adegoke and Concurrency acknowledge and abide by the terms of Adegoke's continuing post-employment obligations to 3Cloud.

45.    3Cloud also advised Defendants that virtually all of Adegoke's knowledge of Digital Transformation to a cloud environment was provided to Adegoke by 3Cloud, and that his interaction with some of 3Cloud's most important customers, and his access to 3Cloud's sale strategies, pricing strategies, and overall business strategies required that he honor the post-employment restrictions of his Employment Agreement and Confidentiality Agreement.

46.    Additionally, 3Cloud's November 16, 2017 letters specifically advised Adegoke and Concurrency that all materials in their possession or control related in any way to 3Cloud and Adegoke's new employment at Concurrency needed to be preserved in light of potential litigation over the theft of 3Cloud's trade secrets and the violation of Adegoke's post-employment non-compete restrictions.

47.    Specifically, 3Cloud's November 16, 2017 letter advised Adegoke that:

> You are also on notice, as you have been since at least receiving 3Cloud's November 6 letter, regarding potential litigation over your breach of the non-compete and non-solicitation restrictions in your Agreement, and the misappropriation of 3Cloud's confidential business information and trade secrets, including potential statutory claims under the federal Defend Trade Secrets Act and the Computer Fraud and Abuse Act, as well as the Illinois Trade Secrets Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. As such, you are legally obligated to preserve all documents, information, and communications in your possession, custody or control relating in any way to 3Cloud, regardless of whether in hard copy or electronic form, and including information stored on your personal as well as your work computer(s), mobile device(s), and/or flash

13

drives, and all documents and information relating to your efforts to find other employment outside of 3Cloud, including, but not limited to, personal calendars, interview appointments, notes, and communications with Concurrency, other potential employers, recruiters, or any other persons.

48.     After receiving 3Cloud's November 16, 2017 letter, including the above quoted instructions regarding the legal obligation to preserve all documents and information in any form relating to 3Cloud, Adegoke has deliberately destroyed such information, including at the very least 3Cloud documents formerly stored on Adegoke's personal OneDrive account.

49.     On or about December 14, 2017, Defendants advised 3Cloud that they did not intend to honor the terms of Adegoke's non-compete restrictions. They further announced that Adegoke would agree only to provide limited access to one of Adegoke's digital storage mediums to search for 3Cloud documents on the condition that 3Cloud not file a civil action over the theft of 3Cloud's trade secrets or to enforce the non-compete or any other provision of Adegoke's Employment Agreement or Confidentiality Agreement.

50.     At no time have Defendants offered to return the $17,500 payment that Adegoke received as express consideration for the twelve-month non-compete and other post-employment restrictions under his Employment Agreement and Confidentiality Agreement with 3Cloud.

# COUNT I
## MISAPPROPRIATION OF TRADE SECRETS UNDER THE DTSA
### (Against Adegoke)

51.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

52.     At all times relevant, there was in effect the Defend Trade Secrets Act, 18 U.S.C. 1832, et seq.

53.     Adegoke has continued to misappropriate 3Cloud's trade secrets by using 3Cloud's confidential information to develop technology and market himself to competitors of 3Cloud in order to undercut 3Cloud's position in the market and steal 3Cloud's business.

54.     As a result of Defendants' continued and willful misappropriation of 3Cloud's trade secrets, 3Cloud is entitled to actual damages in an amount to be determined at trial, as well as punitive damages stemming from Adegoke's willful and deliberate misrepresentation to 3Cloud that he did not take and does not have 3Cloud's trade secrets and confidential information.

55.     Because 3Cloud lacks a complete and adequate remedy law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment.  Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures that actual loss attributed to the theft or profits acquired by Adegoke as a result of the trade secret theft.

56.     Alternatively, because 3Cloud lacks an adequate remedy at law for actual damages done, and because Adegoke is currently in possession of 3Cloud's secrets and using them to his advantage, 3Cloud requests that this Court grant the Company a "reasonable royalty" on sales generated by Adegoke at Concurrency, pursuant to 18 U.S.C. § 1836 (b)(3)(B).

57.     In addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further use and disclosure of 3Cloud's trade secrets.

**COUNT II**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**(Against Adegoke)**

58.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

59.     At all times relevant, there was in effect the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et. seq.

60.     While still employed by 3Cloud, Adegoke intentionally accessed 3Cloud's protected computer system and without authorization, or acting beyond what he was authorized to do, accessed information on the protected systems and transmitted confidential information belonging to 3Cloud to undisclosed storage devices or systems.

61.     As a result of Adegoke's unauthorized access and/or exceeding his authorized access, 3Cloud has been damaged by the loss of the value of 3Cloud's trade

16

secrets and 3Cloud's competitive edge in the market. 3Cloud has also incurred substantial response costs to address the breach by Adegoke.

62.     Adegoke's conduct violates the Computer Fraud and Abuse Act.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS UNDER ITSA
### (Against Adegoke)

63.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

64.     At all relevant times there was in effect the Illinois Trade Secrets Act, 765 ILCS 1065, et seq.

65.     3Cloud regularly expends substantial time and money to develop and maintain confidential, proprietary, and trade secret information, including, but not limited to, specific and unique techniques and procedures relating to cloud based strategies, a client/prospects database complete with contact information, marketing strategies, client/prospects needs and feedback, and rates, terms and other project specifications, among other data. This information constitutes "trade secrets" under the Illinois Trade Secrets Act.

66.     Adegoke's actions constitute misappropriation of 3Cloud's trade secrets. His conduct in this regard was willful and deliberate, particularly in that Adegoke promised he would abide by the terms of his Confidentiality Agreement while at 3Cloud and thereafter, when in reality he was stealing 3Cloud's trade secrets and then taking steps to hide his activities, including by destroying evidence of his wrongdoing.

17

67.     3Cloud has been damaged by Adegoke's conduct, including the time, money and efforts spent developing unique processes and strategies and protecting them from becoming publicly known.

68.     If Adegoke is not enjoined from any and all violations and continuing use and disclosure of the trade secrets misappropriated from 3Cloud, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

69.     Accordingly, as a result of Adegoke's misappropriation, 3Cloud is entitled to actual damages in an amount to be determined at trial, as well as punitive damages stemming from Adegoke's willful and deliberate misrepresentation to 3Cloud that he would not use 3Cloud's trade secrets and confidential information.

70.     Alternatively, because 3Cloud lacks a complete and adequate remedy at law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment. Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures the actual loss attributed to the theft or profits acquired by Adegoke as a result of his theft of 3Cloud's trade secrets.

71.     Further, in addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further use and disclosure of 3Cloud's trade secrets.

18

## COUNT IV
## <u>BREACH OF CONTRACT</u>
### (Against Adegoke)

72.    3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

73.    Adegoke executed and agreed to abide by the terms of his Employment Agreement and Confidentiality Agreement with 3Cloud.

74.    The Employment and Confidentiality Agreements were supported by good and valuable consideration including, but not limited to, Adegoke's hiring and continued employment with 3Cloud, his training both at 3Cloud and at 3Cloud paid for programs, the guarantee of a first-year fixed bonus of $35,000, on top of Adegoke's base annual salary of $175,000 and any discretionary performance bonus, and payment to Adegoke of the first such guaranteed bonus payment on July 31, 2017, in the amount of $17,500.

75.    The terms of the Agreements protect the legitimate interest of 3Cloud, including its highly valuable, proprietary, and confidential trade secret information. The provisions and covenants pose no undue hardship on Adegoke, and are reasonable as to duration and scope to protect 3Cloud's legitimate business interests.

76.    Adegoke voluntarily terminated his employment from 3Cloud on October 20, 2017.

77.    Adegoke breached his Employment and Confidentiality Agreements by, among other things, studying, copying, and taking 3Cloud trade secrets, including

processes and other information used to create cloud based applications, digital transformation strategies, pricing, client and prospective client lists.

78.    Adegoke further breached his Agreements by transmitting 3Cloud's confidential and trade secret information to his remote storage platforms, without 3Cloud's consent, attempting to hide the fact he copied the information, lying about the fact he copied the information, not returning the misappropriated information to 3Cloud, not providing access to his personal storage platforms and devices involved in the theft, destroying the data and files on his 3Cloud issued laptop computer, and using the misappropriated confidential information and trade secrets to his own benefit and those of 3Cloud's competitors.

79.    Adegoke has also breached his Employment and Confidentiality Agreements by performing defined Company Business within the Restricted Territory for Concurrency - a known direct competitor of 3Cloud.

80.    3Cloud has been damaged by Adegoke's conduct, including the time, money and efforts spent developing its unique digital transformation processes, business and pricing plans, client lists, the costs of training Adegoke, and the loss of the guaranteed bonus paid to Adegoke in exchange for the post-employment restrictive covenants he is now violating, among other things.

81.    If Adegoke is not enjoined from any and all violations and continuing violations of his Agreements, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well

as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

82.     Accordingly, as a result of Adegoke's breach of his Employment and Confidentiality Agreements, 3Cloud is entitled to actual damages in an amount to be determined at trial.

83.     Alternatively, because 3Cloud may lack a complete and adequate remedy at law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment.  Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures that actual loss attributed to the breach by Adegoke as a result of his trade secret theft and use with competitors.

84.     Further, in addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further violations of the restrictive covenants contained in his Employment and Confidentiality Agreements with 3Cloud.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Adegoke)

85.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

86.     As Practice Director and as a Principal Architect, Adegoke held a position of trust and confidence at 3Cloud, and as an employee, owed 3Cloud a fiduciary duty of loyalty.

87.     While Adegoke was still employed by 3Cloud and therefore bound by his fiduciary duty, he purposely accessed and copied confidential and proprietary information for the purpose of using such information to his own benefit and/or that of 3Cloud's competitors.

88.     Adegoke has since attempted to hide the fact he stole the information by destroying files and records of his activities on the laptop computer issued to him by 3Cloud, fabricating false excuses for accessing the information, and then denying he had taken or still had in his possession any files belonging to 3Cloud.

89.     As a result of Adegoke's actions, 3Cloud has been damaged in the form of lost profits, price reductions, recovery costs, and loss of good will among other things.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Concurrency)

90.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

91.     Adegoke knew that he was obligated not to compete with 3Cloud's Company Business within the Restricted Territory, as demonstrated by his signing the Confidentiality Agreement and confirming his awareness of the same after his resignation.

92.     Concurrency similarly was aware of Adegoke's post-employment obligations to 3Cloud, including for twelve months not to assist 3Cloud's competitors

with respect to "Company Business" within the Restricted Territory, nor to take or use 3Cloud's confidential information and trade secrets.

93.    Despite this knowledge, Concurrency's has interfered with the Employment and Confidentiality Agreements with Adegoke by employing him to act in a business strategy role to build Concurrency's Cloud Datcenter and Customer Engagement practices for Concurrency's benefit.

94.    Concurrency's employment of Adegoke, which is based on his experience, training, and certifications developed by 3Cloud, will result in unfair competition against 3Cloud, including but not limited by the inevitable disclosure and use of 3Cloud's confidential business information and trade secrets.

95.    3Cloud has been damaged by Adegoke's and Concurrency's conduct, including the time, money and efforts spent developing its unique digital transformation processes, business and pricing plans, client lists, the costs of training Adegoke, and the loss of the guaranteed bonus paid to Adegoke in exchange for the restrictive covenants, among other things.

96.    If Defendants are not enjoined from any and all violations and continuing violations of interference with 3Cloud's contractual relations, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

## COUNT VII – SPOLIATION OF EVIDENCE
### (Against Adegoke)

97.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

98.     Pursuant to Sec 2(e)(ii) of the Confidentiality Agreement (see ¶ 21 *infra*), there was a special relationship between Adegoke and 3Cloud in the form of a contractual duty to preserve and return to the Company, in good condition, all items referenced in Sec. 2(e)(i) of the Confidentiality Agreement.

99.     Adegoke was reminded of his duty to preserve and return following his voluntary resignation in correspondence from counsel for 3Cloud.

100.     Notwithstanding his obligation to return all 3Cloud materials to 3Cloud following Adegoke's voluntary resignation Adegoke: a) erased the hard drive of 3Cloud's laptop computer before returning it, including reimaging the hard drive and deleting his personal profile; b) he either deleted or refuses to return the hundreds of files he copied from 3Cloud's secure server; and c) he has either deleted or refuses to return the 3Cloud files that were stored on his Microsoft OneDrive account.

101.     Adegoke's destruction or hiding of 3Cloud materials violates the special relationship created by the contractual duty outlined in Sec 2(e)(ii) of the Confidentiality Agreement.

102.     A reasonable person in Adegoke's position should have foreseen that the material he destroyed or is currently refusing to return would be material to a potential civil action against him given he had a contractual duty not to do what he has done and he was reminded of that duty.

103.    3Cloud has been injured to the extent that its materials have been stolen, that software on Adegoke's computer has been lost, 3Cloud's ability to prove a case against Adegoke and Concurrency is jeopardized, and other injuries to be proven at trial.

104.    Adegoke's destruction and/or withholding of 3Cloud materials is the proximate cause of 3Cloud's damages in this case.

WHEREFORE, based on the foregoing facts 3Cloud prays that judgment be entered in its favor and against Adegoke and Concurrency as follows:

(a)     that 3Cloud be entitled to actual damages from Defendants in an amount to be determined at trial;

(b)     that 3Cloud be entitled to the equitable remedies of restitution and unjust enrichment from Defendants in the amount of the value derived from the multiple breaches of Adegoke's Agreements and Concurrency's interference with said Agreements, as well as the amount that measures that actual loss attributed to the theft or profits acquired by Adegoke as a result of the trade secret theft;

(c)     that 3Cloud be awarded its attorneys' fees, costs, compensatory damages, and punitive damages from Defendants in an amount to be proven at trial;

(d)     that 3Cloud be entitled to a permanent injunction to prevent Adegoke from engaging in any further violations of the Agreements, stop Adegoke from their continuing misappropriation of 3Cloud's trade secrets, and

identify and return all confidential information and trade secrets
Adegoke took from 3Cloud or provided to its competitors;

(e)     and for any other relief this Honorable Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated:  January 4, 2018                    Respectfully submitted,


By:     s/ Robert D. Sweeney
Robert D. Sweeney (6238209)
John J. Scharkey (6278387)
Sweeney & Scharkey LLC
111 West Washington Street
Burnham Center, Suite 1160
Chicago, Illinois 60602
Tel. (312) 384-0500

*Counsel for Plaintiff, 3Cloud, LLC*

# EXHIBIT A



October 21, 2016

Adetayo Adegoke
4756 S Drexel Blvd
Chicago, IL 60615


Mr. Adegoke,

We are pleased to offer you the position of Practice Director - Cloud Modernization with 3Cloud, LLC ("3Cloud" or the "Company"). This offer is contingent on our completion of a satisfactory pre-employment background check and reference check. Additional details about the terms and conditions of your employment offer are set forth below.

Subject to your acceptance of this offer, your employment with 3Cloud will begin on November 16, 2017. You will report to Bob Moore, Vice President of Professional Services, unless notified otherwise. The initial scope of Employee's job duties and responsibilities shall include building out the Cloud Modernization services organization, participating in presales activities, running all aspects of delivery, as well as such other duties and responsibilities as may be determined by the Company. During your employment, you shall devote your best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity, or other approved leave) to the business and affairs of the Company, including any subsidiaries and/or affiliates. You shall perform your duties and responsibilities to the best of your abilities in a diligent, trustworthy, businesslike and efficient manner.

Employment Period. Notwithstanding any provision to the contrary, the nature and term of your employment shall be "at-will," such that either you or the Company may terminate your employment with the Company for any reason, or for no reason at all, at any time, upon two-week's notice of the termination.

Base Salary. The Company shall pay you for work performed on a salary basis in installments twice per month based on the Company's normal payroll practices as may be in effect from time to time. Your initial base salary will be $175,000 per year. Thereafter, the Company may review and make modifications to your salary from time to time. The Company may withhold from any amounts payable under this letter all federal, state, city or other taxes as the Company is required to withhold pursuant to any applicable law, regulation or ruling.

Bonus. Effective January 1, 2017, you will be eligible to receive an annual bonus of $35,000 to be paid semi-annually on July 31, 2017 and January 31, 2018. These bonus payments are guaranteed provided that you are employed by 3Cloud at the time of the payment.

In future years, 3Cloud will establish appropriate revenue and gross profit margin targets to fund an attractive bonus structure.

Overachievement Bonus Payment. You may also be eligible to receive discretionary performance bonuses based on the achievement of revenue and gross profit margin metrics as determined from time to time by the Company. In 2017, you will be eligible to receive such a discretionary bonus payment of up to $40,000 to be earned in the following manner:

(a)     $20,000 provided either condition is met: (i) $1,500,000 in revenue is generated by/in the Company's Cloud Modernization practice: or (i) $600,000 in gross

Any Overachievement Bonus Payment earned shall be paid to you on January 31, 2018. The Company may reevaluate your eligibility for Overachievement Bonus Payments annually thereafter; and such payments shall be paid in the calendar year following the calendar year in which such bonus was earned.

Benefits. You will be entitled to participate in the 3Cloud's standard medical benefits that are generally made available to the Company's employees and as they exist and are modified from time to time and subject to satisfying the applicable eligibility requirements. Benefits offered by 3Cloud are subject to modification, suspension or termination at any time in accordance with the terms of the plan documents and applicable law.

Vacation. You are eligible to take vacation as needed on an appropriate basis and subject to manager approval.

Confidentiality; Non-Solicitation. This Offer is contingent on you signing the attached Confidential Information and Non-Solicitation Agreement attached hereto. As added consideration for the same, the Company will guarantee the first-year bonus payment of $35,000 (to be paid semi-annually on July 31, 2017, ant January 31, 2018) ("Fixed Bonus Payment"), provided you are employed on the date of payment. In the event you are not employed on the date of such payment, the Company may in its discretion choose to pay you $10,000 as separate and additional consideration for the Confidential Information and Non-Solicitation Agreement, or choose to waive enforcement of the same as part of a general release agreement signed by you.

General Provisions. This letter shall be governed by, and construed in accordance with, the internal, substantive laws of the State of Illinois. This letter is personal to you and you may not assign it. It will be binding upon and inure to the benefit of 3Cloud's successors and assigns.

If you accept this Offer, subject to the conditions and contingencies described above, please sign this letter in the space provided below, sign the enclosed Confidential Information and Non-Solicitation Agreement, and return both signed documents to my attention. We are

excited to welcome you as a member of 3Cloud's team and look forward to your future contributions to the Company's success.

Sincerely,

Mike Rocco
Chief Executive Officer

Accepted and Agreed to:

_____
Adetayo Adegoke

Date: _____

<u>Enclosure</u>
Confidential Information and Non-Solicitation Agreement

# EXHIBIT B

# CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT

This CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT ("Agreement") is entered into as of October 21, 2016 (the "Effective Date") between 3Cloud, LLC (the "Company") and Adetayo Adegoke ("Employee") (collectively, the "Parties").

WHEREAS, the Employee signed an Offer Letter on October 21, 2016 and agreed to employment with the Company; and

WHEREAS, the Employee, in the course of his or her employment by the Company, will have access to and use certain documents and information in a confidential nature; and

WHEREAS, the Employee has agreed that as a condition of his or her employment with the Corporation that he or she will not disclose such confidential information.

In consideration of the mutual covenants contained herein and other good and valuable consideration as described below, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    Consideration.  As described more fully in the Offer Letter dated October 21, 2016, as separate and additional consideration for the Employee's agreement to abide by the restrictions contained in this Agreement, the Company will guarantee the first-year bonus payment of $35,000 (to be paid semi-annually on July 31, 2017, and January 31, 2018) ("Fixed Bonus Payment"), provided Employee is employed as of the date of the first payment (July 31, 2017).  In the event Employee is not employed on the date of the first payment (July 31, 2017), the Company may in its discretion choose to pay Employee $10,000 as separate and additional consideration, or choose to waive enforcement of this Agreement as part of a general release agreement signed by Employee.

2.    Competitive Activity; Confidentiality; Non-Solicitation.

(a)    Acknowledgements and Agreements.  Employee hereby acknowledges and agrees that in the performance of Employee's duties to the Company during his employment, Employee will be brought into frequent contact with existing and potential customers of the Company throughout the United States. Employee also agrees that trade secrets and confidential information of the Company, more fully described in subparagraph 2(e)(i), below, gained by Employee during his association with the Company have been developed by the Company through substantial expenditures of time, effort and money, and constitute valuable and unique property of the Company. Employee further understands and agrees that the foregoing makes it necessary for the protection of the Company's Business that Employee not compete with the Company during Employee's employment with the Company and not compete with the Company for a reasonable period thereafter, as further provided in the subparagraphs, below.

(b)    Covenants.

1

(i)    <u>Covenants During Employment</u>.  While employed by the Company, Employee will not compete with, undermine or otherwise work in a manner that is contrary to the interests of the Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, while employed by the Company, Employee will not:

    (A)    enter into or engage in any business which competes with the Company's Business;

    (B)    solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business;

    (C)    divert, entice or otherwise take away any customers, business, patronage or orders of the Company or attempt to do so; or

    (D)    promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

(ii)    <u>Covenants Following Termination</u>.  For a period of twelve (12) months following the termination of Employee's employment with the Company, Employee will not:

    (A)    enter into or engage in any business which competes with the Company's Business within the Restricted Territory;

    (B)    solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;

    (C)    divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or

    (D)    promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(iii)    <u>Indirect Competition</u>.  For the purposes of subparagraphs 2(b)(i) and (ii) inclusive, but without limitation thereof, Employee will be in violation if Employee engages in any or all of the activities set forth therein directly as an individual on Employee's own account, or indirectly as a partner, joint venturer, employee, agent, salesperson, consultant, officer and/or director of any firm,

2

Initial A.A.

association, partnership, corporation or other entity, or as a stockholder of any corporation in which Employee or Employee's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than three percent (3%) of the outstanding stock.

(iv)     If it shall be judicially determined that Employee has violated this subparagraph 2(b), then the period applicable to each obligation that Employee shall have been determined to have violated shall automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

(c)     The Company.  For purposes of this Agreement, the Company shall include any and all direct and indirect subsidiary, parent, affiliated, or related entities of the Company for which Employee worked or had responsibility at the time of termination of Employee's employment and at any time during the two (2) years prior to such termination.

(d)     Non-Solicitation.  Employee will not directly or indirectly at any time during the period of Employee's employment or thereafter, attempt to disrupt, damage, impair or interfere with the Company's Business by raiding any of the Company's employees or soliciting any of them to resign from their employment by the Company, or by disrupting the relationship between the Company and any of its consultants, agents or representatives.  Employee acknowledges that this covenant is necessary to enable the Company to maintain a stable workforce and remain in business.

(e)     Further Covenants.

(i)     Employee will keep in strict confidence, and will not, directly or indirectly, at any time, during or after Employee's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any trade secrets or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Employee may have acquired such information.  Such confidential information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information.  Employee specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by the Company, and/or Employee, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by

3

Initial AA.

Employee during Employee's employment with the Company (except in the course of performing Employee's duties and obligations to the Company) or after the termination of Employee's employment shall constitute a misappropriation of the Company's trade secrets.

(ii)    Employee agrees that upon termination of his employment with the Company, for any reason, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement.  In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

(f)    Discoveries and Inventions; Work Made for Hire.

(i)    Employee agrees that upon conception and/or development of any idea, discovery, invention, improvement, software, writing or other material or design that: (A) relates to the business of the Company, or (B) relates to the Company's actual or demonstrably anticipated research or development, or (C) results from any work performed by Employee for the Company, Employee will assign to the Company the entire right, title and interest in and to any such idea, discovery, invention, improvement, software, writing or other material or design. Employee has no obligation to assign any idea, discovery, invention, improvement, software, writing or other material or design that Employee conceives and/or develops entirely on Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information unless the idea, discovery, invention, improvement, software, writing or other material or design: (x) relates to the business of the Company, or (y) relates to the Company's actual or demonstrably anticipated research or development, or (z) results from any work performed by Employee for the Company.  Employee agrees that any idea, discovery, invention, improvement, software, writing or other material or design that relates to the business of the Company or relates to the Company's actual or demonstrably anticipated research or development which is conceived or suggested by Employee, either solely or jointly with others, within one (1) year following the termination of Employee's employment shall be presumed to have been so made, conceived or suggested in the course of such employment with the use of the Company's equipment, supplies, facilities, and/or trade secrets.

(ii)    In order to determine the rights of Employee and the Company in any idea, discovery, invention, improvement, software, writing or other material, and to insure the protection of the same, Employee agrees that during Employee's employment, and for one (1) year after the termination of Employee's employment, Employee will disclose immediately and fully to the Company any idea, discovery, invention, improvement, software, writing or other material or

4

Initial K.A.

design conceived, made or developed by Employee solely or jointly with others. The Company agrees to keep any such disclosures confidential. Employee also agrees to record descriptions of all work in the manner directed by the Company and agrees that all such records and copies, samples and experimental materials will be the exclusive property of the Company. Employee agrees that at the request of and without charge to the Company, but at the Company's expense, Employee will execute a written assignment of the idea, discovery, invention, improvement, software, writing or other material or design to the Company and will assign to the Company any application for letters patent or for trademark registration made thereon, and to any common-law or statutory copyright therein; and that Employee will do whatever may be necessary or desirable to enable the Company to secure any patent, trademark, copyright, or other property right therein in the United States and in any foreign country, and any division, renewal, continuation, or continuation in part thereof, or for any reissue of any patent issued thereon. In the event the Company is unable, after reasonable effort, and in any event after ten business days, to secure Employee's signature on a written assignment to the Company of any application for letters patent or to any common-law or statutory copyright or other property right therein, whether because of Employee's physical or mental incapacity or for any other reason whatsoever, Employee irrevocably designates and appoints one of the founders of the Company as Employee's attorney-in-fact to act on Employee's behalf to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, copyright or trademark.

       (iii)    Employee acknowledges that, to the extent permitted by law, all work papers, reports, documentation, drawings, photographs, negatives, tapes and masters therefore, prototypes and other materials (hereinafter, "items"), including without limitation, any and all such items generated and maintained on any form of electronic media, generated by Employee during Employee's employment with the Company shall be considered a "work made for hire" and that ownership of any and all copyrights in any and all such items shall belong to the Company. The item will recognize the Company as the copyright owner, will contain all proper copyright notices, e.g., "(creation date) 3Cloud, LLC, All Rights Reserved," and will be in condition to be registered or otherwise placed in compliance with registration or other statutory requirements throughout the world.

      (g)    <u>Communication of Contents of Agreement</u>. While employed by the Company and for a period of twelve (12) months following the termination of Employee's employment thereafter, Employee will communicate the contents of paragraph 2 of this Agreement to any person, firm, association, partnership, corporation or other entity that Employee intends to be employed by, associated with, or represent.

      (h)    <u>Confidentiality Agreements</u>. Employee agrees that he shall not disclose to the Company or induce the Company to use any secret or confidential information belonging to Employee's former employer(s). Employee warrants that Employee is not bound by the terms of a confidentiality agreement or other agreement with a third party that he has not fully disclosed to the Company that would potentially preclude or limit

5

conceived during employment with the Company. Employee agrees to provide the Company with a copy of any and all agreements with a third party that preclude or limit Employee's right to make disclosures or to engage in any other activities contemplated by Employee's employment with the Company.

(i)     Relief. Employee acknowledges and agrees that the remedy at law available to the Company for breach of any of Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that, in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision contained in subparagraphs 2(b), 5(d), 5(e), 5(f), 5(g) and 5(h) inclusive, of this Agreement, without the necessity of proof of actual damage.

(j)     Reasonableness. Employee acknowledges that Employee's obligations under this paragraph 2 are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Employee were to violate such obligations. Employee further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration, which Employee acknowledges constitutes good, valuable and sufficient consideration.

3.     Definitions.

(a)     "Company's Business" means a full service technology consulting firm that provides cloud strategies, solutions and managed services for commercial clients, including, but not limited to cloud modernization, advanced data analytics, Internet of things, Azure infrastructure services and cloud applications development.

(b)     "Restricted Territory" means: (i) the geographic area(s) within a one-hundred (100) mile radius of Chicago; (ii) the State of Texas, and (iii) all of the specific customer accounts, whether within or outside of the geographic area described in (i) or (ii) above, with which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

4.     Survival. Subject to any limits on applicability contained therein this Agreement shall survive and continue in full force in accordance with its terms notwithstanding any termination of Employee's employment.

5.     Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid or unenforceable in any respect under any applicable law, such invalidity or unenforceability shall not affect any other provision, but this Agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

6

Initial

6. <u>Prevailing Party's Litigation Expenses</u>.  In the event of litigation between the Company and Employee related to this Agreement, the non-prevailing party shall reimburse the prevailing party for any costs and expenses (including, without limitation, attorneys' fees) reasonably incurred by the prevailing party in connection therewith.

7. <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by Employee, the Company and their respective heirs, executors, personal representatives, successors and assigns, except that neither party may assign any rights or delegate any obligations hereunder without the prior written consent of the other party. Employee hereby consents to the assignment by the Company of all of its rights and obligations hereunder to any successor to the Company by merger or consolidation or purchase of all or substantially all of the Company's assets, provided such transferee or successor assumes the liabilities of the Company hereunder.

8. <u>Choice of Law</u>.  This Agreement shall be governed by, and construed in accordance with, the internal, substantive laws of the State of Illinois.  Employee agrees that the state and federal courts located in the State of Illinois shall have jurisdiction in any action, suit or proceeding against Employee based on or arising out of this Agreement and Employee hereby: (a) submits to the personal jurisdiction of such courts; (b) consents to service of process in connection with any action, suit or proceeding against Employee; and (c) waives any other requirement (whether imposed by statute, rule of court or otherwise) with respect to personal jurisdiction, venue or service of process.

9. <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

10. **<u>Operation of Agreement</u>.  This Agreement will be binding immediately upon its execution, but, notwithstanding any provision of this Agreement to the contrary, this Agreement will not become effective or operative (and neither Party will have any obligation hereunder) until the "<u>Effective Date</u>".**

[SIGNATURES ON FOLLOWING PAGE]

Initial A.A.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**3Cloud, LLC**

By: _____

Name: Robert C. Moore

Title: VP, Professional Services

**Adetayo Adegoke**

_____

Adetayo Adegoke

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.1
### Eastern Division

3Cloud, LLC

                      Plaintiff,

v.                                      Case No.: 1:18−cv−00076

                                      Honorable Elaine E. Bucklo

Concurrency, Inc., et al.

                      Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 16, 2019:

    MINUTE entry before the Honorable M. David Weisman: Motion hearing held. For the reasons stated on the record, including the complete inadequacy of Defendant Adegoke's objections and responses, the Court grants the portion of Plaintiff's motion to compel [99] regarding specific discovery requests and an award of fees. Defendant Adegoke shall supplement his response to all discovery requests identified in Plaintiff's motion by 10/23/19. The Court will issue an order with respect to Rule 37 fees after reviewing Plaintiff's anticipated fee petition and Defendant's objections (if any). The Court enters and continues the portion of the motion concerning an award of default judgment. Status/Motion hearing set for 10/30/19 at 9:15 a.m. For the reasons stated on the record, Plaintiff's oral motion to compel written discovery production by Defendant Concurrency is granted over Defendant Concurrency's objection. Defendant shall produce the information discussed on the record by 11/22/19. If Defendant fails to produce the requested information by 11/22/19, Plaintiff may file a motion for sanctions, if appropriate. Mailed notice (ao,)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Adetayo Adegoke |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of Illinois |
| Case number | 19-34092 |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | 3Cloud, LLC | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☑ No ☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent? Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | Sweeney Scharkey & Blanchard / Garrett Nye | |
| | Name | Name |
| | 230 W. Monroe St., Suite 1500 | |
| | Number       Street | Number       Street |
| | Chicago          IL          60606 | |
| | City                State        ZIP Code | City                State        ZIP Code |
| | Contact phone 312-384-1287 | Contact phone |
| | Contact email gnye@ssbpartners.com | Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |
| 4. Does this claim amend one already filed? | ☐ No ☑ Yes.  Claim number on court claims registry (if known) No. 2 | Filed on 02/11/2020 MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No ☐ Yes.  Who made the earlier filing? | |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____429,852.51 **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Claims asserted in pending litigation in the USDC for the N.D. Ill.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                       $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:      $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | | | Amount entitled to priority |
|---|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   05/04/2020
MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

Name   Michelangelo Rocco
First name   Middle name   Last name

Title   CEO

Company   3Cloud, LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   3025 Highland Parkway, Suite 525
Number   Street

Downers Grove   IL   60515
City   State   ZIP Code

Contact phone   _____   Email   mrocco@3cloudsolutions.com

---

## Attachment to Proof of Claim

Debtor is a former employee of 3Cloud, LLC ("3Cloud"). Shortly after resigning, Debtor was hired by Concurrency, Inc. ("Concurrency"), 3Cloud's competitor. Around that time, 3Cloud became aware that Debtor misappropriated certain trade secrets belonging to 3Cloud. Among other things, these actions were breaches of the terms of Debtor's Employment Agreement and/or Confidential Information and Non-Solicitation Agreement. Accordingly, on January 4, 2018, 3Cloud filed its Complaint in the United States District Court for the Northern District of Illinois, thereby commencing *3Cloud, LLC v. Concurrency, Inc. and Adetayo Adegoke*, Case No. 1:18-CV-0076 ("District Court Litigation"). In its Complaint, 3Cloud seeks recovery of damages resulting from Debtor's actions. These claims arise in contract, tort and pursuant to certain statutory provisions regarding trade secrets. A true and correct copy of the Complaint filed in the District Court Litigation is attached hereto as Exhibit "A."

While the litigation remains pending against Concurrency, 3Cloud has calculated the amount it believes it is owed. An itemization of its claim is as follows:

| | |
|---|---|
| Attorneys' Fees: | $220,585.78 |
| Restitution for Breach (2017 – 2019): | $182,766.73 |
| Disgorgement of Bonus for Breach: | $ 17,500.00 |
| Return of Investment in Movere Certification: | $   9,000.00 |
| Total: | $429,852.51 |

With respect to 3Cloud's claim for attorneys' fees, the line item above includes pre-petition fees incurred with respect to the District Court Litigation. Fees have been incurred/paid to Jones Day ($56,074.50), Epstein Becker & Green, P.C. ($78,080.78) and Sweeney, Scharkey & Blanchard LLC ($86,430.50). The invoices reflecting these fees are voluminous and contain information protected by the attorney-client privilege. Copies of redacted invoices are available upon request. 3Cloud further notes that a portion of these fees were incurred with respect to certain

discovery disputes in the District Court Litigation. A true and correct copy of a minute order awarding sanctions to 3Cloud is attached hereto as Exhibit "B."

With respect to 3Cloud's claim for restitution, 3Cloud's claim equals the difference between the income Debtor earned at Concurrency, Inc. and what he would have earned at 3Cloud. Information shedding light on Debtor's income while employed by Concurrency was produced by Debtor as part of the District Court Litigation and was used to calculate 3Cloud's claim for restitution. This information is within Debtor's possession and has been attached hereto as Exhibit "C," with the exception of documents that are subject to a protective order in the District Court Litigation. Specifically, the claim was calculated as follows:

- In 2017, Debtor worked at Concurrency from October 23 through December 31. According to his employment agreement with Concurrency, Debtor earned $62,500.00 during that time span. Had he remained at 3Cloud, Debtor would have earned $33,653.85[1] during the same time span (ten weeks), resulting in an incremental benefit to Debtor of $28,856.15.

- In 2018, Debtor earned $285,936.28 at Concurrency. Had he remained at 3Cloud, Debtor would have earned $192,500.00[2] in 2018, resulting in an incremental benefit to Debtor of $93,436.38.

- In 2019, Debtor worked at Concurrency from January 1 through April 17 (and was paid through May 15). During that time, Debtor earned $127,781.89. Had Debtor remained at 3Cloud, Debtor would have earned $67,307.69 during the same time period (20 weeks), resulting in an incremental benefit to Debtor of $60,474.20.

The remaining two lines items reflect a bonus that was paid to Debtor by 3Cloud in July of 2017 and costs associated with paying for Debtor's Movere certification.

---

[1] This reflects a pro-rata amount of Debtor's $175,000.00 base salary at 3Cloud.

[2] 3Cloud owed Debtor a $17,500.00 guaranteed bonus in 2018.

**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| 3CLOUD, LLC, | |
| Plaintiff, | Civil Action No. |
| v. | Judge |
| | Magistrate |
| CONCURRENCY, INC., and ADETAYO ADEGOKE, | |
| | Demand for Jury Trial |
| Defendants. | |

## COMPLAINT

Plaintiff 3Cloud, LLC ("3Cloud" or the "Company"), by and through its undersigned counsel, for its Complaint against Defendants Concurrency, Inc. ("Concurrency") and Adetayo Adegoke ("Adegoke") (collectively "Defendants") states as follows:

## NATURE OF THE ACTION

1.     This is an action for damages, equitable relief, and permanent injunctive relief based on Defendants' theft of 3Cloud's confidential information and trade secrets, tortious conduct, and Mr. Adegoke's breach of his employment agreement. Founded by former Microsoft executives, 3Cloud is the premier technology consulting firm in Chicago that helps businesses transition to and maximize the Microsoft Azure platform. 3Cloud helps businesses develop applications and processes to take advantage of cloud computing, using the Azure platform to provide better data services and analytics, cloud-scale infrastructure, and a host of other capabilities that

Microsoft Azure makes possible for small businesses or enterprise clients seeking public, private or hybrid cloud solutions.

2.      3Cloud spends substantial sums protecting its confidential and proprietary information and in educating its employees in processes and training that make 3Cloud the premier Microsoft Azure partner for businesses seeking to improve or create a cloud presence.

3.      During the late summer and fall of 2017, unbeknownst to 3Cloud, Adegoke, 3Cloud's former Practice Director for Cloud Infrastructure and Principal Architect, began a calculated and deceitful enterprise of accessing and stealing proprietary and confidential documents from 3Cloud so that he could utilize that information in subsequent employment he would obtain with one of 3Cloud's direct competitors, Defendant Concurrency.

4.      As a result, Adegoke has violated multiple provisions of his employment agreements, entitling 3Cloud to the relief sought in this action. Additionally, Concurrency's conduct in knowingly continuing to employ Adegoke in violation of his contractual obligations to 3Cloud and with the intent of using his knowledge, training and experience gained at 3Cloud, including the inevitable disclosure of its illegally acquired confidential information and trade secrets, tortiously interfered with 3Cloud's contract with Adegoke.

5.      Adegoke further breached his fiduciary duty of loyalty to 3Cloud by stealing 3Cloud's trade secrets and confidential information while employed by 3Cloud and then attempting to cover his trail and lie about what he did.

## PARTIES

6.      3Cloud is a Delaware limited liability company, with its principal place of business at 3025 Highland Parkway in Downers Grove, Illinois.

7.      On information and belief, Adegoke is an Illinois resident who resides at 4756 South Drexel in Chicago, Illinois.

8.      Concurrency is a Wisconsin corporation doing business in Illinois with offices at 150 North Wacker Drive in Chicago, Illinois.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of 18 U.S.C. § 1832 and 18 U.S.C. § 1030, and 28 U.S.C. § 1367(a) permits supplemental jurisdiction over the remaining state-law claims.

10.      Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because this action arises from a contract in which a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS
## COMMON TO ALL COUNTS AND ALL DEFENDANTS

### Adegoke's Agreements with 3Cloud

11.      On or about October 21, 2016, 3Cloud offered Adegoke employment with the Company at an annual base salary of $175,000.  His position was Practice Director – Cloud Modernization, and in that capacity he was responsible for, among other things, building out the Cloud Modernization services organization,

participating in presales activities with potential customers, and running all aspects of delivery to potential clients and clients.

12.     In conjunction with his acceptance of the offer of employment from 3Cloud, Adegoke signed an Employment Agreement ("Employment Agreement") and a Confidential Information and Non-Solicitation Agreement ("Confidentiality Agreement"), true and accurate copies of which are attached hereto and the terms are fully incorporated herein as Exhibit A and Exhibit B, respectively.

13.     As part of the Employment Agreement, 3Cloud gave Adegoke a guaranteed first year $35,000 bonus as consideration for Adegoke executing the Confidentiality Agreement.  The guaranteed bonus was payable to Adegoke in two installments, on July 31, 2017 and January 31, 2018, provided Adegoke was employed on the date of payment. In the event Adegoke's employment was separated before July 31, 2017, 3Cloud had the option to pay Adegoke the sum of $10,000 as consideration for the Confidentiality Agreement. (Exhibit A at 1-2; Exhibit B ¶ 1.)

14.     3Cloud paid Adegoke the first guaranteed bonus installment of $17,500 on July 31, 2017 in exchange for Adegoke signing the Confidentiality Agreement.

15.     Adegoke voluntarily resigned his employment with 3Cloud before the second guaranteed installment was due. Specifically, Adegoke notified 3Cloud on October 8, 2017 that he would resign in two weeks in order to accept other employment. At the time, Adegoke declined to provide information about his new employment, which turned out to be with Concurrency in direct violation of the post-employment restrictions in Adegoke's Confidentiality Agreement.

4

16.     Under the Confidentiality Agreement, Adegoke agreed that he would, during the course of his employment, have access to confidential documents and information; that he would be brought into frequent contact with existing and potential customers of the Company; and that the Company had developed its confidential information and trade secrets through the substantial expenditure of time, effort and money.  Adegoke further agreed that he would not disclose this information.  (*See* Exhibit B ¶ 2(a).)

17.     Adegoke agreed in the Confidentiality Agreement that:

> (ii) For a period of (12) months following the termination of Employee's employment with the Company, Employee will not:
>
>> (A) enter into or engage in any business which competes with the Company's Business within the Restricted Territory;
>>
>> (B) solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;
>>
>> (C) divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or
>>
>> (D) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation, or any other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(Exhibit B ¶ 2(b)(ii)(A-D).)

18.     The Confidentiality Agreement further provides:

> (i)     Employee will keep in strict confidence, and will not, directly or indirectly, at any time, during or after

Employee's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any trade secrets, or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Employee may have acquired such information. Such confidential information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses, and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information. Employee specifically acknowledges that all such confidential information, whether reduced to any form of writing, maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by the Company, and/or Employee, derives independent economic value from not being readily known or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by Employee during Employee's employment with the Company (except in the course of performing Employee's duties and obligations to the Company) or after the termination of Employee's employment shall constitute a misappropriation of the Company's trade secrets.

(ii) Employee agrees that upon termination of his employment with the Company, for any reason, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement. In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing, and/or recovering such property.

6

(Exhibit B ¶ 2(e)(i-ii).)

19.     With respect to the relief available under the Confidentiality

Agreement, it states:

> i.  Employee acknowledges and agrees that the remedy at law available to the Company for breach of any of Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provisions contained in subparagraphs 2(b), 5(d), 5(e), 5(f), 5(g) and 5(h) inclusive, of this Agreement, without the necessity of proof of actual damage.

(Exhibit B ¶2(i).)

20.     With respect to Adegoke's concurrence that the restrictions of the

Confidentiality Agreement are reasonable, the Confidentiality Agreement states:

> j.  Employee acknowledges that the Employee's obligations under this paragraph 2 are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Employee were to violate such obligations.  Employee further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration, which Employee acknowledges constitutes good, valuable and sufficient consideration.

(Exhibit B ¶2(j).)

21.     The Confidentiality Agreement defines Company's Business and

Restricted Territory as:

> (a) "Company's Business" means a full service technology consulting firm that provides cloud strategies, solutions and managed services for commercial clients, including but not limited to, cloud modernization, advanced data analytics,

7

Internet of Things, Azure infrastructure services and cloud applications development.

(b) "Restricted Territory" means (i) the geographic area(s) within a one-hundred (100) mile radius of Chicago; (ii) the State of Texas, and (iii) all of the specific customer accounts, whether within or without the geographic area described in (i) or (ii) above, which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

(Exhibit B ¶3(a-b).)

### Adegoke's Prior Job Experience and Performance at 3Cloud

22.     Adegoke's primary job experience prior to coming to 3Cloud was in the desktop environment.

23.     Nonetheless, Adegoke billed himself as having greater experience in cloud infrastructure and digital transformation projects than he actually had.

24.     At various times, when called upon to perform tasks appropriate for a Practice Director, Adegoke had to admit that he had never done such work before. For example, prior to working for 3Cloud Adegoke had not done a cloud data migration for a business.

25.     3Cloud nonetheless invested significant resources in training Adegoke in all aspects of its business.

26.     For example, in addition to providing Adegoke access and training with respect to all of 3Cloud's methods, strategies, pricing and other proprietary information, 3Cloud sent Adegoke to Seattle, Washington to train and become

certified in a critical Platform as a Service (PaaS) called Movere owned by Unified Logic. 3Cloud did this at significant expense.

27.    Movere certification is extremely limited and valuable and a company can become a preferred Movere vendor with only a single Movere resource, like Adegoke, once trained by Uniform Logic.

28.    Recognizing that it needed someone with more experience and knowledge in the role of Practice Director, on August 2, 2017, 3Cloud told Adegoke that he was being moved into the role of Principal Architect. The change in role resulted in no loss in pay to Adegoke and did not modify the terms of his Confidentiality Agreement.

29.    Approximately five weeks later, on September 8, 2017, Adegoke accessed and copied hundreds of files on 3Cloud's secure computer network, including files from key clients and across file directories containing information regarding confidential pricing models, architectural documents, and client presentations, among other things. These confidential 3Cloud files included numerous files for which Adegoke was not authorized to access and for which he had no legitimate need based on his current position with the Company or his responsibilities attendant thereto.

30.    On September 13, 2017, Adegoke accessed 3Cloud's secure network and copied documentation related to 3Cloud's newly launched Managed Services business ("Azure Assurance"), including proposed contractual terms, pricing and service definitions.    None of these materials had anything to do with Adegoke's responsibilities at 3Cloud.

9

31.    On September 18 and 19, 2017, Adegoke accessed 3Cloud's secure network and copied dozens more documents that did not pertain to Adegoke's current work or responsibilities.  These documents included 3Cloud's business agreements and contract templates, Microsoft partner documentation, 3Cloud's rate cards, pricing calculators, and sales pipeline information, among other things.

32.    On October 8, 2017, Adegoke contacted 3Cloud CEO, Mike Rocco, by phone and advised Rocco that he was giving two weeks' notice of his voluntary resignation. While Adegoke stated he was going to work for another company, he declined to identify his new employer.

33.    On October 20, 2017, Adegoke's last day of employment, instead of coming into the office, Adegoke shipped his 3Cloud issued laptop computer back to 3Cloud.

34.    Adegoke did not send the computer back in its unaltered condition with 3Cloud's business files and hard drive intact.  Instead, without instruction or permission from 3Cloud, Adegoke erased the hard drive of 3Cloud's laptop computer before returning it, including reimaging the hard drive and deleting his personal profile, in order to completely wipe the hard drive of any digital signature of his activities and make it extremely difficult, if not impossible, to determine what was on or done with the computer.

35.    At no time was Adegoke told or given permission to wipe his 3Cloud issued computer, nor reinstall Windows.

10

36.     Adegoke's actions in wiping clean and reimaging his 3Cloud laptop computer prior to returning it resulted in 3Cloud losing business files stored on the laptop, losing software licensed to 3Cloud that was on Adegoke's computer such as Azure Docit, and losing the ability to analyze Adegoke's conduct with the computer, including the handling of 3Cloud's confidential business information and trade secrets.

### Adegoke Joins Concurrency

37.     On October 31, 2017, Concurrency issued a press release announcing Adegoke was being hired at its office in downtown Chicago in a "newly created vice president position to head two of [Concurrency's] five Digital Transformation practice areas: Customer Engagement and Cloud Datacenter." In his new role at Concurrency, Adegoke is doing much the same work he did for 3Cloud in direct competition with 3Cloud and in plain violation of the twelve-month post-employment non-compete provision in Paragraph 2(b)(ii) of his Confidentiality Agreement.

38.     On November 6, 2017, Mike Rocco at 3Cloud sent a letter to Adegoke advising him 3Cloud had become aware of his apparent theft of trade secrets, including his accessing and copying hundreds of confidential documents for which he had no legitimate business reason or need at the time.  3Cloud also advised Adegoke that he was exposing himself to liability as a result of his misconduct, including violating his non-compete obligations.

39.     On November 7, 2017, Adegoke called Rocco and denied having improperly accessed any 3Cloud documents for other than legitimate business

reasons, and he further denied copying or still having in his possession any 3Cloud documents.

40.     With respect to his work at Concurrency, Adegoke offered no defense to the improper competition. Instead, Adegoke described his current position at Concurrency as being in more of a business strategy role to build Concurrency's Cloud Datacenter and Customer Engagement practices.

41.     From 3Cloud's standpoint, that only exacerbates the harm to 3Cloud by Adegoke utilizing the knowledge and inevitable disclosure of 3Cloud's confidential business information and trade secrets, as well as his experience and training developed by 3Cloud, to strategically build a practice in downtown Chicago that is direct in competition with 3Cloud.

42.     Adegoke sent a letter the following day reasserting his denial of allegations that he was still in possession of any 3Cloud documents.

43.     On November 16, 2017, counsel for 3Cloud sent a letter to Adegoke as well as Concurrency chronicling Adegoke's preceding two months of misconduct with audit results of files Adegoke improperly accessed, including the accessing of hundreds of files within seconds of each other, consistent with a large scale copying effort, involving files for which Adegoke had no legitimate business reason or need at the time, while reiterating and insisting that Adegoke honor the terms of the Employment Agreement and Confidentiality Agreement.

44.     3Cloud and its counsel also advised Defendants that Adegoke's Employment Agreement and Confidentiality Agreement had a non-compete

12

provision, a non-solicitation provision, and provisions regarding the return of 3Cloud documents and materials upon separation. 3Cloud demanded that Adegoke and Concurrency acknowledge and abide by the terms of Adegoke's continuing post-employment obligations to 3Cloud.

45.     3Cloud also advised Defendants that virtually all of Adegoke's knowledge of Digital Transformation to a cloud environment was provided to Adegoke by 3Cloud, and that his interaction with some of 3Cloud's most important customers, and his access to 3Cloud's sale strategies, pricing strategies, and overall business strategies required that he honor the post-employment restrictions of his Employment Agreement and Confidentiality Agreement.

46.     Additionally, 3Cloud's November 16, 2017 letters specifically advised Adegoke and Concurrency that all materials in their possession or control related in any way to 3Cloud and Adegoke's new employment at Concurrency needed to be preserved in light of potential litigation over the theft of 3Cloud's trade secrets and the violation of Adegoke's post-employment non-compete restrictions.

47.     Specifically, 3Cloud's November 16, 2017 letter advised Adegoke that:

> You are also on notice, as you have been since at least receiving 3Cloud's November 6 letter, regarding potential litigation over your breach of the non-compete and non-solicitation restrictions in your Agreement, and the misappropriation of 3Cloud's confidential business information and trade secrets, including potential statutory claims under the federal Defend Trade Secrets Act and the Computer Fraud and Abuse Act, as well as the Illinois Trade Secrets Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. As such, you are legally obligated to preserve all documents, information, and communications in your possession, custody or control relating in any way to 3Cloud, regardless of whether in hard copy or electronic form, and including information stored on your personal as well as your work computer(s), mobile device(s), and/or flash

drives, and all documents and information relating to your efforts to find other employment outside of 3Cloud, including, but not limited to, personal calendars, interview appointments, notes, and communications with Concurrency, other potential employers, recruiters, or any other persons.

48.     After receiving 3Cloud's November 16, 2017 letter, including the above quoted instructions regarding the legal obligation to preserve all documents and information in any form relating to 3Cloud, Adegoke has deliberately destroyed such information, including at the very least 3Cloud documents formerly stored on Adegoke's personal OneDrive account.

49.     On or about December 14, 2017, Defendants advised 3Cloud that they did not intend to honor the terms of Adegoke's non-compete restrictions. They further announced that Adegoke would agree only to provide limited access to one of Adegoke's digital storage mediums to search for 3Cloud documents on the condition that 3Cloud not file a civil action over the theft of 3Cloud's trade secrets or to enforce the non-compete or any other provision of Adegoke's Employment Agreement or Confidentiality Agreement.

50.     At no time have Defendants offered to return the $17,500 payment that Adegoke received as express consideration for the twelve-month non-compete and other post-employment restrictions under his Employment Agreement and Confidentiality Agreement with 3Cloud.

## COUNT I
## <u>MISAPPROPRIATION OF TRADE SECRETS UNDER THE DTSA</u>
### (Against Adegoke)

51.    3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

52.    At all times relevant, there was in effect the Defend Trade Secrets Act, 18 U.S.C. 1832, et seq.

53.    Adegoke has continued to misappropriate 3Cloud's trade secrets by using 3Cloud's confidential information to develop technology and market himself to competitors of 3Cloud in order to undercut 3Cloud's position in the market and steal 3Cloud's business.

54.    As a result of Defendants' continued and willful misappropriation of 3Cloud's trade secrets, 3Cloud is entitled to actual damages in an amount to be determined at trial, as well as punitive damages stemming from Adegoke's willful and deliberate misrepresentation to 3Cloud that he did not take and does not have 3Cloud's trade secrets and confidential information.

55.    Because 3Cloud lacks a complete and adequate remedy law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment.  Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures that actual loss attributed to the theft or profits acquired by Adegoke as a result of the trade secret theft.

15

56.     Alternatively, because 3Cloud lacks an adequate remedy at law for actual damages done, and because Adegoke is currently in possession of 3Cloud's secrets and using them to his advantage, 3Cloud requests that this Court grant the Company a "reasonable royalty" on sales generated by Adegoke at Concurrency, pursuant to 18 U.S.C. § 1836 (b)(3)(B).

57.     In addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further use and disclosure of 3Cloud's trade secrets.

**COUNT II**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**(Against Adegoke)**

58.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

59.     At all times relevant, there was in effect the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et. seq.

60.     While still employed by 3Cloud, Adegoke intentionally accessed 3Cloud's protected computer system and without authorization, or acting beyond what he was authorized to do, accessed information on the protected systems and transmitted confidential information belonging to 3Cloud to undisclosed storage devices or systems.

61.     As a result of Adegoke's unauthorized access and/or exceeding his authorized access, 3Cloud has been damaged by the loss of the value of 3Cloud's trade

16

secrets and 3Cloud's competitive edge in the market. 3Cloud has also incurred substantial response costs to address the breach by Adegoke.

62.     Adegoke's conduct violates the Computer Fraud and Abuse Act.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS UNDER ITSA
### (Against Adegoke)

63.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

64.     At all relevant times there was in effect the Illinois Trade Secrets Act, 765 ILCS 1065, et seq.

65.     3Cloud regularly expends substantial time and money to develop and maintain confidential, proprietary, and trade secret information, including, but not limited to, specific and unique techniques and procedures relating to cloud based strategies, a client/prospects database complete with contact information, marketing strategies, client/prospects needs and feedback, and rates, terms and other project specifications, among other data. This information constitutes "trade secrets" under the Illinois Trade Secrets Act.

66.     Adegoke's actions constitute misappropriation of 3Cloud's trade secrets. His conduct in this regard was willful and deliberate, particularly in that Adegoke promised he would abide by the terms of his Confidentiality Agreement while at 3Cloud and thereafter, when in reality he was stealing 3Cloud's trade secrets and then taking steps to hide his activities, including by destroying evidence of his wrongdoing.

17

67. 3Cloud has been damaged by Adegoke's conduct, including the time, money and efforts spent developing unique processes and strategies and protecting them from becoming publicly known.

68. If Adegoke is not enjoined from any and all violations and continuing use and disclosure of the trade secrets misappropriated from 3Cloud, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

69. Accordingly, as a result of Adegoke's misappropriation, 3Cloud is entitled to actual damages in an amount to be determined at trial, as well as punitive damages stemming from Adegoke's willful and deliberate misrepresentation to 3Cloud that he would not use 3Cloud's trade secrets and confidential information.

70. Alternatively, because 3Cloud lacks a complete and adequate remedy at law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment. Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures the actual loss attributed to the theft or profits acquired by Adegoke as a result of his theft of 3Cloud's trade secrets.

71. Further, in addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further use and disclosure of 3Cloud's trade secrets.

## COUNT IV
## <u>BREACH OF CONTRACT</u>
### (Against Adegoke)

72.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

73.     Adegoke executed and agreed to abide by the terms of his Employment Agreement and Confidentiality Agreement with 3Cloud.

74.     The Employment and Confidentiality Agreements were supported by good and valuable consideration including, but not limited to, Adegoke's hiring and continued employment with 3Cloud, his training both at 3Cloud and at 3Cloud paid for programs, the guarantee of a first-year fixed bonus of $35,000, on top of Adegoke's base annual salary of $175,000 and any discretionary performance bonus, and payment to Adegoke of the first such guaranteed bonus payment on July 31, 2017, in the amount of $17,500.

75.     The terms of the Agreements protect the legitimate interest of 3Cloud, including its highly valuable, proprietary, and confidential trade secret information. The provisions and covenants pose no undue hardship on Adegoke, and are reasonable as to duration and scope to protect 3Cloud's legitimate business interests.

76.     Adegoke voluntarily terminated his employment from 3Cloud on October 20, 2017.

77.     Adegoke breached his Employment and Confidentiality Agreements by, among other things, studying, copying, and taking 3Cloud trade secrets, including

19

processes and other information used to create cloud based applications, digital transformation strategies, pricing, client and prospective client lists.

78.     Adegoke further breached his Agreements by transmitting 3Cloud's confidential and trade secret information to his remote storage platforms, without 3Cloud's consent, attempting to hide the fact he copied the information, lying about the fact he copied the information, not returning the misappropriated information to 3Cloud, not providing access to his personal storage platforms and devices involved in the theft, destroying the data and files on his 3Cloud issued laptop computer, and using the misappropriated confidential information and trade secrets to his own benefit and those of 3Cloud's competitors.

79.     Adegoke has also breached his Employment and Confidentiality Agreements by performing defined Company Business within the Restricted Territory for Concurrency - a known direct competitor of 3Cloud.

80.     3Cloud has been damaged by Adegoke's conduct, including the time, money and efforts spent developing its unique digital transformation processes, business and pricing plans, client lists, the costs of training Adegoke, and the loss of the guaranteed bonus paid to Adegoke in exchange for the post-employment restrictive covenants he is now violating, among other things.

81.     If Adegoke is not enjoined from any and all violations and continuing violations of his Agreements, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well

20

as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

82.     Accordingly, as a result of Adegoke's breach of his Employment and Confidentiality Agreements, 3Cloud is entitled to actual damages in an amount to be determined at trial.

83.     Alternatively, because 3Cloud may lack a complete and adequate remedy at law for actual damages due to the nature of the harm caused by Adegoke, 3Cloud seeks the equitable remedy of unjust enrichment.  Under the circumstances, equity and good conscience dictate that 3Cloud is entitled to recoup financial compensation that measures that actual loss attributed to the breach by Adegoke as a result of his trade secret theft and use with competitors.

84.     Further, in addition to actual damages, 3Cloud is entitled to attorneys' fees and costs, as well as a permanent injunction barring Adegoke from any further violations of the restrictive covenants contained in his Employment and Confidentiality Agreements with 3Cloud.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Adegoke)

85.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

86.     As Practice Director and as a Principal Architect, Adegoke held a position of trust and confidence at 3Cloud, and as an employee, owed 3Cloud a fiduciary duty of loyalty.

87.     While Adegoke was still employed by 3Cloud and therefore bound by his fiduciary duty, he purposely accessed and copied confidential and proprietary information for the purpose of using such information to his own benefit and/or that of 3Cloud's competitors.

88.     Adegoke has since attempted to hide the fact he stole the information by destroying files and records of his activities on the laptop computer issued to him by 3Cloud, fabricating false excuses for accessing the information, and then denying he had taken or still had in his possession any files belonging to 3Cloud.

89.     As a result of Adegoke's actions, 3Cloud has been damaged in the form of lost profits, price reductions, recovery costs, and loss of good will among other things.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Concurrency)

90.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

91.     Adegoke knew that he was obligated not to compete with 3Cloud's Company Business within the Restricted Territory, as demonstrated by his signing the Confidentiality Agreement and confirming his awareness of the same after his resignation.

92.     Concurrency similarly was aware of Adegoke's post-employment obligations to 3Cloud, including for twelve months not to assist 3Cloud's competitors

with respect to "Company Business" within the Restricted Territory, nor to take or use 3Cloud's confidential information and trade secrets.

93.     Despite this knowledge, Concurrency's has interfered with the Employment and Confidentiality Agreements with Adegoke by employing him to act in a business strategy role to build Concurrency's Cloud Datcenter and Customer Engagement practices for Concurrency's benefit.

94.     Concurrency's employment of Adegoke, which is based on his experience, training, and certifications developed by 3Cloud, will result in unfair competition against 3Cloud, including but not limited by the inevitable disclosure and use of 3Cloud's confidential business information and trade secrets.

95.     3Cloud has been damaged by Adegoke's and Concurrency's conduct, including the time, money and efforts spent developing its unique digital transformation processes, business and pricing plans, client lists, the costs of training Adegoke, and the loss of the guaranteed bonus paid to Adegoke in exchange for the restrictive covenants, among other things.

96.     If Defendants are not enjoined from any and all violations and continuing violations of interference with 3Cloud's contractual relations, 3Cloud will suffer irreparable injury, including but not limited to the loss of valuable confidential information, clients and prospects, as well as the general loss of goodwill in the industry, for which 3Cloud's remedies at law are inadequate.

## COUNT VII – SPOLIATION OF EVIDENCE
**(Against Adegoke)**

97.     3Cloud repeats and realleges each and every allegation contained in Paragraphs 1 through 50 above as though fully set forth herein.

98.     Pursuant to Sec 2(e)(ii) of the Confidentiality Agreement (see ¶ 21 *infra*), there was a special relationship between Adegoke and 3Cloud in the form of a contractual duty to preserve and return to the Company, in good condition, all items referenced in Sec. 2(e)(i) of the Confidentiality Agreement.

99.     Adegoke was reminded of his duty to preserve and return following his voluntary resignation in correspondence from counsel for 3Cloud.

100.    Notwithstanding his obligation to return all 3Cloud materials to 3Cloud following Adegoke's voluntary resignation Adegoke: a) erased the hard drive of 3Cloud's laptop computer before returning it, including reimaging the hard drive and deleting his personal profile; b) he either deleted or refuses to return the hundreds of files he copied from 3Cloud's secure server; and c) he has either deleted or refuses to return the 3Cloud files that were stored on his Microsoft OneDrive account.

101.    Adegoke's destruction or hiding of 3Cloud materials violates the special relationship created by the contractual duty outlined in Sec 2(e)(ii) of the Confidentiality Agreement.

102.    A reasonable person in Adegoke's position should have foreseen that the material he destroyed or is currently refusing to return would be material to a potential civil action against him given he had a contractual duty not to do what he has done and he was reminded of that duty.

24

103.   3Cloud has been injured to the extent that its materials have been stolen, that software on Adegoke's computer has been lost, 3Cloud's ability to prove a case against Adegoke and Concurrency is jeopardized, and other injuries to be proven at trial.

104.   Adegoke's destruction and/or withholding of 3Cloud materials is the proximate cause of 3Cloud's damages in this case.

WHEREFORE, based on the foregoing facts 3Cloud prays that judgment be entered in its favor and against Adegoke and Concurrency as follows:

(a)   that 3Cloud be entitled to actual damages from Defendants in an amount to be determined at trial;

(b)   that 3Cloud be entitled to the equitable remedies of restitution and unjust enrichment from Defendants in the amount of the value derived from the multiple breaches of Adegoke's Agreements and Concurrency's interference with said Agreements, as well as the amount that measures that actual loss attributed to the theft or profits acquired by Adegoke as a result of the trade secret theft;

(c)   that 3Cloud be awarded its attorneys' fees, costs, compensatory damages, and punitive damages from Defendants in an amount to be proven at trial;

(d)   that 3Cloud be entitled to a permanent injunction to prevent Adegoke from engaging in any further violations of the Agreements, stop Adegoke from their continuing misappropriation of 3Cloud's trade secrets, and

identify and return all confidential information and trade secrets Adegoke took from 3Cloud or provided to its competitors;

(e)    and for any other relief this Honorable Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: January 4, 2018                  Respectfully submitted,

By:    s/ Robert D. Sweeney
Robert D. Sweeney (6238209)
John J. Scharkey (6278387)
Sweeney & Scharkey LLC
111 West Washington Street
Burnham Center, Suite 1160
Chicago, Illinois 60602
Tel. (312) 384-0500

*Counsel for Plaintiff, 3Cloud, LLC*

EXHIBIT A



October 21, 2016

Adetayo Adegoke
4756 S Drexel Blvd
Chicago, IL 60615

Mr. Adegoke,

　　We are pleased to offer you the position of Practice Director - Cloud Modernization with 3Cloud, LLC ("3Cloud" or the "Company"). This offer is contingent on our completion of a satisfactory pre-employment background check and reference check. Additional details about the terms and conditions of your employment offer are set forth below.

　　Subject to your acceptance of this offer, your employment with 3Cloud will begin on November 16, 2017. You will report to Bob Moore, Vice President of Professional Services, unless notified otherwise. The initial scope of Employee's job duties and responsibilities shall include building out the Cloud Modernization services organization, participating in presales activities, running all aspects of delivery, as well as such other duties and responsibilities as may be determined by the Company. During your employment, you shall devote your best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity, or other approved leave) to the business and affairs of the Company, including any subsidiaries and/or affiliates. You shall perform your duties and responsibilities to the best of your abilities in a diligent, trustworthy, businesslike and efficient manner.

　　Employment Period. Notwithstanding any provision to the contrary, the nature and term of your employment shall be "at-will," such that either you or the Company may terminate your employment with the Company for any reason, or for no reason at all, at any time, upon two-week's notice of the termination.

　　Base Salary. The Company shall pay you for work performed on a salary basis in installments twice per month based on the Company's normal payroll practices as may be in effect from time to time. Your initial base salary will be $175,000 per year. Thereafter, the Company may review and make modifications to your salary from time to time. The Company may withhold from any amounts payable under this letter all federal, state, city or other taxes as the Company is required to withhold pursuant to any applicable law, regulation or ruling.

　　Bonus. Effective January 1, 2017, you will be eligible to receive an annual bonus of $35,000 to be paid semi-annually on July 31, 2017 and January 31, 2018. These bonus payments are guaranteed provided that you are employed by 3Cloud at the time of the payment.

In future years, 3Cloud will establish appropriate revenue and gross profit margin targets to fund an attractive bonus structure.

Overachievement Bonus Payment. You may also be eligible to receive discretionary performance bonuses based on the achievement of revenue and gross profit margin metrics as determined from time to time by the Company. In 2017, you will be eligible to receive such a discretionary bonus payment of up to $40,000 to be earned in the following manner:

(a)    $20,000 provided either condition is met: (i) $1,500,000 in revenue is generated by/in the Company's Cloud Modernization practice; or (i) $600,000 in gross

Any Overachievement Bonus Payment earned shall be paid to you on January 31, 2018. The Company may reevaluate your eligibility for Overachievement Bonus Payments annually thereafter; and such payments shall be paid in the calendar year following the calendar year in which such bonus was earned.

Benefits. You will be entitled to participate in the 3Cloud's standard medical benefits that are generally made available to the Company's employees and as they exist and are modified from time to time and subject to satisfying the applicable eligibility requirements. Benefits offered by 3Cloud are subject to modification, suspension or termination at any time in accordance with the terms of the plan documents and applicable law.

Vacation. You are eligible to take vacation as needed on an appropriate basis and subject to manager approval.

Confidentiality; Non-Solicitation. This Offer is contingent on you signing the attached Confidential Information and Non-Solicitation Agreement attached hereto. As added consideration for the same, the Company will guarantee the first-year bonus payment of $35,000 (to be paid semi-annually on July 31, 2017, ant January 31, 2018) ("Fixed Bonus Payment"), provided you are employed on the date of payment. In the event you are not employed on the date of such payment, the Company may in its discretion choose to pay you $10,000 as separate and additional consideration for the Confidential Information and Non-Solicitation Agreement, or choose to waive enforcement of the same as part of a general release agreement signed by you.

General Provisions. This letter shall be governed by, and construed in accordance with, the internal, substantive laws of the State of Illinois. This letter is personal to you and you may not assign it. It will be binding upon and inure to the benefit of 3Cloud's successors and assigns.

If you accept this Offer, subject to the conditions and contingencies described above, please sign this letter in the space provided below, sign the enclosed Confidential Information and Non-Solicitation Agreement, and return both signed documents to my attention. We are

excited to welcome you as a member of 3Cloud's team and look forward to your future contributions to the Company's success.

Sincerely,


Mike Rocco
Chief Executive Officer

Accepted and Agreed to:

_____
Adetayo Adegoke

Date: _____10 - 21 - 2016_____


Enclosure
Confidential Information and Non-Solicitation Agreement

EXHIBIT B

# CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT

This CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT ("Agreement") is entered into as of October 21, 2016 (the "Effective Date") between 3Cloud, LLC (the "Company") and Adetayo Adegoke ("Employee") (collectively, the "Parties").

WHEREAS, the Employee signed an Offer Letter on October 21, 2016 and agreed to employment with the Company; and

WHEREAS, the Employee, in the course of his or her employment by the Company, will have access to and use certain documents and information in a confidential nature; and

WHEREAS, the Employee has agreed that as a condition of his or her employment with the Corporation that he or she will not disclose such confidential information.

In consideration of the mutual covenants contained herein and other good and valuable consideration as described below, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    <u>Consideration</u>.  As described more fully in the Offer Letter dated October 21, 2016, as separate and additional consideration for the Employee's agreement to abide by the restrictions contained in this Agreement, the Company will guarantee the first-year bonus payment of $35,000 (to be paid semi-annually on July 31, 2017, and January 31, 2018) ("Fixed Bonus Payment"), provided Employee is employed as of the date of the first payment (July 31, 2017).  In the event Employee is not employed on the date of the first payment (July 31, 2017), the Company may in its discretion choose to pay Employee $10,000 as separate and additional consideration, or choose to waive enforcement of this Agreement as part of a general release agreement signed by Employee.

2.    <u>Competitive Activity; Confidentiality; Non-Solicitation</u>.

(a)    <u>Acknowledgements and Agreements</u>.  Employee hereby acknowledges and agrees that in the performance of Employee's duties to the Company during his employment, Employee will be brought into frequent contact with existing and potential customers of the Company throughout the United States. Employee also agrees that trade secrets and confidential information of the Company, more fully described in subparagraph 2(e)(i), below, gained by Employee during his association with the Company have been developed by the Company through substantial expenditures of time, effort and money, and constitute valuable and unique property of the Company. Employee further understands and agrees that the foregoing makes it necessary for the protection of the Company's Business that Employee not compete with the Company during Employee's employment with the Company and not compete with the Company for a reasonable period thereafter, as further provided in the subparagraphs, below.

(b)    <u>Covenants</u>.

(i)     Covenants During Employment.  While employed by the Company, Employee will not compete with, undermine or otherwise work in a manner that is contrary to the interests of the Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, while employed by the Company, Employee will not:

> (A)     enter into or engage in any business which competes with the Company's Business;

> (B)     solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business;

> (C)     divert, entice or otherwise take away any customers, business, patronage or orders of the Company or attempt to do so; or

> (D)     promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

(ii)     Covenants Following Termination.  For a period of twelve (12) months following the termination of Employee's employment with the Company, Employee will not:

> (A)     enter into or engage in any business which competes with the Company's Business within the Restricted Territory;

> (B)     solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;

> (C)     divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or

> (D)     promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(iii)     Indirect Competition.  For the purposes of subparagraphs 2(b)(i) and (ii) inclusive, but without limitation thereof, Employee will be in violation if Employee engages in any or all of the activities set forth therein directly as an individual on Employee's own account, or indirectly as a partner, joint venturer, employee, agent, salesperson, consultant, officer and/or director of any firm,

2                                         Initial A.A.

association, partnership, corporation or other entity, or as a stockholder of any corporation in which Employee or Employee's spouse, child or parent owns. directly or indirectly, individually or in the aggregate, more than three percent (3%) of the outstanding stock.

(iv)   If it shall be judicially determined that Employee has violated this subparagraph 2(b), then the period applicable to each obligation that Employee shall have been determined to have violated shall automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

(c)   The Company.  For purposes of this Agreement, the Company shall include any and all direct and indirect subsidiary, parent, affiliated, or related entities of the Company for which Employee worked or had responsibility at the time of termination of Employee's employment and at any time during the two (2) years prior to such termination.

(d)   Non-Solicitation.  Employee will not directly or indirectly at any time during the period of Employee's employment or thereafter, attempt to disrupt, damage, impair or interfere with the Company's Business by raiding any of the Company's employees or soliciting any of them to resign from their employment by the Company, or by disrupting the relationship between the Company and any of its consultants, agents or representatives.  Employee acknowledges that this covenant is necessary to enable the Company to maintain a stable workforce and remain in business.

(e)   Further Covenants.

(i)   Employee will keep in strict confidence, and will not, directly or indirectly, at any time, during or after Employee's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any trade secrets or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Employee may have acquired such information.  Such confidential information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information.  Employee specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by the Company, and/or Employee, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by

3

Initial A.A.

Employee during Employee's employment with the Company (except in the course of performing Employee's duties and obligations to the Company) or after the termination of Employee's employment shall constitute a misappropriation of the Company's trade secrets.

(ii)     Employee agrees that upon termination of his employment with the Company, for any reason, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement. In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

(f)     <u>Discoveries and Inventions; Work Made for Hire.</u>

(i)     Employee agrees that upon conception and/or development of any idea, discovery, invention, improvement, software, writing or other material or design that: (A) relates to the business of the Company, or (B) relates to the Company's actual or demonstrably anticipated research or development, or (C) results from any work performed by Employee for the Company, Employee will assign to the Company the entire right, title and interest in and to any such idea, discovery, invention, improvement, software, writing or other material or design. Employee has no obligation to assign any idea, discovery, invention, improvement, software, writing or other material or design that Employee conceives and/or develops entirely on Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information unless the idea, discovery, invention, improvement, software, writing or other material or design: (x) relates to the business of the Company, or (y) relates to the Company's actual or demonstrably anticipated research or development, or (z) results from any work performed by Employee for the Company. Employee agrees that any idea, discovery, invention, improvement, software, writing or other material or design that relates to the business of the Company or relates to the Company's actual or demonstrably anticipated research or development which is conceived or suggested by Employee, either solely or jointly with others, within one (1) year following the termination of Employee's employment shall be presumed to have been so made, conceived or suggested in the course of such employment with the use of the Company's equipment, supplies, facilities, and/or trade secrets.

(ii)     In order to determine the rights of Employee and the Company in any idea, discovery, invention, improvement, software, writing or other material, and to insure the protection of the same, Employee agrees that during Employee's employment, and for one (1) year after the termination of Employee's employment, Employee will disclose immediately and fully to the Company any idea, discovery, invention, improvement, software, writing or other material or

Initial K.A.

design conceived, made or developed by Employee solely or jointly with others. The Company agrees to keep any such disclosures confidential. Employee also agrees to record descriptions of all work in the manner directed by the Company and agrees that all such records and copies, samples and experimental materials will be the exclusive property of the Company. Employee agrees that at the request of and without charge to the Company, but at the Company's expense, Employee will execute a written assignment of the idea, discovery, invention, improvement, software, writing or other material or design to the Company and will assign to the Company any application for letters patent or for trademark registration made thereon, and to any common-law or statutory copyright therein; and that Employee will do whatever may be necessary or desirable to enable the Company to secure any patent, trademark, copyright, or other property right therein in the United States and in any foreign country, and any division, renewal, continuation, or continuation in part thereof, or for any reissue of any patent issued thereon. In the event the Company is unable, after reasonable effort, and in any event after ten business days, to secure Employee's signature on a written assignment to the Company of any application for letters patent or to any common-law or statutory copyright or other property right therein, whether because of Employee's physical or mental incapacity or for any other reason whatsoever, Employee irrevocably designates and appoints one of the founders of the Company as Employee's attorney-in-fact to act on Employee's behalf to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, copyright or trademark.

(iii) Employee acknowledges that, to the extent permitted by law, all work papers, reports, documentation, drawings, photographs, negatives, tapes and masters therefore, prototypes and other materials (hereinafter, "items"), including without limitation, any and all such items generated and maintained on any form of electronic media, generated by Employee during Employee's employment with the Company shall be considered a "work made for hire" and that ownership of any and all copyrights in any and all such items shall belong to the Company. The item will recognize the Company as the copyright owner, will contain all proper copyright notices, e.g., "(creation date) 3Cloud, LLC, All Rights Reserved," and will be in condition to be registered or otherwise placed in compliance with registration or other statutory requirements throughout the world.

(g) <u>Communication of Contents of Agreement</u>. While employed by the Company and for a period of twelve (12) months following the termination of Employee's employment thereafter, Employee will communicate the contents of paragraph 2 of this Agreement to any person, firm, association, partnership, corporation or other entity that Employee intends to be employed by, associated with, or represent.

(h) <u>Confidentiality Agreements</u>. Employee agrees that he shall not disclose to the Company or induce the Company to use any secret or confidential information belonging to Employee's former employer(s). Employee warrants that Employee is not bound by the terms of a confidentiality agreement or other agreement with a third party that he has not fully disclosed to the Company that would potentially preclude or limit

5

Initial _A.A._

conceived during employment with the Company. Employee agrees to provide the Company with a copy of any and all agreements with a third party that preclude or limit Employee's right to make disclosures or to engage in any other activities contemplated by Employee's employment with the Company.

(i) <u>Relief</u>. Employee acknowledges and agrees that the remedy at law available to the Company for breach of any of Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that, in addition to any other rights or remedies that the Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision contained in subparagraphs 2(b), 5(d), 5(e), 5(f), 5(g) and 5(h) inclusive, of this Agreement, without the necessity of proof of actual damage.

(j) <u>Reasonableness</u>. Employee acknowledges that Employee's obligations under this paragraph 2 are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Employee were to violate such obligations. Employee further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company to perform its obligations under this Agreement and by other consideration, which Employee acknowledges constitutes good, valuable and sufficient consideration.

3.   <u>Definitions</u>.

(a) "<u>Company's Business</u>" means a full service technology consulting firm that provides cloud strategies, solutions and managed services for commercial clients, including, but not limited to cloud modernization, advanced data analytics, Internet of things, Azure infrastructure services and cloud applications development.

(b) "<u>Restricted Territory</u>" means: (i) the geographic area(s) within a one-hundred (100) mile radius of Chicago; (ii) the State of Texas, and (iii) all of the specific customer accounts, whether within or outside of the geographic area described in (i) or (ii) above, with which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

4.   <u>Survival</u>. Subject to any limits on applicability contained therein this Agreement shall survive and continue in full force in accordance with its terms notwithstanding any termination of Employee's employment.

5.   <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid or unenforceable in any respect under any applicable law, such invalidity or unenforceability shall not affect any other provision, but this Agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

6

<u>Initial</u>

6.    <u>Prevailing Party's Litigation Expenses</u>.  In the event of litigation between the Company and Employee related to this Agreement, the non-prevailing party shall reimburse the prevailing party for any costs and expenses (including, without limitation, attorneys' fees) reasonably incurred by the prevailing party in connection therewith.

7.    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by Employee, the Company and their respective heirs, executors, personal representatives, successors and assigns, except that neither party may assign any rights or delegate any obligations hereunder without the prior written consent of the other party. Employee hereby consents to the assignment by the Company of all of its rights and obligations hereunder to any successor to the Company by merger or consolidation or purchase of all or substantially all of the Company's assets, provided such transferee or successor assumes the liabilities of the Company hereunder.

8.    <u>Choice of Law</u>.  This Agreement shall be governed by, and construed in accordance with, the internal, substantive laws of the State of Illinois.  Employee agrees that the state and federal courts located in the State of Illinois shall have jurisdiction in any action, suit or proceeding against Employee based on or arising out of this Agreement and Employee hereby: (a) submits to the personal jurisdiction of such courts; (b) consents to service of process in connection with any action, suit or proceeding against Employee; and (c) waives any other requirement (whether imposed by statute, rule of court or otherwise) with respect to personal jurisdiction, venue or service of process.

9.    <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

10.    **<u>Operation of Agreement</u>.  This Agreement will be binding immediately upon its execution, but, notwithstanding any provision of this Agreement to the contrary, this Agreement will not become effective or operative (and neither Party will have any obligation hereunder) until the "<u>Effective Date</u>".**

[SIGNATURES ON FOLLOWING PAGE]

7

<u>Initial</u>  A.A.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**3Cloud, LLC**

By: _____

Name:  Robert C. Moore

Title:  VP, Professional Services

**Adetayo Adegoke**

_____
Adetayo Adegoke

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

3Cloud, LLC

**(b)** County of Residence of First Listed Plaintiff    Cook County, Illinois
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Sweeney & Scharkey, LLC
111 W. Washington St., Ste 1160, Chicago, IL 60602
312.384.0500

## DEFENDANTS

Concurrency, Inc. and Adetayo Adegoke

County of Residence of First Listed Defendant    Cook County, Illinois
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☑ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

|                                   | PTF | DEF |                                                      | PTF | DEF |
|-----------------------------------|-----|-----|------------------------------------------------------|-----|-----|
| Citizen of This State             | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State          | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                 | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729 (a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☑ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities Employment<br>☐ 446 Amer. w/Disabilities Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION *(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)*

18 U.S.C. 1832, Misappropriation of Trade Secrets Under the DTSA

## VII. Previous Bankruptcy Matters *(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)*

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $  500,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☑ Yes  ☐ No

## IX. RELATED CASE(S) IF ANY  *(See instructions):*

JUDGE _____    DOCKET NUMBER _____

## X. This case (check one box)  ☑ Is not a refiling of a previously dismissed action  ☐ is a refiling of case number _____ previously dismissed by Judge _____

DATE 1/4/2018    SIGNATURE OF ATTORNEY OF RECORD /s/ Robert D. Sweeney

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Previous Bankruptcy Matters** For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

**VIII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**IX.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**X.** **Refiling Information.** Place an "X" in one of the two boxes indicating if the case is or is not a refiling of a previously dismissed action. If it is a refiling of a previously dismissed action, insert the case number and judge.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Rev. 1 - 04/13/2016

EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.1
### Eastern Division

3Cloud, LLC

                              Plaintiff,

v.                                              Case No.: 1:18−cv−00076
                                                Honorable Elaine E. Bucklo

Concurrency, Inc., et al.

                              Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 16, 2019:

   MINUTE entry before the Honorable M. David Weisman: Motion hearing held. For the reasons stated on the record, including the complete inadequacy of Defendant Adegoke's objections and responses, the Court grants the portion of Plaintiff's motion to compel [99] regarding specific discovery requests and an award of fees. Defendant Adegoke shall supplement his response to all discovery requests identified in Plaintiff's motion by 10/23/19. The Court will issue an order with respect to Rule 37 fees after reviewing Plaintiff's anticipated fee petition and Defendant's objections (if any). The Court enters and continues the portion of the motion concerning an award of default judgment. Status/Motion hearing set for 10/30/19 at 9:15 a.m. For the reasons stated on the record, Plaintiff's oral motion to compel written discovery production by Defendant Concurrency is granted over Defendant Concurrency's objection. Defendant shall produce the information discussed on the record by 11/22/19. If Defendant fails to produce the requested information by 11/22/19, Plaintiff may file a motion for sanctions, if appropriate. Mailed notice (ao,)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**EXHIBIT C**



Adetayo Adegoke
4756 S. Drexel Blvd
Chicago, IL 60615

Phone: 312-498-0257

Email: adegade@gmail.com

October 6, 2017

     Re:   Offer of employment

Dear Tayo,

     We wish to extend an offer to employ you as Vice President of Customer Engagement. The basic terms and conditions of your employment would be the following:

     1.    You will be employed on a full-time basis commencing October 23rd, 2017. The employment relationship will not have a definite term.

     The VP of Customer Engagement oversees the delivery of services for multiple practices within Concurrency. Azure & Cloud Datacenter, Communication & Mobility and Productivity & Collaboration. This role is heavily focused on emerging technologies, technical standards, cross functional capabilities, and competitive analysis which is vital to Concurrency's growth. You will work closely with the rest of the Executive and Leadership teams as well as all other departments including sales, marketing, alliances, finance, HC and other resource areas to successfully grow Concurrency.

     2.    As a full time, employee, you will owe to Concurrency, Inc. your full and undivided efforts. You may not be employed at any time during your employment with Concurrency, Inc. without specific prior written consent in any capacity that conflicts in any way with your work at Concurrency, Inc. You will be expected to agree in writing to keep information you obtain during your employment confidential and to refrain from competing with Concurrency, Inc. A sample of the agreement you will sign at the commencement of your employment is enclosed. In addition, you agree to abide by all valid and enforceable post-employment restrictions provided for under the law and / or provided in any agreements you have with your prior employers or other third parties and you will not utilize or disclose in your employment with Concurrency, Inc. any confidential or proprietary information of a former employer or other third party absent express authorization from such former employer or third party.

     3.    Your compensation will be a base compensation plus additional commissions and bonuses as defined within annual Sales and Business Planning documentation subject to federal and state withholding, FICA, and other standard deductions. Your initial base compensation will be paid at a rate of $260,000.00 per year, payable every other Friday. You are also eligible for an annual variable bonus. Please see attached document for details. Concurrency is offering you a one-time sign-on bonus in the amount of $12,500.00 to be paid

CON -000019

after the completion of your first ninety days. This must be paid back in full if you leave the organization on your own terms within one year of service from the date of payment.

4. During your employment with Concurrency, Inc. you will be expected to achieve and maintain requisite vendor and industry certifications. Concurrency will pay or reimburse you for expenses of continuing education, as long as the expense is approved in advance, and for normal business expenses and business mileage at the then current IRS rate. Reimbursement for travel outside of Southeastern Wisconsin and Northern Illinois should be approved in advance.

5. The normal business day for Concurrency employees is 8:00 AM to 5:00 PM. Business attire in the Concurrency office is generally business casual; whenever meeting or working with Concurrency clients or prospective clients appropriate business attire is required.

6. In addition to Concurrency's EIGHT recognized holidays and after the first ninety days of employment you will be entitled to twenty (20) days of paid time off (PTO) per year distributed on an accrual basis throughout the year. Vacation periods must be scheduled in advance and coordinated with your co-employees and supervisor. You should notify your supervisor as far in advance as possible of your intention to take vacation days.

7. You will be eligible to be covered by the group health insurance plan maintained by Concurrency starting on the first day of the month following a full 30 days of employment. Concurrency reserves the right in its sole discretion to (i) change at any time the administrator of the group health insurance plan, (ii) modify the terms and scope of the group health insurance plan, and/or (iii) terminate all group health insurance plans.

8. After the first ninety days of employment you will be eligible to participate in the section 401(k) plan for Concurrency employees. The plan currently allows for employee contributions; employer contributions may be made in the future.

9. Concurrency, Inc. will pay for and encourages membership in and expects attendance at meetings of at least one professional society and one community service organization.

10. Neither this offer letter nor any other written or verbal statements constitute a contract or any guarantee of continued employment or employment on any specific terms. You are an at-will employee and no compensation or benefits are earned or accrued beyond the last day of work. All compensation, including but not limited to salary, bonuses and benefits are subject to change at any time at the company's sole discretion.

If the above terms and conditions are acceptable to you please accept our offer by signing and dating this document and the enclosed confidentiality agreement and emailing both documents to jsavage@concurrency.com and Kweiland@concurrency.com within five days of the date of this letter.

CON -000020

Concurrency

Very truly yours,

Concurrency, Inc.


James Savage


To accept this offer of employment, please sign and date:

_____
Adetayo Adegoke


Date:   10-06-2017
_____

CON-000021



13600 bishops court
Brookfield WI 53005
phone 262.364.5300
fax 262.364.5910
www.concurrency.com

January 1, 2018

Adetayo Adegoke
4756 S. Drexel Blvd
Chicago, IL 60615

Phone: 312-498-0257

Email: adegade@gmail.com

Below are your 2018 Vice President level bonus criteria:

Eligible Bonus of $60,000 (annual amount)

| |
|---|
| Individual Business Unit - Sales $ / GM% (weighted at 30% each (60% total)) |
| Sales $ Goal of $X,XXX,XXX |
| GM % Goal of XX% |
| All Up Company - Sales $ /GM% (weighted at 15% each (30% total)) |
| Sales $ Goal of $XX,XXX,XXX |
| GM % Goal of XX% |
| 3rd Party Revenue related to Business Unit $ (10%) |
| Goal of $XXX,XXX |

These bonus criteria apply to the 2018 calendar year and may be subject to change per management's discretion. Because bonuses cannot be calculated until after the end of the relevant quarter, they usually are not distributed until the second month after the end of the quarter.
A bonus is only payable if the employee is employed on the last day of the quarter upon which the bonus calculation is based.

Decisions as to the applicability or interpretation of the bonus criteria and bonus plan and as to all questions and issues arising under this plan will be made by Concurrency senior management and these decisions will be final made in its sole discretion.

Please sign and return to Human Capital to begin eligibility for the 2018 bonus.

_____          10-06-2017
Adetayo Adegoke                              Date

CON -000022



13600 Bishops Court
Brookfield, WI 53005
(866) 930-8356
www.concurrency.com

Attn:   Adetayo Adegoke
        Vice President
Re:     2019 Concurrency Management Bonus Program

Adetayo,

We feel extremely fortunate to have you as a part of the Concurrency Management Team. This team is committed to achieving, even exceeding, financial performance targets. Because of your commitment, we are pleased to inform you of your participation in the 2019 Concurrency Management Bonus Program. As a Vice President you will be eligible for a bonus worth 23.1% of your January 1, 2019 annual salary of $260,000, equaling $60,000. This bonus amount is based on 100% attainment of Company Revenue (50% of bonus), and Company EBITDA (50% of bonus). This is a quarterly bonus plan, with earned bonus payments occurring within 6 weeks after each quarter end.

*Table 1 – Quarterly Financial Performance Budget and Bonus Potential*

| Period | Service Delivery Revenue | EBITDA | Management Bonus |
|---|---|---|---|
| Q1 2019 | $7,541,000 | 12.0% | $15,000 |
| Q2 2019 | $8,150,000 | 12.0% | $15,000 |
| Q3 2019 | $8,272,000 | 12.0% | $15,000 |
| Q4 2019 | $7,744,000 | 12.0% | $15,000 |
| Total 2019 | $31,707,000 | 12.0% | $60,000 |

*Note: Actual bonus payouts for attainment may vary slightly due to rounding used above for presentation purposes*

If you have been hired in 2019, you will be eligible for this bonus the first full quarter after your hire date. Any adjustments to your bonus amount will be left to the discretion of your manager, with approval from Finance.

On behalf of the Jim Savage and Executive team, we sincerely thank you for all your efforts.

**Dan Weise**
Vice President of Finance
Concurrency, Inc.

© 2019 Concurrency, Inc. | Real Microsoft expertise. Real business value.™

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

AGREEMENT
FOR CONFIDENTIALITY, NON-COMPETITION, AND NON-SOLICITATION

This agreement is made effective October 6, 2017, between Concurrency, Inc. ("Company") and  Adetayo Adegoke ("Employee") in consideration of the facts recited below and the terms, conditions, and covenants contained in this agreement.

A. Recitations.

1.    The Company wishes to employ the Employee, and the Employee wishes to be employed by the Company, as of the effective date of this agreement.

2.    The Company is engaged primarily in the business of providing information technology services, including consulting, network engineering, information technology product sales, and information technology support to lending institutions and other businesses.

3.    The Company and the Employee anticipate that during the term of the Employee's employment with the Company the Employee will have access to and obtain knowledge about the Company's pricing information, proprietary products, proprietary processes, proprietary software, software source codes and systems, customer lists, customer information, business methods, financial and other information regarding the operations of the Company, and other information that is confidential and/or proprietary to the Company and not available to the general public ("Confidential Information").

4.    The Company wishes to prevent such information from being disclosed to third parties and/or used by the Company's competitors.

B. Terms, conditions, and covenants.

In consideration of and reliance upon the circumstances recited above, the Company and the Employee agree and covenants as follows:

1.    CONFIDENTIAL INFORMATION.

a.    The Employee shall not except in the performance of the Employee's duties at any time use or disclose any Confidential Information to any person or entity, provided that Confidential Information shall not include information in the public domain without fault of the Employee, information that was known by the Employee prior to the Employee's employment with the Company, and information received from another person by the Employee if the other person has no duty to the Company to keep the information confidential.

b.    The Employee shall use reasonable efforts to maintain the confidentiality of Confidential Information and to prevent dissemination of Confidential Information to persons not authorized by the Company to receive Confidential Information.

c.    All memoranda, notes, records, papers, whether prepared by the Employee or prepared by third parties for the Company or for presentation to the Company in any form, whether written, graphic, or electronic, and contained in

1

CON -000023

or on any media, and all copies of such documents relating to the Company's business, and any related models, samples, drawings, and presentation materials (collectively, the "Business Documents"), shall be owned by the Company. The Employee shall not at any time use, copy, or remove from the Company's office any of the Business Documents other than for use in connection with the Company's business. Upon termination of the Employee's employment with the Company, the Employee shall return to the Company any Business Documents or copies of them in the Employee's possession or control.

    d.    The Employee shall not improperly use or disclose any confidential, proprietary, or trade secret information of any former employer or of any other person unless I have the consent of such employer or person.

    e.    The Employee shall not disclose, except as necessary to perform the Employee's duties in a manner that is consistent with the Company's duties to a third party, any confidential, trade secret, or proprietary information that was provided to the Company by such third party in circumstances that require the Company to restrict the disclosure of such information.

    2.    WORK PRODUCT.  With respect to all computer code, computer programs, software, works that may be subject to copyright, and inventive ideas originated or developed by the Employee for the Company's business while in the employ of the Company ("Work Product"), to the extent the Work Product relates to projects upon which the Employee has worked during said employment or to the business carried on or contemplated by the Company, or as to which the Employee has acquired information as a result of said employment, and all copyright and patents obtained on Work Product:

    a.    Employee shall disclose and assign all of the Work Product and any copyrights and patents obtained thereon to the Company;

    b.    All of the Work Product and any copyrights and patents thereon shall be the exclusive property of the Company; and

    c.    Employee will at any and all times during and after the term of the Employee's employment hereunder furnish such information and assistance, and execute such registrations, applications, assignments, and other documents as may be advisable in the opinion of the Company to obtain and perfect both domestic and foreign copyrights and/or patents, title to which is to be vested in the Company, and Employee gives the Company full and exclusive power to prosecute all such registrations and applications and all proceedings in connection therewith.

    3.    NO COMPETITION.

    a.    For a period of eighteen months after termination of the Employee's employment with the Company, the Employee shall not directly or indirectly compete with the Company by (i) owning, having a proprietary interest (except for an equity interest of no more than 5% in a publicly traded corporation), being employed by, or serving as a consultant or in any other capacity with any person, firm, or business entity that provides or offers to provide information technology services, including consulting, network engineering, information technology product sales, and information technology support to any persons or

2

entities who are customers or prospects of the Company at the time of termination of the Employee's employment with the Company; or (ii) as an employee, independent contractor, or employee or agent of any person, firm, or business entity, providing or offering to provide information technology services, including consulting, network engineering, information technology product sales, and information technology support to any persons or entities who are customers or prospects of the Company at the time of termination of the Employee's employment with the Company. For purposes of this agreement, "customers and prospects of the Company" shall mean persons and entities with whom the Employee has dealt and that have purchased goods or services from the Company or have been solicited by the Employee to purchase goods or services from the Company within 36 months prior to termination of the Employee's employment with the Company. The provisions of this section 3(a) shall not apply in the event the Employee's employment with the Company is terminated by the Company within the first 90 days of employment.

      b.    During and for a period of twelve months after termination of the Employee's employment by the Company, the Employee shall not solicit, recruit, or induce any employee of the Company to leave the employment of the Company.

      4.    SURVIVABILITY. Employee's obligations in Sections 1, 2, and 3 hereof shall survive the termination of Employee's employment with Concurrency for any reason whatsoever.

      5.    REASONABLENESS. The Employee agrees and acknowledges that the provisions of sections 1, 2, and 3 of this agreement are fair and reasonable in both scope and content and are reasonably necessary for the protection of the Company's business. The Employee further acknowledges that the Employee has had a reasonable opportunity to consider this agreement and its implications, that he has had an opportunity to consult counsel of the Employee's choice regarding this agreement, and that the Employee understands this agreement.

      6.    SCOPE. The Company and the Employee intend this agreement to be a complete statement of their agreement regarding the matters addressed in this agreement, but both parties recognize that other terms and conditions of employment of the Employee have been expressed and agreed upon by the parties and that the Employee shall be an "at will" employee. Nothing herein shall be construed as creating an employment agreement for a definite term or any rights inconsistent with an at will employment relationship.

CON -000025

7.   INJUNCTIVE RELIEF.  The Employee agrees that a breach of the provisions of this agreement would result in irreparable and continuing damage to the Company that would be continuing, substantial, and incapable of precise measurement, and for which there would be no adequate remedy at law, such that in the event of any breach or threatened breach of this agreement the Company shall be entitled to injunctive and such other and further relief, including damages, as may be proper, without any requirement that the Company post a bond.

To indicate their agreement and consent to the above, the parties have executed this agreement on the dates written above their signatures.

Dated _____, 2017                              10 - 06 , 2017
Concurrency, Inc.

By:   _____                    _____
           James Savage                                          Adetayo Adegoke

4

CON -000026